# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Michael Abernathy**
210 James Loop
Killeen, TX 76542

**Cedrick Arthur**
501 East Simon Street
Glennville, GA 30427

**Larry Bess**
307 Lakeview Drive
Glennville, GA 30427

**Darius Cain**
710 Green Street
Glennville, GA 30427

**Marcus Carter**
P.O. Box 144
Baxley, GA 31515

**Mario Cavazos**
304 North Howe
Lampasas, TX 76550

**Mike Cowley**
P.O. Box 352
High Island, TX 77623

**Bonita Cromartie**
1047 Lake Village Drive
Columbus, SC 29229

**Vernon Dasher**
P.O. Box 1171
Baxley, GA 31515

**Misael Diaz**
14 Millard Circle
Monroe, NY 10950

**Jason Foster**
2388 Watsonfain Trail
Loganville, GA 30052

Civil Action No. _____

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE TRAFFICKING VICTIMS
PROTECTION ACT AND IT PROGENY

PUNITIVE DAMAGES REQUESTED

JURY DEMAND

**Michael Gatson**
2502 Hilltop Circle
Waycross, GA 31501

**Delonte Green**
1167 Barrow Bay Road
Claxton, GA 30417

**Jerome Greene**
P.O. Box 94
Claxton, GA 30414

**Christopher Jacobs**
3053 Woodbridge Drive
Anniston, AL 36207

**Ryan Jakubowski**
6443 Lehnert Street
Gwynn Oak, MD 21207-5276

**Kyle Kendrick**
300 Country Road 1002
New Boston, TX 75570

**Justin Logan**
2171 Kingston Court,
Ste 1, ABP505-1
Marietta, GA 30067

**Alton McNeil**
2409 Ridge Run
Lillington, NC 27546

**LaDarius Phillips**
514 Green Street
Glennville, GA 30427

**Frank Lambey**
10931 Atkinson Avenue
Inglewood, CA 90303

**Lawrence Freeman**
1116 Rosebrook Drive
Clarksville, TN 3704

**Eric Nelson**
320 Second Street
Hinesville, GA 31313

**Michael Nomura**
111 East Carson Street, No. 8-55
Carson, CA 90745

**Josean Ortiz-Medina**
Harker Heights, Texas 76548

**Edward Ponder**
637 Greenleaf Road
Conyers, GA 30013

**Tamecia Turner**
209 Oak Road
Anniston, AL 36206

**Jeffery Willis**
271 Bayou Road
Drew, MS 38737

**Tristan Yumul**
7302 Mesa College Drive
San Diego, CA 92111

*On their own behalf and on behalf of*
*all others similarly situated*
*Plaintiffs*

*v.*

**The Carlyle Group, Inc.**
1001 Pennsylvania Avenue NW
Washington, DC 20004

**ManTech International Corp.**
1100 New Jersey Avenue, S.E., Suite 740
Washington, D.C. 20003

**ManTech Telecommunications and**
**Information Sys. Corp.**
12015 Lee Jackson Highway
Fairfax, Virginia 22033

**Michael Brogan**
12908 Carriage Ford Rd
Nokesville, VA 20181

**Kevin Cody**
42318 Iron Bit Place
Chantilly, VA 20152

**Muge Cody**
42318 Iron Bit Place
Chantilly, VA 20152

**Bonnie Cook**
9325 Mainsail Dr
Burke, VA 22015

**Brian Earhart**
401 Ashcroft Ave
Cresson, PA 16630

**John Guarnieri**
193 Shrum Cemetery Rd
Westmoreland, TN 37186

**Mark Croll**
Nutsey Lane
Galmore Industrial
Estate Totton
Southampton, Hampshire
United Kingdom 8040 3XJ

**Kathryn Romance**
13408 Amy Way
Herndon, VA 20171

*Defendant*s

## TABLE OF CONTENTS

Introduction…………………………………………………………………………………1

Parties……………………………………………………………………………………...2

Plaintiffs Are Former ManTech Employees Who ManTech Employed
Illegally in Kuwait and Afghanistan

Michael Abernathy…………………………………3

Cedrick Arthur………………………………3

Larry Bess…………………………………….3

Darius Cain…………………………………4

Marcus Carter………………………………5

Mario Cavazos………………………………6

Mike Cowley………………………………..7

Bonita Cromartie……………………………8

Vernon Dasher………………………………8

Misael Diaz…………………………………9

Jason Foster…………………………………10

Michael Gatson……………………………11

Delonte Green………………………………11

Jerome Greene………………………………12

Christopher Jacobs………………………...13

Ryan Jakubowski…………………………14

Kyle Kendrick……………………………15

Justin Logan………………………………16

Alton McNeil………………………………16

LaDarius Phillips…………………………17

Frank Lambey………………………………18

Lawrence Freeman…………………………19

Eric Nelson…………………………………20

Michael Nomura…………………………21

Josean Ortiz-Medina………………………21

Edward Ponder……………………………22

Tamecia Turner……………………………23

1

Jeffery Willis…………………………………24

Tristan Yumul…………………………….25

Absent KMSF Class Members……………26

Defendants Are Corporate Entities and Individuals Who Were Part of a
Venture to Profit from Violations of the TVPA

The Carlyle Group, Inc.……………………27

ManTech International Corporation……….27

ManTech Telecommunications and
Information Systems……………………….27

Michael Brogan……………………………28

Kevin Cody………………………….…...……28

Muge Cody…………………………………28

Bonnie Cook………………………………29

Brian Earhart……………………………29

John Guarnieri…………………………29

Mark Croll…………………………………29

Kathryn Romance………………………… 29

JURISDICTION AND VENUE……………………………………………………….31

COUNT 1, Violations of the TVPA, 18 U.S.C. §§ 1581, et seq

ManTech    and    Millbrook    Confiscated   ……………………32
Plaintiffs' Passports in Violation of 18 U.S.C.
§1592

ManTech Threatened Plaintiffs with Serious   ……………………33
Financial and Professional Harm if They Left
Kuwait

ManTech and Millbrook Systemically Abused   ……………………35
Kuwait's Private Sector Labor Law

ManTech and Millbrook Systemically Abused   ……………………37
Kuwait's Immigration Laws

ManTech and Millbrook Colluded to Launder   ……………………42
Money into Kuwait to Further Violations of
the TVPA

ManTech and Millbrook Illegally Obtained   ……………………46
Kuwait Resident Visas and Work Permits
Under False Pretenses and Through Systemic
Fraud

ManTech and Millbrook Intentionally Denied Plaintiffs and Absent Class Members the Benefits and Protections of Kuwait's Laws ........................47

Defendants' TVPA Violations Caused Plaintiffs to be Denied the Protection of Law and Thus Exposed to Dangerous and Illegal Levels of Toxic Poison ........................49

Defendants' TVPA Violations Caused Plaintiffs to Be Denied the Protection of Law and Allowed ManTech to Profit From Wage Theft ........................54

Defendant Carlyle, With Notice That ManTech Had Been Unjustly Enriched Through TVPA Violations and Attendant Wage Theft, Purchased ManTech Resulting in ManTech's Ill-Gotten Gains and Stolen Wages Becoming Carlyle Assets ........................71

COUNT 2, Violations of 18 U.S.C. §1956 Laundering of Monetary Instruments....................................................................72

CLASS ACTION LLEGATIONS.......................................................................... 73

PRAYER FOR RELIEF............................................................................... 74

## INTRODUCTION

Come now Michael Abernathy, Cedrick Arthur, Larry Bess, Darius Cain, Marcus Carter, Mario Cavazos, Mike Cowley, Bonita Cromartie, Vernon Dasher, Misael Diaz, Jason Foster, Michael Gatson, Delonte Green, Jerome Greene, Christopher Jacobs, Ryan Jakubowski, Kyle Kendrick, Justin Logan, Alton McNeil, LaDarius Phillips, Frank Lambey, Lawrence Freeman, Eric Nelson, Michael Nomura, Josean Ortiz-Medina, Edward Ponder, Tamecia Turner, Jeffery Willis, and Tristan Yumul, on their own behalf and on behalf of all those similarly situated, to the United States District Court of the District of Columbia to seek compensation and equitable relief for damages inflicted upon them by Defendants The Carlyle Group, Inc.; ManTech International Corp.; ManTech Telecommunications and Information Sys. Corp.; Michael Brogan; Kevin Cody; Muge Cody; Bonnie Cook; John Guarnieri; Mark Croll; and Kathryn Romance for violations of the Trafficking Victims Protection Act ("TVPA") and its progeny (including but not limited to the Trafficking Victims Protection Reauthorization Act or TVPA) (hereinafter, collectively, referred to the TVPA).

The acts and omissions giving rise to TVPA liability occurred in Kuwait and Afghanistan and were perpetrated by Defendants as part of a scheme to become unjustly enriched from Contract No. W56HZV-12-C-0127 ("the Contract") entered with the U.S. Army Contracting Command, Warren, Michigan. The Contract was for logistics sustainment and support for the Mine Resistant Ambush Protected family of vehicles ("MRAPs"). ManTech won this contract by offering dramatically reduced costs to the United States in servicing and repairing damaged MRAPs. However, ManTech realized the reduced costs (and its corresponding profits) by abusing Plaintiffs in a manner prohibited by the TVPA.

1

**PARTIES**

*Plaintiffs Are Former ManTech Employees Who ManTech
Employed Illegally in Kuwait and Afghanistan*

1.      Plaintiff **Michael Abernathy** ("Abernathy") is citizen of Texas and was employed by ManTech at the Kuwait Maintenance and Sustainment Facility ("KMSF") in Kuwait during the relevant time of this lawsuit. As ManTech's employee, Abernathy suffered the deprivations described herein. Specifically, ManTech employed Abernathy in Kuwait to work on the Contract yet violated Kuwaiti law by employing Abernathy illegally. Specifically, ManTech put Abernathy to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Abernathy at constant risk of being arrested. Moreover, Abernathy had his passport confiscated by ManTech which then gave Abernathy's passport to a Kuwaiti-owned and registered company Millbrook International Services, LTD. (dba in Kuwait as "Millbrook Kuwait"; hereinafter referred to as "Millbrook"). Abernathy was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Abernathy as an employee of Millbrook. This false representation created additional legal jeopardy for Abernathy because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Abernathy was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Abernathy was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Abernathy was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Abernathy was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

2

2.      Plaintiff **Cedrick Arthur** ("Arthur") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Arthur suffered the deprivations described herein. Specifically, ManTech employed Arthur in Kuwait to work on the Contract yet violated Kuwaiti law by employing Arthur illegally. Specifically, ManTech put Arthur to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Arthur at constant risk of being arrested. Moreover, Arthur had his passport confiscated by ManTech which then gave Arthur's passport to Millbrook. Arthur was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Arthur as an employee of Millbrook. This false representation created additional legal jeopardy for Arthur because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Arthur was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Arthur was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Arthur was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Arthur was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

3.      Plaintiff **Larry Bess** ("Bess") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Bess suffered the deprivations described herein. Specifically, ManTech employed Bess in Kuwait to work on the Contract yet violated Kuwaiti law by employing Bess illegally.

Specifically, ManTech put Bess to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Bess at constant risk of being arrested. Moreover, Bess had his passport confiscated by ManTech which then gave Bess's passport to Millbrook. Bess was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Bess as an employee of Millbrook. This false representation created additional legal jeopardy for Bess because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Bess was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Bess was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Bess was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Bess was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

4.      Plaintiff **Darius Cain** ("Cain") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Cain suffered the deprivations described herein. Specifically, ManTech employed Cain in Kuwait to work on the Contract yet violated Kuwaiti law by employing Cain illegally. Specifically, ManTech put Cain to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Cain at constant risk of being arrested. Moreover, Cain had his passport confiscated by ManTech which then gave Cain's passport to Millbrook. Cain was placed in additional jeopardy by ManTech and Millbrook as those companies agreed

4

collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Cain as an employee of Millbrook. This false representation created additional legal jeopardy for Cain because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Cain was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Cain was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Cain was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Cain was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

5.      Plaintiff **Marcus Carter** ("Carter") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Carter suffered the deprivations described herein. Specifically, ManTech employed Carter in Kuwait to work on the Contract yet violated Kuwaiti law by employing Carter illegally. Specifically, ManTech put Carter to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Carter at constant risk of being arrested. Moreover, Carter had his passport confiscated by ManTech which then gave Carter's passport to Millbrook. Carter was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Carter as an employee of Millbrook. This false representation created additional legal jeopardy for Carter because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and

collaborated to ensure that Carter was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Carter was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Carter was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Carter was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

6.      Plaintiff **Mario Cavazos** ("Cavazos") is a citizen of Texas and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Cavazos suffered the deprivations described herein. Specifically, ManTech employed Cavazos in Kuwait to work on the Contract yet violated Kuwaiti law by employing Cavazos illegally. Specifically, ManTech put Cavazos to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Cavazos at constant risk of being arrested. Moreover, Cavazos had his passport confiscated by ManTech which then gave Cavazos's passport to Millbrook. Cavazos was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Cavazos as an employee of Millbrook. This false representation created additional legal jeopardy for Cavazos because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Cavazos was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Cavazos was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Cavazos was denied the protection of both the laws of the United States and the laws

of Kuwait with respect to workplace safety. Specifically, Cavazos was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

7.     Plaintiff **Mike Cowley** ("Cowley") is a citizen of Texas and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Cowley suffered the deprivations described herein. Specifically, ManTech employed Cowley in Kuwait to work on the Contract yet violated Kuwaiti law by employing Cowley illegally. Specifically, ManTech put Cowley to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Cowley at constant risk of being arrested. Moreover, Cowley had his passport confiscated by ManTech which then gave Cowley's passport to Millbrook. Cowley was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Cowley as an employee of Millbrook. This false representation created additional legal jeopardy for Cowley because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Cowley was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Cowley was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Cowley was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Cowley was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

8.      Plaintiff **Bonita Cromartie** ("Cromartie") is a citizen of South Carolina and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Cromartie suffered the deprivations described herein. Specifically, ManTech employed Cromartie in Kuwait to work on the Contract yet violated Kuwaiti law by employing Cromartie illegally. Specifically, ManTech put Cromartie to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Cromartie at constant risk of being arrested. Moreover, Cromartie had her passport confiscated by ManTech which then gave Cromartie's passport to Millbrook. Cromartie was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Cromartie as an employee of Millbrook. This false representation created additional legal jeopardy for Cromartie because it placed her under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Cromartie was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Cromartie was denied the overtime pay and paid holiday she was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Cromartie was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Cromartie was not provided the personal protective equipment, ventilator, or other safety equipment she would have been provided under the laws of the United States or the laws of the State of Kuwait.

9.      Plaintiff **Vernon Dasher** ("Dasher") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Dasher suffered the deprivations described herein. Specifically, ManTech employed

Dasher in Kuwait to work on the Contract yet violated Kuwaiti law by employing Dasher illegally. Specifically, ManTech put Dasher to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Dasher at constant risk of being arrested. Moreover, Dasher had his passport confiscated by ManTech which then gave Dasher's passport to Millbrook. Dasher was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Dasher as an employee of Millbrook. This false representation created additional legal jeopardy for Dasher because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Dasher was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Dasher was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Dasher was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Dasher was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

10.    Plaintiff **Misael Diaz** ("Diaz") is a citizen of New York and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Diaz suffered the deprivations described herein. Specifically, ManTech employed Diaz in Kuwait to work on the Contract yet violated Kuwaiti law by employing Diaz illegally. Specifically, ManTech put Diaz to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Diaz at constant risk of being arrested. Moreover, Diaz had his passport confiscated by ManTech which then gave Diaz's passport to Millbrook. Diaz

was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Diaz as an employee of Millbrook. This false representation created additional legal jeopardy for Diaz because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Diaz was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Diaz was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Diaz was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Diaz was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

11.    Plaintiff **Jason Foster** ("Foster") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Foster suffered the deprivations described herein. Specifically, ManTech employed Foster in Kuwait to work on the Contract yet violated Kuwaiti law by employing Foster illegally. Specifically, ManTech put Foster to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Foster at constant risk of being arrested. Moreover, Foster had his passport confiscated by ManTech which then gave Foster's passport to Millbrook. Foster was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Foster as an employee of Millbrook. This false representation created additional legal jeopardy for Foster because it placed him under the jurisdiction of the Kuwaiti government through

10

its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Foster was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Foster was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Foster was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Foster was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

12.     Plaintiff **Michael Gatson** ("Gatson") is a citizen of Georgia and was employed by ManTech in Afghanistan during the relevant time giving rise to this complaint. As ManTech's employee, Gatson suffered deprivation of right associated with working in a foreign locale without the protection of law. Specifically, ManTech employed Gatson in Afghanistan to work on the Contract yet violated the laws of both the United States and the Islamic Republic of Afghanistan including its Labor Code (and its predecessors and as modified by that country's 1934 acceptance of the principles of the International Labour Organization). By denying the protection of any country's laws -- including protections that could and should have been in place to protect him against the hazard of working in the toxic environment associated with the burning and grind of CARC as described *supra*. Moreover, Gatson was denied the overtime and holiday pay to which he was entitled law.

13.     Plaintiff **Delonte Green** ("Green") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Green suffered the deprivations described herein. Specifically, ManTech employed Green in Kuwait to work on the Contract yet violated Kuwaiti law by employing Green illegally.

Specifically, ManTech put Green to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Green at constant risk of being arrested. Moreover, Green had his passport confiscated by ManTech which then gave Green's passport to Millbrook. Green was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Green as an employee of Millbrook. This false representation created additional legal jeopardy for Green because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Green was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Green was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Green was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Green was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

14. Plaintiff **Jerome Greene** ("Greene") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Greene suffered the deprivations described herein. Specifically, ManTech employed Greene in Kuwait to work on the Contract yet violated Kuwaiti law by employing Greene illegally. Specifically, ManTech put Greene to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Greene at constant risk of being arrested. Moreover, Greene had his passport confiscated by ManTech which then gave Greene's passport to Millbrook. Greene was placed in additional jeopardy by ManTech and Millbrook as those

companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Greene as an employee of Millbrook. This false representation created additional legal jeopardy for Greene because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Greene was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Greene was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Greene was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Greene was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

15.      Plaintiff **Christopher Jacobs** ("Jacobs") is a citizen of Alabama and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Jacobs suffered the deprivations described herein. Specifically, ManTech employed Jacobs in Kuwait to work on the Contract yet violated Kuwaiti law by employing Jacobs illegally. Specifically, ManTech put Jacobs to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Jacobs at constant risk of being arrested. Moreover, Jacobs had his passport confiscated by ManTech which then gave Jacobs's passport to Millbrook. Jacobs was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Jacobs as an employee of Millbrook. This false representation created additional legal jeopardy for Jacobs because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and

collaborated to ensure that Jacobs was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Jacobs was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Jacobs was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Jacobs was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

16.     Plaintiff **Ryan Jakubowski** ("Jakubowski") is a citizen of Maryland and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Jakubowski suffered the deprivations described herein. Specifically, ManTech employed Jakubowski in Kuwait to work on the Contract yet violated Kuwaiti law by employing Jakubowski illegally. Specifically, ManTech put Jakubowski to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Jakubowski at constant risk of being arrested. Moreover, Jakubowski had his passport confiscated by ManTech which then gave Jakubowski's passport to Millbrook. Jakubowski was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Jakubowski as an employee of Millbrook. This false representation created additional legal jeopardy for Jakubowski because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Jakubowski was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Jakubowski was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Jakubowski was

14

denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Jakubowski was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

17.     Plaintiff **Kyle Kendrick** ("Kendrick") is a citizen of Texas and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Kendrick suffered the deprivations described herein. Specifically, ManTech employed Kendrick in Kuwait to work on the Contract yet violated Kuwaiti law by employing Kendrick illegally. Specifically, ManTech put Kendrick to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Kendrick at constant risk of being arrested. Moreover, Kendrick had his passport confiscated by ManTech which then gave Kendrick's passport to Millbrook. Kendrick was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Kendrick as an employee of Millbrook. This false representation created additional legal jeopardy for Kendrick because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Kendrick was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Kendrick was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Kendrick was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Kendrick was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

15

18.    Plaintiff **Justin Logan** ("Logan") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Logan suffered the deprivations described herein. Specifically, ManTech employed Logan in Kuwait to work on the Contract yet violated Kuwaiti law by employing Logan illegally. Specifically, ManTech put Logan to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Logan at constant risk of being arrested. Moreover, Logan had his passport confiscated by ManTech which then gave Logan's passport to Millbrook. Logan was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Logan as an employee of Millbrook. This false representation created additional legal jeopardy for Logan because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Logan was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Logan was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Logan was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Logan was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

19.    Plaintiff **Alton McNeil** ("McNeil") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, McNeil suffered the deprivations described herein. Specifically, ManTech employed McNeil in Kuwait to work on the Contract yet violated Kuwaiti law by employing McNeil

illegally. Specifically, ManTech put McNeil to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed McNeil at constant risk of being arrested. Moreover, McNeil had his passport confiscated by ManTech which then gave McNeil's passport to Millbrook. McNeil was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that McNeil as an employee of Millbrook. This false representation created additional legal jeopardy for McNeil because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that McNeil was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, McNeil was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, McNeil was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, McNeil was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

20.     Plaintiff **LaDarius Phillips** ("Phillips") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Phillips suffered the deprivations described herein. Specifically, ManTech employed Phillips in Kuwait to work on the Contract yet violated Kuwaiti law by employing Phillips illegally. Specifically, ManTech put Phillips to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Phillips at constant risk of being arrested. Moreover, Phillips had his passport confiscated by ManTech which then gave Phillips's passport to Millbrook. Phillips was placed in additional jeopardy by ManTech and Millbrook as

those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Phillips as an employee of Millbrook. This false representation created additional legal jeopardy for Phillips because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Phillips was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Phillips was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Phillips was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Phillips was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

21.     Plaintiff **Frank Lambey** ("Lambey") is a citizen of California and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Lambey suffered the deprivations described herein. Specifically, ManTech employed Lambey in Kuwait to work on the Contract yet violated Kuwaiti law by employing Lambey illegally. Specifically, ManTech put Lambey to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Lambey at constant risk of being arrested. Moreover, Lambey had his passport confiscated by ManTech which then gave Lambey's passport to Millbrook. Lambey was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Lambey as an employee of Millbrook. This false representation created additional legal jeopardy for Lambey because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and

collaborated to ensure that Lambey was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Lambey was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Lambey was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Lambey was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

22.     Plaintiff **Lawrence Freeman** ("Freeman") is a citizen of Tennessee and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Freeman suffered the deprivations described herein. Specifically, ManTech employed Freeman in Kuwait to work on the Contract yet violated Kuwaiti law by employing Freeman illegally. Specifically, ManTech put Freeman to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Freeman at constant risk of being arrested. Moreover, Freeman had his passport confiscated by ManTech which then gave Freeman's passport to Millbrook. Freeman was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Freeman as an employee of Millbrook. This false representation created additional legal jeopardy for Freeman because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Freeman was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Freeman was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Freeman was denied the protection of both the laws of the

United States and the laws of Kuwait with respect to workplace safety. Specifically, Freeman was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

23.     Plaintiff **Eric Nelson** ("Nelson") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Nelson suffered the deprivations described herein. Specifically, ManTech employed Nelson in Kuwait to work on the Contract yet violated Kuwaiti law by employing Nelson illegally. Specifically, ManTech put Nelson to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Nelson at constant risk of being arrested. Nelson was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Nelson as an employee of Millbrook. This false representation created additional legal jeopardy for Nelson because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Nelson was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Nelson was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Nelson was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Nelson was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

24.     Plaintiff **Michael Nomura** ("Nomura") is a citizen of California and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Nomura suffered the deprivations described herein. Specifically, ManTech employed Nomura in Kuwait to work on the Contract yet violated Kuwaiti law by employing Nomura illegally. Specifically, ManTech put Nomura to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Nomura at constant risk of being arrested. Moreover, Nomura had his passport confiscated by ManTech which then gave Nomura's passport to Millbrook. Nomura was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Nomura as an employee of Millbrook. This false representation created additional legal jeopardy for Nomura because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Nomura was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Nomura was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Nomura was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Nomura was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

25.     Plaintiff **Josean Ortiz-Medina** ("Ortiz-Medina") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Ortiz-Medina suffered the deprivations described herein. Specifically, ManTech employed Ortiz-Medina in Kuwait to work on the Contract yet violated Kuwaiti law by

employing Ortiz-Medina illegally. Specifically, ManTech put Ortiz-Medina to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Ortiz-Medina at constant risk of being arrested. Moreover, Ortiz-Medina had his passport confiscated by ManTech which then gave Ortiz-Medina's passport to Millbrook. Ortiz-Medina was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Ortiz-Medina as an employee of Millbrook. This false representation created additional legal jeopardy for Ortiz-Medina because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Ortiz-Medina was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Ortiz-Medina was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Ortiz-Medina was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Ortiz-Medina was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

26. Plaintiff **Edward Ponder** ("Ponder") is a citizen of Georgia and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Ponder suffered the deprivations described herein. Specifically, ManTech employed Ponder in Kuwait to work on the Contract yet violated Kuwaiti law by employing Ponder illegally. Specifically, ManTech put Ponder to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Ponder at constant risk of being arrested. Moreover, Ponder had his passport confiscated by ManTech which then gave Ponder's passport to

Millbrook. Ponder was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Ponder as an employee of Millbrook. This false representation created additional legal jeopardy for Ponder because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Ponder was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Ponder was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Ponder was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Ponder was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

27.     Plaintiff **Tamecia Turner** ("Turner") is a citizen of Alabama and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Turner suffered the deprivations described herein. Specifically, ManTech employed Turner in Kuwait to work on the Contract yet violated Kuwaiti law by employing Turner illegally. Specifically, ManTech put Turner to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Turner at constant risk of being arrested. Moreover, Turner had her passport confiscated by ManTech which then gave Turner's passport to Millbrook. Turner was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Turner as an employee of Millbrook. This false representation created additional legal jeopardy for Turner because it placed her under the jurisdiction of the Kuwaiti government through

its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Turner was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Turner was denied the overtime pay and paid holiday she was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Turner was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Turner was not provided the personal protective equipment, ventilator, or other safety equipment she would have been provided under the laws of the United States or the laws of the State of Kuwait.

28.     Plaintiff **Jeffery Willis** ("Willis") is a citizen of Mississippi and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Willis suffered the deprivations described herein. Specifically, ManTech employed Willis in Kuwait to work on the Contract yet violated Kuwaiti law by employing Willis illegally. Specifically, ManTech put Willis to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Willis at constant risk of being arrested. Moreover, Willis had his passport confiscated by ManTech which then gave Willis's passport to Millbrook. Willis was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Willis as an employee of Millbrook. This false representation created additional legal jeopardy for Willis because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Willis was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Willis was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally,

Willis was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Willis was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

29.     Plaintiff **Tristan Yumul** ("Yumul") is a citizen of California and was employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Yumul suffered the deprivations described herein. Specifically, ManTech employed Yumul in Kuwait to work on the Contract yet violated Kuwaiti law by employing Yumul illegally. Specifically, ManTech put Yumul to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed Yumul at constant risk of being arrested. Moreover, Yumul had his passport confiscated by ManTech which then gave Yumul's passport to Millbrook. Yumul was placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that Yumul as an employee of Millbrook. This false representation created additional legal jeopardy for Yumul because it placed him under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that Yumul was denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, Yumul was denied the overtime pay and paid holiday he was entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, Yumul was denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, Yumul was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the United States or the laws of the State of Kuwait.

30. The **Absent KMSF Class Members** are citizens of the United States who were employed by ManTech at the KMSF during the relevant time giving rise to this complaint. As ManTech's employees, the Absent KMSF Class members suffered the deprivations described herein. Specifically, ManTech employed the Absent KMSF Class Members in Kuwait to work on the Contract yet violated Kuwaiti law by employing them illegally. Specifically, ManTech put the Absent KMSF Class Members to work on the Contract yet did not acquire the visas and work permits necessary and, by failing to do so, placed the Absent KMSF Class members at constant risk of being arrested. Moreover, the Absent KMSF Class Members had their passports confiscated by ManTech which then gave the Absent KMSF Class Members' passports to Millbrook. The Absent KMSF Class Members were placed in additional jeopardy by ManTech and Millbrook as those companies agreed collaborated to misrepresent, to the Kuwait Ministry of Social Affairs and Labor, that the Absent KMSF Class Members were employees of Millbrook. This false representation created additional legal jeopardy for the Absent KMSF Class Members because it placed them under the jurisdiction of the Kuwaiti government through its regulation of Millbrook, a Kuwaiti company. ManTech and Millbrook also agreed and collaborated to ensure that the Absent KMSF Class Members were denied the protection of both the laws of the United States and the laws of Kuwait. Specifically, the Absent KMSF Class Members were denied the overtime pay and paid holiday they were entitled to under the laws of the United States and the laws of the State of Kuwait. Additionally, the Absent KMSF Class Members were denied the protection of both the laws of the United States and the laws of Kuwait with respect to workplace safety. Specifically, the Absent KMSF Class Members were not provided the personal protective equipment, ventilator, or other safety equipment they would have been provided under the laws of the United States or the laws of the State of Kuwait.

*Defendants Are Corporate Entities and Individuals Who Were Part of a*
*Venture to Profit from Violations of the TVPA*

31.     Defendant **The Carlyle Group, Inc.** ("Carlyle") is a publicly-traded (NASDAQ "CG") multinational private equity, alternative asset management and financial services corporation based in Washington, DC with $376 billion of assets under management. In 2022, Carlyle purchased ManTech for approximately $4.2 billion with actual knowledge of 1) ManTech's trafficking activities and 2) with the intention of capturing the profit and opportunities generated by ManTech's performance of and payments for the Contract – notwithstanding its knowledge that much of the profit realized by ManTech through the Contract was the result wage theft, the abuse of Kuwait's labor and immigration laws, and ManTech engaging in activities prohibited by the TVPA.

32.     Defendant **ManTech International Corporation** ("MT International") is a Delaware corporation with offices in the District of Columbia at 1100 New Jersey Avenue, SE Suite 740, Washington, D.C. 20003 and 600 Maryland Avenue, SW, Washington, D.C. 20024. MT International is a publicly traded company that provides defense-related services to the U.S. Government in the District of Columbia and throughout the world.

33.     Defendant **ManTech Telecommunications and Information Systems Corporation** ("MT Telecom"), at times relevant to this complaint was a wholly owned subsidiary of MT International, incorporated in Delaware and based in Virginia, with a registered agent for service of process located in the District of Columbia. at 1015 15th Street, NW, Suite 1000, Washington, D.C. 20005. MT Telecom transacted considerable, ongoing business in the District of Columbia with various U.S. government agencies, in its own name and through MT International. On information and belief, MT Telecom merged in 2013 with and into ManTech Advanced Systems International, Inc., a Virginia corporation and subsidiary of ManTech

27

International Corporation. Accordingly, all allegations made against MT Telecom are made against ManTech Advanced Systems International, Inc. For ease of review, Defendants are referred to herein as "ManTech."

34.     Defendant **Michael Brogan** ("Brogan") is a resident of Virginia. At times relevant to this complaint,  Brogan served as ManTech's Senior Vice President for Strategy with authority over ManTech's operations in Kuwait. As Senior Vice President for Strategy, and as is detailed below,  Brogan had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA. Brogan had knowledge of the abuses of Kuwait law through email communication and through briefings provided by a variety of persons working on the Contract.

35.     Defendant **Kevin Cody** ("K. Cody") is a resident of Virginia. At times relevant to this complaint,  K. Cody served as ManTech Business Unit President of ManTech's Global Contingency Operations division, a subdivision of ManTech's Technical Services Group Systems Sustainment and Integrated Logistics Business Unit ("TSG SSILOG" Business Unit). As Business Unit President and as a person responsible for winning the bid to perform the Contract (and as is detailed below). Also as detailed below, Cody had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

36.     Defendant **Muge Cody** ("M. Cody") is a resident of Virginia. At times relevant to this complaint,  M. Cody served as Vice President for ManTech's Ground Systems Operations or Program Manager of the Contract. In these roles, and as is detailed below,  M. Cody had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

37.     Defendant **Bonnie Cook** ("Cook") is a resident of Virginia. At times relevant to this complaint,  Cook served as the Senior Vice President for Business Operations for ManTech Technical Services Corporation. As Senior Vice President for Business Operations for ManTech Technical Services Corporation, and as is detailed below,  Cook had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

38.     Defendant **Brian Earhart** ("Earhart") is a resident of Pennsylvania. At the times relevant to the allegations of this lawsuit,  Earhart served as ManTech's Senior Maintenance Supervisor at the KMSF. As Senior Maintenance Supervisor at the KMSF, and as is detailed below, Earhart had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

39.     Defendant **John Guarnieri** ("Guarnieri") is a resident of Tennessee. At times relevant to this complaint,  Guarnieri served as ManTech's Theater Manager in Kuwait. As Theater Manager, and as is detailed below,  Guarnieri had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

40.     Defendant **Mark Croll** ("Croll") is a citizen and resident of the United Kingdom. At times relevant to this complaint, Croll served as the President of Millbrook International Services, LTD. (dba in Kuwait as "Millbrook Kuwait"; hereinafter referred to as "Millbrook").

41.     Defendant **Kathryn Romance** ("Romance") is a resident of Virginia. At times relevant to this complaint,  Romance served as ManTech's Procurement Manager with authority over ManTech's operations in Kuwait. As ManTech's Procurement Manager, and as is detailed below,  Romance had firsthand knowledge of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPA.

42.     The Contract was the largest contract that, up to that time, ManTech had performed. Brogan, K. Cody, M. Cody, Cook, Earhart, Myers, and Romance's livelihood as employees at ManTech was dependent, in part, upon the profit earned by ManTech from the Contract. On information and belief, Brogan, K. Cody, M. Cody, Cook, Earhart, Myers, and Romance also received incentive bonuses tied to the profit ManTech earned on the Contract. On information and belief, Brogan, K. Cody, M. Cody, Cook, Earhart, Myers, and Romance received stock-options as part of their overall employment benefit with ManTech. As the Contract was the largest contract ever performed by ManTech, the unjust riches obtained by ManTech through violations of the TVPA during performance of the Contract caused ManTech's stock to increase in value thus further enriching Brogan, K. Cody, M. Cody, Cook, Earhart, Myers, and Romance.  Croll also personally profited from the trafficking activity alleged in this complaint. Brogan, K. Cody, M. Cody, Cook, Croll, Earhart, Myers, and Romance benefited financially by participating in a venture that engaged in forced labor. Defendants, including Carlyle, are joint and severally liable for the offenses described herein because they all benefitted from participating and realizing profits from a venture which has engaged in forced labor. With respect to Carlyle, with explicit notice and a duty to investigate ManTech's trafficking activities, Carlyle chose to purchase ManTech whose value had been inflated by the unjust riches realized through trafficking activity. Thus, with actual knowledge, Carlyle incorporated the value of ManTech's unjust enrichment into its purchase price of ManTech and thus, itself, intended to be unjustly enriched through its purchase of ManTech. Moreover, on information and belief, between announcing its intention to purchase ManTech on or about May 16, 2022 and its consummation of that purchase on or about September 15, 2022, Carlyle joined a venture that had been created for the purpose of defeating attempts to

disgorge the unjust enrichment ManTech had obtained through its TVPA violations. By joining this venture, Carlyle, itself, sought to become unjustly enriched from ManTech's TVPA violations.

## JURISDICTION AND VENUE

43.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1332, 1367 and 3730(b), and 18 U.S.C. §§ 1595(a) and 1596(a).

44.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(3) and 3732(a), as Carlyle is headquartered in Washington, DC and regularly conducts business in Washington, DC. Also, ManTech conducts a continuous, robust course of business in the District of Columbia, maintaining offices in the District of Columbia and contracting with various U.S. government agencies based in the District of Columbia. Venue is appropriate for the remainder of Defendants as they were employees of ManTech, visited Washington, DC, and its immediate suburbs as a regular course of conducting their business in DC, and could reasonably be expected to be haled into court in Washington, DC.

45.     Though  Croll is a citizen of the United Kingdom, this Court has personal jurisdiction over him as he traveled into the forum for the purposes of planning violations of the TVPA herein described. Specifically, on or about January 23, 2013,  Croll traveled to Washington, DC for the purpose of meeting with  Romance and other ManTech personnel to plan the illicit activities constituting the violations of the TVPA herein complained of herein.

## COUNT 1
### Violations of the TVPA
### 18 U.S.C. §§ 1581, *et seq.*

46.     The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

47.     Plaintiffs bring this count under18 U.S.C. § 1581, *et seq.*

48.     Section 1595 of the TVPA allows private citizens to sue a perpetrator who has violated the TVPA.

49.     A Defendant is liable under the TVPA if her or she knowingly provides or obtains the labor or services of a person by means of harm or threats of serious harm to that person or another person; abuse or threatened abuse of law or legal process; or any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. 18 U.S.C. § 1589(a).

50.     Section 1592 establishes that whoever knowingly conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person -- in the course of a violation of section 1589 with intent to violate section 1589; or to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the services of that person, is liable under the TVPA.

*ManTech and Millbrook Confiscated Plaintiffs' Passports in Violation of 18 U.S.C. §1592*

51.     ManTech regularly took Plaintiffs' passports from them and denied Plaintiffs' possession of their passports for weeks and months at a time.

52.     ManTech gave Millbrook possession of Plaintiffs passports thereby further denying Plaintiffs' access to their own passports for weeks and months at a time. Typically, Millbrook would only return passports for the limited purpose of requiring Plaintiffs to execute a "visa run" to Bahrain. However, Millbrook would typically confiscate Plaintiffs' passport again immediately upon their return from Bahrain.  *See* discussion *infra*.

*ManTech Threatened Plaintiffs with Serious Financial and*
*Professional Harm if They Left Kuwait*

53.     Plaintiffs were required to sign employment contracts that committed them to work

for ManTech for twenty-four (24) months. A significant financial penalty was imposed for early

termination. "MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation Sponsorship &

Work Visa- Kuwait (CIVIL ID)" made it clear that ManTech would control the immigration

requirements for its employees to work at the KMSF, incurring substantial costs for this process.

Plaintiffs' employment contracts stated:

> Due to the significant cost for sponsorship, (up to and exceeding
> $10,000 per person for first year and $5,000 for second year), you
> agree to commit to a minimum period of employment (deployment)
> of 24 months or the completion of the contract whichever comes
> first. Once the process is completed, *should you decide to terminate*
> *employment, or are terminated for any reason*, voluntary or
> involuntary, prior to completing 24 months (non-consecutive) of
> "boots on ground" (BOG) service, *you are responsible for costs*
> *incurred and will be required to reimburse the cost to obtain a work*
> *visa*. In this event, ManTech will make a determination of financial
> obligation based on the current circumstances. *Reimbursable costs*
> *include all expenses related directly and indirectly to the*
> *sponsorship, including travel, lodging, per diem, medical exam(s),*
> *background investigation and administration/ administrative fees. If*
> *terminated, you may also be responsible for employment and*
> *deployment costs* as described in the Offer Addendum, as well as
> costs related to any training or certification process provided to you
> as part of your employment, including employment related expenses
> described in the Offer Addendum.

Emphasis added.

54.     The ManTech MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation

Sponsorship & Work Visa- Kuwait (CIVIL ID) made clear that if, prior to completing two years

of employment in Kuwait, a ManTech employee either quit or was terminated, he would be

contractually obligated to pay ManTech approximately $15,000.00 as reimbursement for the costs

incurred for sponsorship of that employee in Kuwait.

55.     The above-referenced Addendum was the creation of K. Cody and M. Cody who had determined that ManTech had underbid the true cost of performance on the Contract. Specifically, in calculating the costs associated with ManTech's bid for the contract, K. Cody and M. Cody had made certain assumptions about ManTech's ability to lower the compensation of ManTech's workforce as compared to the compensation being paid by the incumbent contractors. However, after the United States accepted ManTech's bid for the contract, K. Cody and M. Cody realized that ManTech would experience dramatic attrition of qualified mechanics due to ManTech's planned compensation cuts. The expected attrition was expected to be so high that K. Cody and M. Cody believed that ManTech would be unable to perform the Contract as signed.

56.     K. Cody and M. Cody notified ManTech's senior management that ManTech needed to adjust upwards the cost of ManTech to perform the contract in order to maintain the financial incentive for the incumbent and incoming workforce of mechanics to service the MRAP vehicles. However, ManTech's senior management refused the recommended upward adjustment.

57.     With the prospect that ManTech would lose a significant number of personnel in the face of planned (and executed) compensation cuts, K. Cody and M. Cody created a coercive mechanism to keep qualified mechanics working at the KMSF and other locations. The Addendum provided just such coercion. Specifically, the Addendum threatened to saddle the Plaintiffs and other mechanics with the burden of reimbursing ManTech $15,000 for the cost of compliance with host nation laws if the mechanic did not finish two years of employment in Kuwait. This $15,000.00 amount not only did not corollate with ManTech's actual cost of compliance, it could *not* corollate with such costs. At the time the Addendum was incorporated into the employment contracts of those who would work on the MRAPs in Kuwait, ManTech did not know the cost of compliance with Kuwait's immigration and labor laws. The Addendum was created to punish and deter

Plaintiffs and other mechanics from leaving the KMSF and their work on the MRAPs for two years.

58.     The same was true of the "MRAP-FOV Contract Offer Addendum Contract Mandated Training and Training Certification" addendum that ManTech included in Plaintiffs' employment contracts. It stated:

> In the event that you fail to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, you will be required to reimburse prorated costs related to the training and certification process. You further understand and agree that in the event your employment with ManTech is voluntarily terminated or terminated for cause before you complete this commitment period, you will be required to reimburse training related expenses as defined above on a prorated basis (1/12th for each month that your employment term is short of the twelve (12) month commitment). *Ibid* (emphasis added).

*ManTech and Millbrook Systemically Abused*
*Kuwait's Private Sector Labor Law*

59.     The Kuwait Private Sector Labor Law ("KPSLL") mandates that "the replacement of the expatriate labor force by the national labor force – whenever it can be possible – . . . is one of the main objectives of the State that should finally be achieved." Explanatory Memorandum Law No. (6) of 2010 Concerning Private Sector Labour Law Explanatory Memorandum, pp. 45-6. Expatriates, such as Plaintiffs, cannot work in Kuwait unless they subject themselves to Kuwait's laws.

60.     Article 10 of the KPSLL states: "The employer is banned to employ foreign labor force unless they are duly authorized by the Competent Authority to work for him."

61.     Article 10 further states, "If the worker abandons coming to his work and worked for another employer, the employer shall be obliged to return the employer back to his home country, upon registering an absconding notice against the worker by his main sponsor."

62.     The issuance of a Resident Visa (frequently and hereinafter referred to as a "Visa 18") is a pre-condition to working legally in Kuwait. To qualify for a Visa 18, the Kuwait-national owned company must apply for authorization from the Ministry of Labor and Social Affairs ("MOSAL") for permission to employ such foreign national workers. This application includes submitting information about the prospective employee's qualifications to be a resident alien working in Kuwait such as a criminal records background check, a medical examination, and the provision of important information including fingerprints. If MOSAL approves a Kuwaiti company's application to employ a foreign worker, the necessary Visa 18, Work Authorization, and Civil Identification number are issued to the Kuwait company and the foreign national is then authorized to work as an employee of the Kuwaiti-owned company.

63.     ManTech abused Kuwait's laws because, during all times pertinent to this complaint, Plaintiffs were not duly authorized by any competent authority to work for ManTech asd their presence in Kuwait was illegal. Further, ManTech engaged in a pattern of behavior designed to hide from Kuwaiti authorities that Plaintiffs were not authorized to work in Kuwait.

64.     Only companies that are majority owned by Kuwait nationals may provide employment in Kuwait.

65.     It is illegal for foreign national companies, such as ManTech, to directly employ foreign national workers in Kuwait.

66.     For foreign nationals to work legally in Kuwait, they must be employed by a Kuwaiti-national owned company, and they must obtain a Resident Visa – a resident visa that ensures that, as a resident of Kuwait, they are subject to Kuwait's laws.

67.     ManTech knew it was illegal for Plaintiffs to enter, work, and live in Kuwait without proper immigration and employment authorization. Early in ManTech's deployment to

Kuwait,  M. Cody lamented that she had 46 employees illegally in present in Kuwait, stating, "I have 46 people I (sic) Kuwait with no sponsor. Government will notice . . . soon."

*ManTech and Millbrook Systemically Abused*
*Kuwait's Immigration Laws*

68.     ManTech knew that it was illegal for Plaintiffs to remain in Kuwait after the expiration of a temporary entry visa such as a "tourist" or a "commercial" visa (a commercial visa is also known as a "Visa 14" and is issued to professionals for the purpose of transacting business, but not for the purpose of being employed in Kuwait).

69.     For Plaintiffs to have current tourist visas, ManTech forced them to engage in "visa runs" (otherwise known as "turn and burns") wherein Plaintiffs were forced to fly out of Kuwait to a third country, usually Bahrain, turn around and fly back into Kuwait so that a fresh entry stamp could be made in that employee's passport. To facilitate this visa run, ManTech arranged for the effected employee to meet a Millbrook representative in the early hours of the morning to receive his or her passport to facilitate travel. When the ManTech employee returned from Bahrain the night of the same day, that employee was instructed by ManTech to surrender their passport back to Millbrook.

70.     ManTech was ruthless in its policy of forcing Plaintiffs to engage in turn and burns. On January 6, 2013, six ManTech employees (Chester Rodriguez, Randy Bennett, Gregory Fuller, Julian Poe, Edward Broeder, and Timothy Jennings) refused to participate in a turn and burn to Bahrain and back. Upon learning that these employees' "failure to obey the directions given to them by their Theater Lead," these employees were immediately terminated at the direction of  M. Cody with the knowledge and approval of Defendants, Guarnieri, Earhart and Brogan, flown immediately back to the United States, and charged for the unused ticket to Bahrain that was purchased in their name. ManTech intended that the termination of Rodriguez, Bennett, Fuller,

Poe, Broeder, and Jennings serve as an intimidating warning to the rest of its Kuwait workforce about the consequences of disobeying ManTech's instruction.

71.    In forcing its employees on "visa runs," ManTech demanded that Plaintiffs immediately reenter Kuwait after having disembarked in Bahrain or other transit locations. ManTech demanded immediate reentry because ManTech would not pay for the cost of an overnight hotel in Bahrain. ManTech knew that it was putting Plaintiffs in jeopardy of arrest and deportation when it demanded that Plaintiffs reenter Kuwait immediately after arriving in Bahrain.

72.    ManTech forced Ortiz-Medina, Willis, and Logan to execute a visa run on or about February 3, 2013.

73.    ManTech forced Bess and Carter to execute a visa run on or about February 6, 2013.

74.    ManTech forced Ponder, Phillips, Jakubowski, Foster, and Greene to execute a visa run on or about February 7, 2013.

75.    ManTech forced Phillips, Turner, and Yumul to execute a visa run on or about February 10, 2013.

76.    ManTech forced Cavazos and Ortiz-Medina to execute a visa run on or about February 13, 2013. ManTech forced Cavazos to execute another visa run on or about July 19, 2013.

77.    ManTech forced Jacobs, McNeil, and Lambey to execute a visa run on or about February 20, 2013.

78.    ManTech forced Ortiz-Medina and Willis to execute a visa run on or about March 3, 2013.

79.    ManTech forced Cromartie and Nomura to execute a visa run on or about March 11, 2013.

80.     ManTech forced Abernathy and Green, to execute a visa run on or about March 17, 2013. ManTech tried to force Arthur to execute a visa run on that same date; however, because he did not take the flight to Bahrain as ManTech had demanded, he was terminated.

81.     ManTech forced Freeman to execute a visa run on or about April 21, 2013.

82.     ManTech forced Cowley and Kendrick to execute a visa run on or about April 14, 2013 and another visa run on July 19, 2013.

83.     After each "visa run," yet prior to securing a properly authorized Visa 18 for each effected ManTech employee, ManTech instructed those with fresh tourist visas to resume compensated employment at the KMSF – a violation of Kuwait's laws.

84.     Between November 1, 2012 and September 1, 2013, ManTech forced Absent Class Members to execute visa runs to obtain new tourist stamps in those Absent Class Members passports. However, visa runs made for the purpose of continuing to earn income in Kuwait are illegal as it is illegal to work without a resident visa (Visa 18). Thus, ManTech requiring Absent Class Members to execute visa runs was an abuse of Kuwait immigration and labor law within the meaning of the TVPA.

85.     ManTech was also aware that it was illegal for Plaintiffs exit Kuwait and then to reenter without waiting forty-eight hours. However, the above-mentioned visa runs were scheduled so that Plaintiffs would exit and reenter all in the same day because ManTech was unwilling to pay for overnight accommodations in Bahrain for the employees it forced to execute visa runs.

86.     ManTech was explicitly warned that Plaintiffs were in danger of being arrested because they were working having only entered Kuwait on tourist visas. Specifically, on December 2, 2012, M. Cody received an email from Keith D. Hunter, a ManTech MRAP Shop Manager who informed Cody "Last evening I received a phone call from a guy at the ministry saying we were

not in compliance with Kuwait government rules because working in Kuwait on tourist visa's (sic) is illegal . . . this guy threatened me with jail time . . . The bottom line is this contract means allot (sic) to me and other (sic) who are employed here and problems like this is not good for the long-term effort." Cody summarily dismissed Mr. Hunter's concerns in an email she copied to her husband, K. Cody, and Earhart.

87.     On December 4, 2012, Defendants Muge and K. Cody received an email from Neeto Sahni, the owner of Neeto International Logistics & Gen. Trading Co., wherein Mr. Sahni warned them "a large number of ManTech employees that are working at the [K]MSF building in Mina Abdullah on a Visa 14 which is a tourist visa. As per Ministry of Labor this is not allowed, and any person found to be working without a valid Visa 18 or document stating that Visa 18 has been processed will face consequences as per Labor Law."

88.     On November 26, 2012, ManTech writing in the name of Kevin Craft, United States Army Joint Program Office (FWD), Mine Resistance Ambush Protected Vehicles, Kuwait (hereinafter "JPO") on ManTech letterhead, wrote to the Assistant Undersecretary, Labor Affairs of MOSAL. The correspondence is captioned: "Confirmation of Millbrook as Subcontractor to ManTech Telecommunications and Information Systems Corporation under Subcontract #GSSV020104." In this letter, ManTech, through JPO, claimed "Millbrook is required to provide approximately 250 American Nationals to support subject prime contract thru (sic) December 2013." This claim to MOSAL was false. Millbrook did not supply any American nationals. The American Nationals were already supplied by ManTech and were never employees of Millbrook.

89.     On December 3, 2012, Contracting Officer Loretta Bursey, Department of the Army, U.S. Contracting Command – Warren, wrote to Kristy Leavitt, Contracts Senior Manager for ManTech. Referencing the Contract and ManTech's pledge to schedule its employees ten hours

a day, seven days a week, Contracting Officer Bursey asked, "[C]an you please detail how ManTech is complying with the Kuwait Labor Law? Based on the 2010 law, and with limited exceptions, the Kuwait Labor Law requires an individual to work an eight-hour day, six days a week." By this correspondence, ManTech had direct notice that its practice of forcing Plaintiffs to work 72 hours a week was in violation of Kuwait's laws. However, ManTech took no action to bring its employment practices with respect to Plaintiffs' work hours, conditions, pay, and safety into compliance with Kuwait's laws.

90. On December 12, 2012, was, again, directly notified that the terms and conditions by which ManTech employed Plaintiffs was illegal. On that date, Neto Sahni followed up with another email warning to Defendants Muge and K. Cody stating, "ManTech has put their employees at risk for working illegally on tourist Visa. Is ManTech ready to continue risking its employees working without visa 18 on tourist visa and risk them on random checking by Ministry for illegal workers?" M. Cody forwarded the email to Romance, ManTech Procurement Manager Joy O'Brien, and K. Cody with the instruction "Don't share this with personnel."

91. To conceal that its employees were working illegally in Kuwait, ManTech entered into an agreement with Millbrook, a company that was, at least on papers submitted to the Kuwait Government, owned by a Kuwaiti national.

92. Under the terms of this agreement (improperly called a "sponsorship agreement"), Millbrook agreed to deliberately misrepresent to the United States and Kuwaiti governments that the U.S. citizens (and other foreign nationals) who were working at the KMSF were Millbrook's own employees.

93. In furtherance of this scheme to misrepresent its employees as employees of a Kuwaiti-national owned company, on December 20, 2012, ManTech Subcontract Manager and

41

now Romance sent a letter to the United States through the U.S. Army Host Nations Affairs in

Kuwait ("HNA") that stated,

> This is to confirm that Millbrook Kuwait, a company registered to
> conduct business in Kuwait, has been subcontracted by ManTech
> Telecommunications and Information Systems Corporation to
> provide labor (AN), in support of referenced prime contract
> (W56HZV-12-0127), under subcontract CSSV020104 . . .
> Millbrook is required to provide approximately 250 American
> Nationals to support subject prime contract thru (sic) 31 December
> 2013 and with potential option periods thru (sic) 30 June 2013.
> Millbrook Kuwait is considered by ManTech as a responsible
> subcontractor, pursuant to both United States Acquisition
> Regulations (FAR) and supplements thereto, including Kuwaiti
> laws.

94.     ManTech sent another letter to HNA, on January 3, 2013, that stated, "This is to

confirm that Millbrook Kuwait commits to bringing the first months proof of payroll to the Host

Nations office upon opening the labor file." This statement was false because, as ManTech knew,

the mechanics working for it on the Contract had not been paid by Millbrook, were not being paid

by Millbrook, and would not be paid by Millbrook.

95.     In reliance of the truth of the claims made by ManTech (claims that were false),

JPO wrote a memo to HNA, also on January 3, 2013, stating "This is to confirm that Millbrook

Kuwait commits to bringing the first months (sic) proof of payroll to the Host Nations office upon

opening a labor file." ManTech was aware that one part of the United States military was passing

along ManTech's false statement, as if true, to another part of the United States military and did

nothing to correct the retransmission of its original false statement.

96.     In reliance of the truth of the claims made by ManTech and repeated as true by JPO,

HNA wrote to the Kuwait Ministry of Social Affairs on January 8, 2013, to certify that Millbrook

Kuwait would be providing 250 personnel for the Contract. With the full faith, credibility, and

explicit certification of the United States with respect to *bona fides* of Millbrook supplying 250 of

its own personnel to work on the Contract, the Kuwaiti government had no reason to further investigate the veracity of representations made by Millbrook to MOSAL regarding "its" employees.

97.     On or about January 22, 2013, in reliance of the U.S. Government's certifications and confirmations to the Kuwait Government regarding the *bona fides* of ManTech's representation that it would obtain the labor for the KMSF from Kuwait-national owned Millbrook, the Kuwait Ministry of Social Affairs and Labors opened a labor file to begin processing resident visa, Visa 18, applications submitted by Millbrook on behalf of "its" employees.

98.     ManTech and Millbrook undertook other activities to conceal from both the United States and Kuwait governments that ManTech was abusing Kuwait's immigration laws by bringing Plaintiffs and more than 200 others into Kuwait into the country illegally and lying to MOSAL about the identity of the Plaintiffs' employer.

*ManTech and Millbrook Colluded to Launder Money into*
*Kuwait to Further Violations of the TVPA*

99.     ManTech and Millbrook entered into an illegal agreement to fake Millbrook salary payments to Plaintiffs and the others working for ManTech at the KMSF.

100.    In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech and Millbrook forced Plaintiffs and ManTech's other employees at the KMSF to sign blank signature cards that provided Millbrook with authorization to open Kuwait-based depository bank accounts at Burgan Bank in Kuwait. When ManTech employees objected to signing these blank authorizations, ManTech ordered them to do so.

101.    The plan to create Kuwait-based, Burgen Bank accounts in the name of the individual Plaintiffs (and all ManTech employees working in Kuwait) was presented to and

approved by Brogan. Brogan knew of the impropriety of this scheme as he instructed ManTech employees not to communicate about it in writing.

102.    In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech agreed to wire funds owed to its employees for *per diem* and cost reimbursement to Millbrook. Using a spreadsheet provided also by ManTech, Millbrook then deposited the funds owed by ManTech to its employees into the Kuwait-based bank accounts Millbrook had opened in these mechanic's' names.

103.    ManTech and Millbrook agreed to use cost reimbursements and *per diem* payments owed to the KMSF mechanics as the source of funds to fake Millbrook's salary payments to these persons to conceal this scheme from the United States.

104.    This scheme (wherein ManTech would use its employee's own money, launder that money into Millbrook's bank account in London, UK so that Millbrook could withdraw that money in Kuwait to fake salary payments to deceive the governments of the United States and Kuwait regarding the identity of the mechanics' employer) was approved by Brogan specifically to avoid detection by the United States. On May 1, 2013, Brogan instructed ManTech's Kuwait-based management to follow through with this scheme because it had the benefit of helping ManTech in several ways, including:

> [W]e do not have to "loan" Millbrook money they cycle in and out of the Kuwait bank and return to us at the end of the effort; we do not have to try to invoice the Government the amount we "loan" Millbrook to recognize revenue and then adjust that amount back out at the end of the POP; we retain relative high ground and avoid criticism with respect to complying with Kuwaiti law; and we do not have to modify our subcontract with "interesting" language that could draw unwanted scrutiny from D[efense] C[ontract] M[anagement] A[gency].

105.    After Millbrook secured these signature authorizations, it set up hundreds of bank accounts at Burgan Bank of Kuwait. However, these bank accounts were established on the false

pretense that these employees were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, these Plaintiffs were placed in danger of arrest, criminal prosecution, and deportation. Specifically,

a.      Millbrook, acting on behalf of ManTech, set a bank account for Lambey on or about April 23, 2013.

b.      Millbrook, acting on behalf of ManTech, set up a bank account for Carter, Ponder, Diaz, Bess, Foster, Greene, Jacobs, Jakubowski, McNeil, Phillips, Turner, and Yumul on or about April 30, 2013.

c.      Millbrook, acting on behalf of ManTech, set up a bank account for Abernathy, Green, and Nomura on or about May 2, 2013.

d.      Millbrook, acting on behalf of ManTech, set up a bank account for Cromartie, Dasher, Logan, Nomura, and Turner on or about May 16, 2013.

e.      Millbrook, acting on behalf of ManTech, set up a bank account for Cowley on or about May 30, 2013.

f.      Millbrook, acting on behalf of ManTech, set up bank accounts for Absent Class Members for the above-described purposes between November 1, 2012 and September 30, 2013.

106.   This money laundering scheme collapsed when ManTech employees could not access the cost and *per diem* reimbursements that they were expected to withdraw from the Kuwait bank accounts that Millbrook had established in their name.

107.   Upon the collapse of the ManTech/Millbrook scheme for using *per diem* and cost reimbursements as the source of cash to launder money into Kuwait, ManTech made direct payments to Millbrook's UK bank accounts for the purpose of Millbrook withdrawing those funds

in Kuwait to fake salary payments into the Burgan Bank accounts set up in the names of the ManTech employees.

108.     Between approximately April 23, 2013 and May 16, 2013, MOSAL issued Visa 18s in the name of Bess, Carter, Cromartie, Dasher, Foster, Greene, Jacobs, Jakubowski, Lambey, Logan, McNeil, Phillips, Ponder, Turner, Willis, and Yumul. However, these Visa 18s were issued on the false representation that these persons were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, these persons were placed in danger of arrest, criminal prosecution, and deportation.

*ManTech and Millbrook Illegally Obtained Kuwait Resident Visas and*
*Work Permits Under False Pretenses and Through Systemic Fraud*

109.     On or about February 21, 2013, MOSAL issued a Visa 18 to Cowley. However, this Visa was issued on the false representation that Cowley was an employee of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, Cowley was placed in danger of arrest, criminal prosecution, and deportation.

110.     On or about June 11, 2013, MOSAL issued a Visa 18 in the name of Abernathy. However, that Visa 18s was issued on the false representation that Abernathy was an employee of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, Abernathy was placed in danger of arrest, criminal prosecution, and deportation.

111.     On information and belief, MOSAL issued other Visa 18s in the names of various ManTech employees. However, such visas were issued on the false representation that these persons were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, such ManTech employees were placed in danger of arrest, criminal prosecution, and deportation.

112.     On or about June 17, 2013, Bess, Jakubowski, Logan, Ponder, and Turner were issued Civil Identification Cards ("CID cards"). Because of the abuse of Kuwait law complained of herein, these CID cards were issued on the false, illegal, and fraudulent representation that they were Millbrook employees.

*ManTech and Millbrook Intentionally Denied Plaintiffs and Absent Class Members the Benefits and Protections of Kuwait's Laws*

113.     None of the Plaintiffs or the Absent KMSF Class Members ever received any of the benefits and protections of Kuwait's labor laws. Nearly simultaneous with delivering the Visa 18s to ManTech's employees, Millbrook demanded that those to whom it provided Visa 18s to sign a letter written in Arabic (with no English language translation). By this letter, (a translation of which was received by ManTech's management when it was discovered that Millbrook had demanded that its employees sign the letter), the Visa 18 recipients were required to pledge that she or he had been employed by Millbrook Kuwait Company and Fawzan United Trading Company (identified as the "Employer"). The letter also required the ManTech employee to certify that she or he had "received from the Employer any and all rights, amounts, dues, salaries, and travel expenses, annual and official leaves, as well as other forms of leave which are applicable by law or payments in lieu of leave, compensation that are due under the employment contract or Kuwaiti law and other rights which may be due to me in relation to my employment with the Employer." Then, the mechanics were required to affirm the statement, "I do hereby expressly declare that I do not have any claims for any rights, amounts, dues, salaries, annual and official leaves, as well as other forms of leave which are applicable by law or payments in lieu of leave, compensations due as per the employment contract or the Kuwaiti law and other rights which may be due to me by the Employer." Finally, the letter required the mechanics to affirm the statement "I hereby expressly, unconditionally, irrevocably release the Employer from any rights, claims or

legal proceedings of whatever nature or form, regardless of whether known or unknown to me, and I hereby expressly waive my right, at any time hereafter, to initiate any legal proceeding against the Employer for any matter, kind or nature whatsoever."

114.    The initial reaction of the ManTech management at the KMSF was to order ManTech's employees not to sign this letter. Wrote Earhart to Romance, and Guarnieri, "I am not allowing our employees to sign this until Corp. gives it's blessing. When I spoke to Lee in regards to this he tells me that they will not surrender our passports unless it is signed this is ILLEGAL!!!!" Romance agreed with Earhart's assessment, replying and copying  M. Cody, "Good Morning – I would not encourage the employee's (sic) to sign this. Its intent lends itself to releasing Millbrook of any responsibility, liability, or accountability."

115.    However, after the question of the propriety of the letter was passed up the chain of command to  Brogan. After  Brogan had a telephone call with Croll, the head of Millbrook,  Brogan passed the order down the chain of command that every ManTech employee who received a Visa 18 from Millbrook had to sign this Arabic language letter. These executed letters were collected by Millbrook and later presented to MOSAL as evidence that Millbrook had fully complied with Kuwait's laws. However, contrary to the representations, Millbrook and ManTech had flagrantly abused Kuwait's laws.

116.    ManTech told Plaintiffs that it would be responsible, as their employer, for obtaining all the immigration approvals and work permits needed for them to work in Kuwait. Through such statements, Plaintiffs were led to believe that ManTech would act in accordance with the law in obtaining the necessary immigration approvals and necessary authorizations for Plaintiffs to work in Kuwait.

117.     Plaintiffs can confirm this systematic, coordinated, ritualized scheme employed by ManTech to abuse Kuwait's immigration laws.

*Defendants' TVPA Violations Caused Plaintiffs to be Denied the Protection of Law and Thus Exposed to Dangerous and Illegal Levels of Toxic Poison*

118.     ManTech used intimidation and coercion to keep its employees in constant fear of being terminated and deported. The work conditions were horrific. The air was putrid and thick with suffocating smoke and fumes from a variety of sources.

119.     The Army's MRAPs are coated with CARC paint. CARC paint is a coating system routinely used on military vehicles to make metal surfaces highly resistant to corrosion and penetration of chemical agents encountered in chemical weapons attacks.

120.     CARC paint contains isocyanate (HDI).[1] The CDC identifies the following about HDI:

> Isocyanates are a family of highly reactive, low molecular weight chemicals. They are widely used in the manufacture of flexible and rigid foams, fibers, coatings such as paints and varnishes, and elastomers, and are increasingly used in the automobile industry, autobody repair, and building insulation materials. Spray-on polyurethane products containing isocyanates have been developed for a wide range of retail, commercial, and industrial uses to protect cement, wood, fiberglass, steel and aluminum, including protective coatings for truck beds, trailers, boats, foundations, and decks.

> Isocyanates are powerful irritants to the mucous membranes of the eyes and gastrointestinal and respiratory tracts. Direct skin contact can also cause marked inflammation. Isocyanates can also sensitize workers, making them subject to severe asthma attacks if they are exposed again. There is evidence that both respiratory and dermal exposures can lead to sensitization. Death from severe asthma in some sensitized subjects has been reported. Workers potentially exposed to isocyanates who experience persistent or recurring eye irritation, nasal congestion, dry or sore throat, cold-like symptoms, cough, shortness of breath, wheezing, or chest tightness should see a physician knowledgeable in work-related health problems.

> Preventing exposure to isocyanates is a critical step in eliminating the health hazard. Engineering controls such as closed systems and ventilation should be the principal method

---

[1]  Chemical Agent Resistant Coating (CARC) Technical Data Sheet, available at https://www.integument.com/wp-content/uploads/2020/11/CARC_TechnicalDataSheet.pdf  (last visited November 12, 2022).

for minimizing isocyanate exposure in the workplace. Other controls, such as worker isolation and use of personal protective equipment such as respirators and personal protective clothing to prevent dermal exposures may also be necessary. Early recognition of sensitization and prompt and strict elimination of exposures is essential to reduce the risk of long-term or permanent respiratory problems for workers who have become sensitized.[2]

121.    Isocyanate/HDI is highly irritating to skin and the respiratory system. Heavy exposure to it can lead to itching and reddening skin, burning sensations in the nose and throat, and watering of the eyes. With extreme exposure, HDI can cause a cough, shortness of breath, pain during respiration, increased sputum production, and tightening of the chest.

122.    Additionally, inhaling high concentrations of solvents contained in CARC can cause coughing, shortness of breath, watery eyes, and respiratory problems, including asthma.

123.    During the drying process, CARC can also release toluene diisocynate ("TDI"). Burning, grinding, or welding CARC paint also releases TDI.

124.    Exposure to HDI and TDI can result in a multitude of adverse health effects. The adverse health effects of TDI exposure include acute airway irritation and sensitization ("isocyanate asthma"). Exposure to TDI can also cause kidney damage.

125.    Occupational asthma related to isocyanate exposure can develop in individuals with no prior history of asthma and can sometimes be followed by more generalized hyperreactivity to other irritants.

126.    Occupational safety best practices dictate that CARC-coated materials should never be cut or welded, and CARC-coated materials should not be grinded or sanded without high-efficiency air purifying respirators in use.

---

[2] The National Institute for Occupational Safety and Health (NIOSH), "Isocynantes," available at https://www.cdc.gov/niosh/topics/isocyanates/default.html (last visited November 12, 2022).

127.    Given the serious health hazards associated with working with CARC paint, it was incumbent upon ManTech to provide workers with suitable and safe work conditions in which workers can avoid the risk of being exposed to or inhaling CARC fumes, particles, or other by-products.

128.    As an Army contractor, ManTech was obligated to follow Department of Defense and Army legal mandates with respect to servicing CARC coated vehicles.

129.    U.S. Army Technical Bulletin 43-0242, WD CARC Spot Painting, Department of the Army, 3 Dec 2007, asserts bluntly at 7-1: "Welding is Out. Never weld or use a cutting torch on CARC – or WD CARC-painted material. Welding or cutting painted surfaces releases toxic gases, vapors, and metal fumes."

130.    The laws of Kuwait also require employers to ensure workplace safety. Specifically, KPSLL Article 83 states,

> The employer shall take all needful precautionary safety measures for securing the safety of his labourers, machinery, equipment, circulated materials in the firm and the persons utilizing these materials against the work hazards. Also, the employer shall provide the required safety and occupational health instruments and kits regarding of which a decision shall be issued by the competent Minister upon seeking the opinion of the competent authorities. The labourer shall not be afforded with any expenses or any amounts may be deducted from his salary against the provision of protection measures & safety tools for him.

131.    Article 84 of the KPSLL creates affirmative obligations for ManTech to inform its employees of the dangers contained in the putrid air they were breathing every day at the KMSF, including the danger caused by burning or grinding CARC paint. This article states:

> The employer shall explain to the labourer, before commencing his work, the hazards which he may be exposed to and the necessary protection measures he should have. The Minister shall issue the relevant regulatory decisions on the instructions and precautionary warning signboards to be fixed in conspicuous places in the work center. and the personal safety measures which the employer shall provide for the different activities.

132.    KPSLL Article 86 establishes additional workplace safety obligations for employers such as ManTech. It states:

> The employer shall take the necessary precautionary measures for protecting workers against health hazards and occupational diseases resulting from the practice of such work and shall further provide the necessary first aid kits and medical services. The Minister shall have the right, upon obtaining the opinion of the Minister of Health, to issue the decisions organizing these precautionary measures, occupational diseases schedules, professions and industries that cause such diseases, schedules of harmful materials and the permissible concentrates for such materials.

133.    The KPSLL also provides for 1) employer-provided insurance at Article 88, 2) employer-obligated payment for treatment of workplace injuries at Article 91, and 3) compensated sick time at Article 93.

134.    The air at the KMSF was polluted with the smoke of burning CARC paint caused by arc-welding of MRAP vehicles, grinding of CARC paint and metal by sanders, the release of fossil fuels from engine exhaust, fumes released from petroleum products, and other toxins released by the employees' abrasive work on the MRAP vehicles.

135.    ManTech ignored Plaintiffs and other ManTech employees' frequent and repeated complaints about the thick, caustic, smoke that gathered within the facility. Most days, an ever-increasing black cloud of toxic smoke filled with caustic chemicals gathered within the KMSF. Plaintiffs were often forced to go out into the searing heat during breaks simply to get fresh air.

136.    In response to the complaints about the poor air quality and in rejecting requests to restart the ventilator fans, ManTech instructed its employees to keep the bays doors of the warehouse open. However, this was not a realistic solution as the outside temperature in Kuwait was frequently 120 degrees Fahrenheit.

137.   Despite many requests from Plaintiffs and other employees at the KMSF, ManTech refused to provide respirators and even refused to provide fresh, clean filters for use with the respirators.

138.   When Plaintiffs and other ManTech employees complained about the lack of respirators to filter the smoke-filled air, ManTech threatened to fire them.

139.   Plaintiffs and other ManTech employees experienced immediate and long-term ill-health effects from their exposure to toxic pollution at the KMSF that continue to this day. All Plaintiffs variously experienced headaches, respiratory distress, sinus congestion, mucus expectoration, and burning in their eyes and throat during the time that they worked at the KMSF. Some Plaintiffs experienced chronic, daily nosebleeds because of working in the KMSF during ManTech's control of the facility.

140.   Many Plaintiffs and other former ManTech employees continue to experience chronic respiratory and sinus illness since working at the KMSF when ManTech controlled the facility. Furthermore, Plaintiffs and other workers might experience other more serious ailments that are associated with long-term exposure to CARC and CARC solvents.

141.   Plaintiffs did not want to work under the inhumane and arduous conditions to which they were subjected by ManTech, but reasonably believed that they had no choice, due to ManTech's control over their lives, as manifested, inter alia, by ManTech's confiscation of their passports, ManTech's refusal to obtain legal authorization (Visa 18, employment authorization, and Ministry of Labor identifications) necessary for them to live without constant fear of arrest, the power that ManTech had to report them to Kuwaiti authorities as having "absconded" if they did not report to work, and ManTech's threat of severe financial penalties were Plaintiffs to leave their employment prior to the expiration of the twenty-four months required of their contract.

*Defendants' TVPA Violations Caused Plaintiffs to Be Denied the Protection of*
*Law and Allowed ManTech to Profit From Wage Theft*

142.     KPSLL Article 64 of the State of Kuwait Labor Law states: "it is forbidden to allow workers to work for more than 48 hours per week or 8 hours a day, except in such events as are specified in this Law." Moreover, "[w]orking hours during the holy month of Ramadan shall be equal to 36 hours per week." Id.

143.     KPSLL Article 66 provides when a laborer is required to work more than forty-eight (48) hours per week, the laborer has the "right to obtain a wage against the overtime hours in a rate which is more than his ordinary rate in a similar period by 25%." The KPSLL makes clear that, "[t]he additional working hours shall not be more than two hours per day and in a maximum number of one hundred eighty (180) hours per year. Also, the additional work periods shall not exceed three days a week and ninety days per year." Id.

144.     Per KPSLL Article 68, "The official holidays granted to a laborer with full pay are: a) Hijiri New Year Day - One day; b) Ascension (lsra & Miraj) Day -One day; c) Eid Al Fitr (Lesser Bairam) -Three days; d) Waqfat Arafat Day - One day; e) Eid Al Adha Greater Bairam - Three days; f) Prophet Birthday - One day; g) National Day (25th February) - One day; h) Liberation Day (26th February) - One day; i) New Gregorian Year - One day." Further, Article 68 states, "If the work circumstances require keeping any laborer in work on any of the official holidays, he shall be paid a double wage together with an alternative compensation day."

145.     Had Plaintiffs worked legally in Kuwait, as required under the KPSLL and consistent with the requirements of Kuwait's immigration laws and the necessity of a Visa 18, they would have been entitled to the overtime wages and other benefits mandated by the laws of Kuwait.

146.     During the time they were employed by ManTech, Plaintiffs' average day consisted of waking up 4:00 a.m. to be picked up by a ManTech bus from the ManTech-provided apartment

at 5:00 a.m. The ManTech work facility was approximately an hour drive away. After signing in at the KMSF, Plaintiffs started work at 7:00 a.m. Plaintiffs were provided a fifteen-minute break at 9:15 a.m. Plaintiffs were provided a one-hour break from 11:30-12:30 – a time that Plaintiffs and most employees would try to venture outside of the KMSF facility to obtain fresh air. Frequently, however, the outside desert conditions were too severe to venture outside, and Plaintiffs were forced to take their lunch break within the toxic fume/smoke-filled FMSF facility. Nonetheless, at times the interior pollution was so painful and suffocating that Plaintiffs ventured into the blistering heat just to breathe somewhat normally. Plaintiffs were provided another fifteen-minute break at 3:00 p.m. Their workday ended at 6:00 p.m. After checking out and boarding the ManTech bus back to their ManTech-provided apartment, Plaintiffs were in their own living quarters at 7:30 p.m. They had virtually no personal freedom except to work, shower, relieve themselves, and go to bed to be ready to rise again at 4:00 a.m. Plaintiffs were provided one day off per week.

147.    Plaintiffs worked 72 hours a week in Kuwait -- 24 hours beyond the Kuwaiti maximum of 48 hours per week (and 32 hours beyond the maximum established by the United States Fair Labor Standards Act, which did not cover them in Kuwait).

148.    By forcing Plaintiffs to work without the protection of any country's laws, ManTech engaged in flagrant wage theft. By way of example, working 12 hours a day, seven days a week would have entitled the Plaintiffs to thirty-two hours of "time and a half" overtime wages under the U.S. Fair Labor Standards Act. Calculated under the KPSLL, Plaintiffs should have received twenty-four hours of "time and a quarter" overtime pay. Instead, operating in a place and under conditions where no country's laws applied, Plaintiffs received no overtime pay and ManTech's profit increased accordingly.

a.      During the pay period ending on March 15, 2013, Abernathy worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Abernathy worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Abernathy worked 68 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Abernathy would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Abernathy, ManTech pocketed the overtime wages that Abernathy was owed under law. Such pocketing of wages owed to Abernathy is wage theft. On information and belief, Abernathy worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

b.      During the pay period ending on March 15, 2013, Arthur worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Arthur worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Arthur worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Arthur would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Arthur, ManTech pocketed the overtime wages that Arthur was owed under law. Such pocketing of wages owed to Arthur is wage theft. On information and belief, Arthur worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

c.       During the pay period ending on March 15, 2013, Bess worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Bess worked 48 hours at the KMSF; during the pay period that ended on March 29, 2013, Bess worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Bess would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Bess, ManTech pocketed the overtime wages that Bess was owed under law. Such pocketing of wages owed to Bess is wage theft. On information and belief, Bess worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

d.       During the period of March 15-29, 2013, Cain worked 66 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cain would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cain, ManTech pocketed the overtime wages that Cain was owed under law. Such pocketing of wages owed to Cain is wage theft. On information and belief, Cain worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

e.       During the pay period ending on March 15, 2013, Carter worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Carter worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Carter worked 68 hours at the KMSF.

Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Carter would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Carter, ManTech pocketed the overtime wages that Carter was owed under law. Such pocketing of wages owed to Carter is wage theft. On information and belief, Carter worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

f.       During the pay period ending on March 15, 2013, Cavazos worked 66 hours at the KMSF; during the pay period that ended on March 22, 2013, Cavazos worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cavazos worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cavazos would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cavazos, ManTech pocketed the overtime wages that Cavazos was owed under law. Such pocketing of wages owed to Cavazos is wage theft. On information and belief, Cavazos worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

g.       During the pay period ending on March 15, 2013, Cowley worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Cowley worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cowley worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked

over 48 hours in a week. Under the Fair Labor Standards Act, Cowley would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cowley, ManTech pocketed the overtime wages that Cowley was owed under law. Such pocketing of wages owed to Cowley is wage theft. On information and belief, Cowley worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

h.      During the pay period ending on March 15, 2013, Cromartie worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Cromartie worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cromartie worked 60 hours at the KMSF. Under the KPSLL, ManTech owed her 1.25x her usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cromartie would have been entitled to 1.50x her usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cromartie, ManTech pocketed the overtime wages that Cromartie was owed under law. Such pocketing of wages owed to Cromartie is wage theft. On information and belief, Cromartie worked at least 60 hours each week she was employed by ManTech in Kuwait and was denied the overtime compensation she would have been entitled to if she had been covered under either the laws of the United States or the laws of the State of Kuwait.

i.      During the pay period ending on March 15, 2013, Dasher worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Dasher worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Dasher worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48

hours in a week. Under the Fair Labor Standards Act, Dasher would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Dasher, ManTech pocketed the overtime wages that Dasher was owed under law. Such pocketing of wages owed to Dasher is wage theft. On information and belief, Dasher worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

j.      During the pay period ending on March 15, 2013, Diaz worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Diaz worked 60 hours at the KMSF; during the pay period that ended on March 29, 2013, Diaz worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Diaz would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Diaz, ManTech pocketed the overtime wages that Diaz was owed under law. Such pocketing of wages owed to Diaz is wage theft. On information and belief, Diaz worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

k.      During the pay period ending on March 15, 2013, Foster worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Foster worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Foster worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Foster would have been entitled to 1.50x his

usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Foster, ManTech pocketed the overtime wages that Foster was owed under law. Such pocketing of wages owed to Foster is wage theft. On information and belief, Foster worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

l.      During the pay period ending on March 15, 2013, Gatson worked 84 hours in Afghanistan; during the pay period that ended on March 22, 2013, Gatson worked 84 hours in Afghanistan; during the pay period that ended on March 29, 2013, Gatson worked 84 hours in Afghanistan. Under the laws of the Islamic Republic of Afghanistan (as modified by that country's adherence to the International Labour Organization, ManTech owed him fair wages, including but not limited to overtime pay, for such excessive work. Under the Fair Labor Standards Act, Gatson would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Gaston, ManTech pocketed the overtime wages that Gatson was owed under law. Such pocketing of wages owed to Gatson is wage theft. On information and belief, Gatson worked at least 60 hours each week he was employed by ManTech in Afghanistan and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

m.      During the pay period ending on March 15, 2013, Green worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Green worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Green worked 70 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Green would have been entitled to 1.50x his

usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Green, ManTech pocketed the overtime wages that Green was owed under law. Such pocketing of wages owed to Green is wage theft. On information and belief, Green worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

        n.      During the pay period ending on March 15, 2013, Greene worked 60 hours at the KMSF; during the pay period that ended on March 22, 2013, Greene worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Greene worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Greene would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Greene, ManTech pocketed the overtime wages that Greene was owed under law. Such pocketing of wages owed to Greene is wage theft. On information and belief, Greene worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

        o.      During the pay period ending on March 15, 2013, Jacobs worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Jacobs worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Jacobs worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Jacobs would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse

of Kuwait's laws and abuse of Jacobs, ManTech pocketed the overtime wages that Jacobs was owed under law. Such pocketing of wages owed to Jacobs is wage theft. On information and belief, Jacobs worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

p.      During the pay period ending on March 15, 2013, Jakubowski worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Jakubowski worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Jakubowski worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Jakubowski would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Jakubowski, ManTech pocketed the overtime wages that Jakubowski was owed under law. Such pocketing of wages owed to Jakubowski is wage theft. On information and belief, Jakubowski worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

q.      During the pay period ending on March 15, 2013, Kendrick worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Kendrick worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Kendrick worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Kendrick would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week.

However, through its abuse of Kuwait's laws and abuse of Kendrick, ManTech pocketed the overtime wages that Kendrick was owed under law. Such pocketing of wages owed to Kendrick is wage theft. On information and belief, Kendrick worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

r.     During the pay period ending on March 15, 2013, Logan worked 65 hours at the KMSF; during the pay period that ended on March 22, 2013, Logan worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Logan worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Logan would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Logan, ManTech pocketed the overtime wages that Logan was owed under law. Such pocketing of wages owed to Logan is wage theft. On information and belief, Logan worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

s.     During the pay period ending on March 15, 2013, McNeil worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, McNeil worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, McNeil worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, McNeil would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its

abuse of Kuwait's laws and abuse of McNeil, ManTech pocketed the overtime wages that McNeil was owed under law. Such pocketing of wages owed to McNeil is wage theft. On information and belief, McNeil worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

t.      During the pay period ending on March 15, 2013, Phillips worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Phillips worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Phillips worked 60 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Phillips would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Phillips, ManTech pocketed the overtime wages that Phillips was owed under law. Such pocketing of wages owed to Phillips is wage theft. On information and belief, Phillips worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

u.      During the pay period ending on March 15, 2013, Lambey worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Lambey worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Lambey worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Lambey would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Lambey, ManTech pocketed the overtime wages that

Lambey was owed under law. Such pocketing of wages owed to Lambey is wage theft. On information and belief, Lambey worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

        v.       During the pay period ending on March 15, 2013, Freeman worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Freeman worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Freeman worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Freeman would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Freeman, ManTech pocketed the overtime wages that Freeman was owed under law. Such pocketing of wages owed to Freeman is wage theft. On information and belief, Freeman worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

        w.       During the pay period ending on May 31, 2013, Nelson worked 72 hours at the KMSF; during the pay period that ended on June 7, 2013, Nelson worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Nelson worked 88 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Nelson would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Nelson, ManTech pocketed the overtime wages that Nelson was owed under law. Such pocketing of wages owed to Nelson is wage theft. On information and belief,

Nelson worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

      x.    During the pay period ending on March 15, 2013, Ponder worked 68 hours at the KMSF; during the pay period that ended on March 22, 2013, Ponder worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Ponder worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Ponder would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Ponder, ManTech pocketed the overtime wages that Ponder was owed under law. Such pocketing of wages owed to Ponder is wage theft. On information and belief, Ponder worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

      y.    During the pay period ending on March 15, 2013, Nomura worked 68 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Nomura would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Nomura, ManTech pocketed the overtime wages that Nomura was owed under law. Such pocketing of wages owed to Nomura is wage theft. On information and belief, Nomura worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

z.      During the pay period ending on March 15, 2013, Ortiz-Medina worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Ortiz-Medina worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Ortiz-Medina worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Ortiz-Medina would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Ortiz-Medina, ManTech pocketed the overtime wages that Ortiz-Medina was owed under law. Such pocketing of wages owed to Ortiz-Medina is wage theft. On information and belief, Ortiz-Medina worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

aa.      During the pay period ending on March 15, 2013, Turner worked 60 hours at the KMSF; during the pay period that ended on March 22, 2013, Turner worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Turner worked 60 hours at the KMSF. Under the KPSLL, ManTech owed her 1.25x her usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Turner would have been entitled to 1.50x her usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Turner, ManTech pocketed the overtime wages that Turner was owed under law. Such pocketing of wages owed to Turner is wage theft. On information and belief, Turner worked at least 60 hours each week she was employed by ManTech in Kuwait and was denied the overtime compensation she would have been entitled to if she had been covered under either the laws of the United States or the laws of the State of Kuwait.

68

bb.     During the pay period ending on March 15, 2013, Willis worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Willis worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Willis worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Willis would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Willis, ManTech pocketed the overtime wages that Willis was owed under law. Such pocketing of wages owed to Willis is wage theft. On information and belief, Willis worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

cc.     During the pay period ending on March 15, 2013, Yumul worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Yumul worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Yumul worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Yumul would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Yumul, ManTech pocketed the overtime wages that Yumul was owed under law. Such pocketing of wages owed to Yumul is wage theft. On information and belief, Yumul worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the United States or the laws of the State of Kuwait.

149.    Through ManTech's abuse, Plaintiffs lacked the protection of any country's laws. They were entitled to the protections of some nation's wage and hour laws yet having left the United States, they were not longer covered by the McNamara-O'Hara Service Contract Act which was generally applicable to the Contract. having brought Plaintiffs into Kuwait illegally and without the recognition and rights afforded to them as residents of Kuwait, Plaintiffs were denied any rights under the KPSLL. Thus, Plaintiffs were denied the compensation and benefits of U.S. law and Kuwait law, both.

150.    Plaintiffs could not advocate for their rights to fair wages because they lived in fear of arrest for lack of U.S. passports, proper immigration papers, and a proper work authorization. Plaintiffs were acutely aware of the fate of Americans who, when arrested by Kuwaiti police for immigration violations, were forced into shared, overcrowded jail cells; with inadequate food; poor sanitation; and physical, verbal, and psychological abuse. Moreover, Plaintiffs knew that, if arrested, they would be subject to summary deportation, and a consequent lifetime ban on reentering Kuwait or any other Gulf-Cooperation Council country. Plaintiffs also feared the consequences of being fired by ManTech, including the financial penalty for termination prior to completing 24-months of service.

151.    Pursuant to 18 U.S.C. §1593(a), the Court shall enter an order of restitution for each and all the TVPA offenses described above.

152.    Pursuant to 18 U.S.C. §1593(b)(1), such an order of restitution shall direct the Defendant to pay the victim the full amount of the victim's losses including any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child

care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense.

153. Under 18 U.S.C. §1593(b)(1), the order of restitution shall also include the greater of the gross income or value to the Defendant of the victim's services including the offender's ill-gotten gains.

*Defendant Carlyle, With Notice That ManTech Had Been Unjustly Enriched Through TVPA Violations and Attendant Wage Theft, Purchased ManTech Resulting in ManTech's Ill-Gotten Gains and Stolen Wages Becoming Carlyle Assets*

154. On or about May 16, 2022, Carlyle announced its intended purchase of ManTech.

155. On May 18, attorneys at Latham & Watkins, counsel to Carlyle in the acquisition of ManTech, were sent a copy of the complaint that had been filed in a related case *United States ex rel. Larry Hawkins et al. v. ManTech International Corporation et al.*, 15-02105.

156. Thus, to the extent that Carlyle was not aware, through its own due diligence, that ManTech's profits and value had been inflated from the profit realized through ManTech's TVPA violations and attendant wage theft, Carlyle had actual notice of ManTech's value had been inflated through ill-gotten gains and stolen wages.

157. Notwithstanding the above-described actual notice, Carlyle's purchase of ManTech was consummated on our about September 15, 2022 after ManTech's shareholders approved the acquisition on or about September 7, 2022.

158. Thus, to the extent that Carlyle was on notice of or knew that ManTech's value had been inflated through profit realized by ManTech's TVPA activities and attendant wage theft, Carlyle's purchase of ManTech evidenced an intention to incorporate ManTech's ill-gotten gains as part of Carlyle's own assets. By incorporating, with knowledge, the profits earned by ManTech through its TVPA-violating activities (including wage theft), into its own inventory of assets, Carlyle became part of a venture to profit from violations of the TVPA.

159.    With notice of the wage theft committed by ManTech prior to the completion

**COUNT 2**
**Violations of 18 U.S.C. §1956**
**Laundering of Monetary Instruments**

160.    The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

161.    18 U.S.C. §1956 (2) establishes that whoever transmits or attempts to transmit funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.  Pursuant to 18 U.S.C. §1956 (c) (7)(B)(vii) specified unlawful activity includes trafficking in persons.

162.    18 U.S.C. §1962 makes it unlawful for any person who has received any income derived, directly or indirectly, through collection of an unlawful debt in which such person has participated as a principal to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

163.    Pursuant to 18 U.S.C. §1964 (c), any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

164.    ManTech transmitted funds from the United States to a Millbrook bank account in the United Kingdom for the purpose of abusing Kuwaiti law, to wit, trafficking U.S. citizens into

that country illegally and falsifying employment by Millbrook Kuwait to circumvent Kuwait's immigration and labor laws and, by doing so, obtain an unlawful debt from the United States.

165.   Pursuant to 18 U.S.C. §1964 (c), Plaintiffs seek relief from the United States District Court for ManTech's illegal activity including, but not limited to, treble of damages established by Plaintiffs any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

## CLASS ACTION ALLEGATIONS

166.   In addition to the twenty-nine named plaintiffs in this action, there are approximately 200 other U.S. citizens who ManTech transported to Kuwait and abused in the manner herein described. In the interest of justice and judicial economy, this action should be certified as a class action to provide relief to absent class members and to prevent Defendants from retaining profits realized through TVPA violations. Specifically, 1) the effort and resources needed to locate and join each victimized former ManTech employee would be impracticable in the absence of the notification processes that would be employed in a class action; 2) there are questions of TVPA, KPSLL, and Kuwait labor law that are common to the experiences of the workers that ManTech brought to Kuwait; 3) given systemic violations of Kuwait law and the mass fraud by ManTech on MOSAL and the concentration of employees at the KMSF, the claims of the named plaintiffs are typical of the claims of the absent class members; 4) one or more of the twenty-nine named plaintiffs will undoubtably be capable of fairly and adequately protect the interests of the absent class members. Moreover, 1) were the former ManTech employees to prosecute separate TVPA actions in different United States District Courts against the named

defendants in this action, there would be a significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for companies such as Carlyle and ManTech as they engage in foreign commerce. This is a particularly important factor given the importance of TVPA enforcement to the United States. Moreover, without the due process protections of Fed. R. Civ. P. 23 disparate adjudications would impair or impede former ManTech employees ability to protect their own interests. These safeguards and efficiencies are especially important to imply given that Defendants treated the mechanics working in Kuwait in the same manner – a uniformity of abuse that makes this action's requested injunctive appropriate and just respecting all of the former ManTech employees working at the KMSF. In addition, Plaintiffs are confident that the Court will recognize that questions of Kuwaiti law and the facts of ManTech's passport confiscation, fraud on MOSAL, denial of overtime pay, and denial of legal protections due to its KMSF employees are common between the named plaintiffs and the absent class members and predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs/Plaintiffs, on behalf of themselves and the U.S., pray as follows:

A.      That, following a motion for class certification, that the Court will certify this action as a class action so that the rights of all of ManTech's KMSF employees may be protected and so that ManTech will be denied the profits and stolen wages it has realized from its TVPA violations.

B.      That Plaintiffs be awarded damages against Defendants, jointly and severally, including compensatory and statutory damages, for the wrongful acts complained of herein, in an amount to be determined at trial;

C.      That the Court order Defendants to pay Plaintiffs and Absent Class Members restitution pursuant to 18 U.S.C. §1593 including but not limited to value to the Defendants of the victim's services in performing the Contract. As the Contract is primarily a human services contract for the repair and maintenance of the MRAPS, Plaintiffs estimate that the value of illegally obtained labor applied to the Contract exceeds $500 million.

D.      That Plaintiffs be awarded punitive or exemplary damages in an amount of which will be proven at trial;

E.      That Plaintiffs be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

F.      That Plaintiffs be awarded pre-judgment and post-judgment interest at the maximum rate allowed by law;

G.      That Plaintiffs be awarded all general, special, and equitable relief to which Plaintiffs are entitled by law;

H.      That Plaintiffs be awarded any other punitive damages not herein specifically identified; and

I.      That Plaintiffs be granted all other necessary further legal and equitable relief as may be determined by the Court for complete justice to be realized on the facts of this case.

Respectfully submitted,

/s/ Joseph A. Hennessey
Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Telephone: (301) 351-5614
Email: jhennessey@jahlegal.com

75

## **JURY DEMANDED**

  Plaintiffs/Plaintiffs hereby demand a trial by jury of all claims within this action that are triable by jury.

/s/ Joseph Hennessey
Joseph A. Hennessey

Wednesday, November 30, 2022

76

**INDEX**

18 U.S.C. § 1581, 34

   Section 1592, 34

   Section 1595, 34

Abernathy, 1, 3, 42, 49, 50, 60

Arthur, 1, 4, 42, 61

Bahrain, 35, 40, 41, 42, 43

Bess, 1, 5, 41, 49, 50, 51, 62

Brogan, 2, 1, 30, 32, 40, 47, 48, 52

Cain, 1, 5, 62

CARC, 13, 53, 54, 55, 56, 57, 58

Carlyle, 2, 4, 1, 29, 33, 77, 78, 80

Carter, 1, 6, 41, 49, 50, 63

Cavazos, 1, 7, 41, 63

Contract, 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 37, 44, 45, 46, 76

Cook, 3, 1, 31, 32

Cowley, 1, 8, 42, 49, 50, 64

Croll, 3, 1, 32, 33, 34, 52

Cromartie, 1, 9, 42, 49, 50, 64

Dasher, 1, 10, 49, 50, 65

Diaz, 1, 11, 49, 65

Earhart, 3, 31, 32, 40, 43, 52

Foster, 1, 11, 41, 49, 50, 66

Freeman, 2, 1, 21, 42, 72

Gatson, 1, 12, 66

Green, 1, 13, 42, 49, 67

Greene, 1, 14, 41, 49, 50, 67

Guarnieri, 3, 1, 31, 40, 52

Hayes, 60

Host Nations Affairs, 45

Isocyanates, 54

Jacobs, 1, 15, 41, 49, 50, 68

Jakubowski, 1, 16, 41, 49, 50, 51, 68

K. Cody, 30, 32, 36, 37, 43, 44

Kendrick, 2, 1, 16, 42, 69

KMSF, 57, 58, 59

KPSLL, 38, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76

labor file, 45, 46

Lambey, 2, 1, 20, 41, 49, 50, 71

Logan, 2, 1, 17, 41, 49, 50, 51, 69

M. Cody, 31, 32, 36, 37, 39, 40, 43, 44, 52

ManTech, 1, 2, 3, 4, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 79

McNeil, 2, 1, 18, 41, 49, 50, 70

Millbrook, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,

25, 26, 27, 28, 32, 35, 38, 39, 40, 44, 45, 46, 47, 48, 49, 50, 51, 52, 79

MOSAL, 38, 44, 46, 47, 50, 51, 53

MT Telecom, 30

Nelson, 2, 1, 22, 72

Nomura, 2, 1, 23, 42, 49, 73

Ortiz-Medina, 2, 1, 23, 41, 74

overtime, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75

passport, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 34, 35, 40

*per diem*, 36, 47, 48, 49, 50

Phillips, 2, 1, 19, 32, 41, 49, 50, 70

Ponder, 2, 1, 24, 41, 49, 50, 51, 73

Resident Visa, 38, 39

Romance, 3, 1, 32, 34, 45, 52

salary, 47, 48, 50, 56

smoke, 53, 57, 60

TDI, 55

toluene diisocynate, 55

Turner, 2, 1, 25, 41, 49, 50, 51, 74

U.S. Army Technical Bulletin 43-0242, WD CARC Spot Painting, Department of the Army, 3 Dec 2007, 55

Visa 18, 38, 42, 43, 46, 50, 51, 52, 58, 59

visa run, 35, 40, 41, 42

W56HZV-12-C-0127

the Contract, 1

Willis, 2, 1, 26, 41, 50, 75

Yumul, 2, 1, 27, 41, 49, 50, 75