# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Michael Abernathy**<br>210 James Loop<br>Killeen, TX 76542 | Civil Action No. 22-cv-03603-ABJ<br><br>**First Amended**<br>**Class Action Complaint for** |
| **Cedrick Arthur**<br>501 East Simon Street<br>Glennville, GA 30427 | **Damages, Restitution and Other**<br>**Statutory, Compensatory and Equitable**<br>**Relief Pursuant to the Trafficking Victims** |
| **Larry Bess**<br>307 Lakeview Drive<br>Glennville, GA 30427 | **Protection Reauthorization Act**<br><br>**Equitable Relief of Restitution and** |
| **Darius Cain**<br>710 Green Street<br>Glennville, GA 30427 | **Disgorgement**<br><br>**An Order to Establish Medical** |
| **Marcus Carter**<br>P.O. Box 144<br>Baxley, GA 31515 | **Monitoring and Treatment**<br><br>**and** |
| **Mario Cavazos**<br>304 North Howe<br>Lampasas, TX 76550 | **Legal and Equitable Relief Arising from**<br>**Money Laundering** |
| **Mike Cowley**<br>P.O. Box 352<br>High Island, TX 77623 | <u>PUNITIVE DAMAGES REQUESTED</u> |
| **Bonita Cromartie**<br>1047 Lake Village Drive<br>Columbus, SC 29229 | <u>JURY DEMAND</u> |
| **Vernon Dasher**<br>P.O. Box 1171<br>Baxley, GA 31515 | |
| **Misael Diaz**<br>14 Millard Circle<br>Monroe, NY 10950 | |
| **Jason Foster**<br>2388 Watsonfain Trail<br>Loganville, GA 30052 | |

**Michael Gatson**
2502 Hilltop Circle
Waycross, GA 31501

**Delonte Green**
1167 Barrow Bay Road
Claxton, GA 30417

**Jerome Greene**
P.O. Box 94
Claxton, GA 30414

**Christopher Jacobs**
3053 Woodbridge Drive
Anniston, AL 36207

**Ryan Jakubowski**
6443 Lehnert Street
Gwynn Oak, MD 21207-5276

**Kyle Kendrick**
300 Country Road 1002
New Boston, TX 75570

**Justin Logan**
2171 Kingston Court,
Ste 1, ABP505-1
Marietta, GA 30067

**Alton McNeil**
2409 Ridge Run
Lillington, NC 27546

**LaDarius Phillips**
514 Green Street
Glennville, GA 30427

**Frank Lambey**
10931 Atkinson Avenue
Inglewood, CA 90303

**Lawrence Freeman**
1116 Rosebrook Drive
Clarksville, TN 3704

**Eric Nelson**
320 Second Street
Hinesville, GA 31313

**Michael Nomura**
111 East Carson Street, No. 8-55
Carson, CA 90745

**Josean Ortiz-Medina**
Harker Heights, Texas 76548

**Edward Ponder**
637 Greenleaf Road
Conyers, GA 30013

**Tamecia Turner**
209 Oak Road
Anniston, AL 36206

**Jeffery Willis**
271 Bayou Road
Drew, MS 38737

**Tristan Yumul**
7302 Mesa College Drive
San Diego, CA 92111

*On their own behalf and on behalf of*
*all others similarly situated*
*Plaintiffs*

*v.*

**The Carlyle Group, Inc.**
1001 Pennsylvania Avenue NW
Washington, DC 20004

**ManTech International Corp.**
1100 New Jersey Avenue, S.E., Suite 740
Washington, D.C. 20003

**ManTech Telecommunications and**
**Information Sys. Corp.**
12015 Lee Jackson Highway
Fairfax, Virginia 22033

**Michael Brogan**
12908 Carriage Ford Rd
Nokesville, VA 20181

**Kevin Cody**
42318 Iron Bit Place
Chantilly, VA 20152

**Muge Cody**
42318 Iron Bit Place
Chantilly, VA 20152

**Bonnie Cook**
9325 Mainsail Dr
Burke, VA 22015

**Kathryn Romance**
13408 Amy Way
Herndon, VA 20171

*Defendant*s

# TABLE OF CONTENTS

Introduction…………………………………………………………………………………..1

Parties…………………………………………………………………………………...2

Plaintiffs Are U.S. Citizens Who Were Harmed by Defendants Violations of the TVPRA

Michael Abernathy…………………………….3

Cedrick Arthur……………………………….4

Larry Bess………………………………….4

Darius Cain……………………………...6

Marcus Carter……………………………….7

Mario Cavazos……………………………….8

Mike Cowley……………………………….9

Bonita Cromartie. …………………………10

Vernon Dasher  ……………………………11

Misael Diaz  ……………………………12

Jason Foster……………………………….13

Delonte Green……………………………….14

Jerome Greene……………………………….15

Christopher Jacobs………………………...16

Ryan Jakubowski………………………….17

Kyle Kendrick……………………………….18

Justin Logan……………………………….19

Alton McNeil……………………………….20

LaDarius Phillips………………………..21

Frank Lambey……………………………….22

Lawrence Freeman…………………………23

Eric Nelson……………………………….24

Michael Nomura………………………….25

Josean Ortiz-Medina………………………26

Edward Ponder……………………………….27

Tamecia Turner…………………………….28

Jeffery Willis……………………………….29

Tristan Yumul…………………………..30

Absent KMSF Class Members……………26

Defendants are U.S. Citizens Who Violated U.S. Law by Violating the TVPRA and Participating in a Venture that Profited from Violations of the TVPRA

ManTech International Corporation……….32

ManTech Telecommunications and
Information Systems………………………32

Michael Brogan……………………………33

Kevin Cody………………………...……34

Muge Cody………………………………..35

Bonnie Cook………………………………36

Kathryn Romance…………………………36

The Carlyle Group, Inc.……………………37

JURISDICTION AND VENUE………………………………………………………39

COUNT 1, Violations of the TVPRA, 18 U.S.C. §§ 1581, et seq

ManTech and Millbrook Confiscated          ……………………41
Plaintiffs' Passports in Violation of 18 U.S.C.
§1592

ManTech Threatened Plaintiffs with Serious   ……………………42
Financial and Professional Harm if They Left
Their Overseas Station

ManTech and Millbrook Colluded to Launder   ……………………52
Money into Kuwait to Further Violations of
the TVPRA

ManTech and Millbrook Illegally Obtained     ……………………55
Kuwait Resident Visa Under False Pretenses
and Through Systemic Fraud

ManTech and Millbrook Intentionally Denied   ……………………56
Plaintiffs and Absent Class Members the
Benefits and Protections of Kuwait's Laws

Defendants' TVPRA Violations Caused         ……………………58
Plaintiffs to be Denied the Protection of Law
and Thus Exposed to Dangerous and Illegal
Levels of Toxic Poison

Defendants' TVPRA Violations Caused         ……………………66
Plaintiffs to Be Denied the Protection of Law

and Allowed ManTech to Profit From Wage
Theft

Defendant Carlyle, With Notice That        ……………………82
ManTech Had Been Unjustly Enriched
Through TVPRA Violations and Attendant
Wage Theft, Purchased ManTech Resulting
in ManTech's Ill-Gotten Gains and Stolen
Wages Becoming Carlyle Assets

COUNT 2, Equitable Relief: Order of Restitution ………………………………………84

COUNT 3, Injunctive Relief: Medical Monitoring………………………………………84

COUNT 4, Violations of 18 U.S.C. §1956
Laundering of Monetary Instruments ……………………………………………………84

CLASS ACTION LLEGATIONS ………………………………………………………86

Michael Gatson's Claims with Respect to ManTech's Misconduct in Afghanistan. . . . . . . .89

PRAYER FOR RELIEF………………………………………………………………90

## INTRODUCTION

Come now Michael Abernathy, Cedrick Arthur, Larry Bess, Darius Cain, Marcus Carter, Mario Cavazos, Mike Cowley, Bonita Cromartie, Vernon Dasher, Misael Diaz, Jason Foster, Michael Gatson, Delonte Green, Jerome Greene, Christopher Jacobs, Ryan Jakubowski, Kyle Kendrick, Justin Logan, Alton McNeil, LaDarius Phillips, Frank Lambey, Lawrence Freeman, Eric Nelson, Michael Nomura, Josean Ortiz-Medina, Edward Ponder, Tamecia Turner, Jeffery Willis, and Tristan Yumul, on their own behalf and on behalf of all those similarly situated, to the United States District Court of the District of Columbia to seek compensation and equitable relief for harms inflicted upon them in the United States ("U.S."), Kuwait, and Afghanistan by ManTech International Corp.; ManTech Telecommunications and Information Sys. Corp. (together hereinafter "ManTech"); Michael Brogan; Kevin Cody; Muge Cody; Bonnie Cook; Kathryn Romance, and The Carlyle Group, Inc. ("Defendants") for violations of the Trafficking Victims Reauthorization Protection Act ("TVPRA") and money laundering.

The acts and omissions giving rise to TVPRA liability occurred in the U.S., Kuwait, and Afghanistan and were perpetrated by Defendants as part of a scheme to become unjustly enriched from Contract No. W56HZV-12-C-0127 ("the Contract") entered into with the U.S. government. The Contract was for logistics sustainment and support for the Mine Resistant Ambush Protected family of vehicles ("MRAPs"). ManTech won this contract by offering dramatically reduced costs to the U.S. in servicing and repairing MRAPs. However, ManTech realized the reduced costs (and its corresponding profits) by abusing Plaintiffs in a manner prohibited by the TVPRA. Moreover, in their effort to enrich themselves from the Contract, Defendants denied Plaintiffs and absent class members personal protective equipment needed to protect them from workplace hazards including but not limited to isocyanates, toluene diisocyanate, and other chemicals. Such exposure initially inflicted harm on Plaintiffs in Kuwait, continues to cause suffering here in the U.S., and threatens

1

chronic future ill-health, with attendant emotional distress and financial loss, in the U.S. Defendants cultivated a workplace ethos wherein ManTech's management, led by its U.S.-based executives, instilled fear of summary employment termination among its workforce. Through fear of summary termination – with the attendant denial of unemployment benefits, the cessation of health insurance for family members living in the U.S., and the detrimental effect of "termination for cause" on future employment, ManTech could coerce compliance and submission to its will.

In addition to the specific acts of control and coercion perpetrated by Defendants, Defendants engaged in inherent coercion of Plaintiffs by denying them the right of redress through access to government. Under customary international law and the law of nations, as reflected in the Universal Declaration of Human Rights ("UDHR", Article 7, all are equal before the law and are entitled without any discrimination to equal protection of the law. UDHR Article 8 makes clear that everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted by law. UDHR Article 9 establishes that no one shall be subjected to arbitrary arrest, detention, or exile. Per UDHR Article 23, everyone has the right to work, to free choice of employment, to just and favorable conditions of work and to protection against unemployment. By transporting the mechanics to foreign locales where, by Defendants' design, they were denied the protection of law, Defendants engaged in a pervasive pattern of inherent coercion.

## **PARTIES**

*Plaintiffs Are U.S. Citizens Who Were Harmed by*
*Defendants' Violations of the TVPRA*

1.      Plaintiff **Michael Abernathy**  ("Abernathy"), a citizen of Texas, entered into an

employment contract with ManTech governed by the laws of the U.S. and was stationed by

ManTech at the U.S.-operated Kuwait Maintenance and Sustainment Facility ("KMSF") in Kuwait

during the relevant time of this lawsuit. ManTech directly or through its agent Millbrook

confiscated Abernathy's passport. Though the contract represented an employee-at-will

relationship allowing the mechanic to voluntarily leave employment at the timing of her or his

choosing, addenda to the contract threatened the mechanic with severe financial harm if the

mechanic left the overseas posing prior to the expiration of twenty-four months. ManTech directly

or through its agent Millbrook International Services, LTD. (dba in Kuwait as "Millbrook Kuwait";

hereinafter referred to as "Millbrook") confiscated Abernathy's passport. As ManTech's

employee, Abernathy suffered harm both in the U.S. and overseas consequent to Defendants' acts

and omissions in the U.S. and overseas.  Specifically, ManTech entered into a U.S.-law contract

to station Abernathy at the KMSF to service U.S. government-owned vehicles yet, because of

intentional acts and decisions made by Defendants within the U.S., caused Abernathy to be

violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of

acts and omissions made by ManTech within the U.S. and carried out in Kuwait, ManTech did not

obtain for Abernathy a valid Kuwait Resident Visa ("Visa 18"), or a valid work permit required to

have the benefit and protection of Kuwait's labor and workplace safety laws. Abernathy was

denied the workplace safety, overtime pay, and paid holiday he was entitled to under the laws of

the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from

ManTech's U.S. bank account into Abernathy's U.S. bank account, the harm inflicted from

ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Abernathy was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Abernathy in Kuwait and threaten him with chronic illness here in the U.S.

2.      Plaintiff **Cedrick Arthur** ("Arthur"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. As ManTech's employee, Arthur suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. Specifically, ManTech entered into a U.S.-law contract to station Arthur at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Arthur to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. ManTech directly or through its agent Millbrook confiscated Arthur's passport. Though the contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As a consequence of decisions and acts made by ManTech within the U.S. and carried out in Kuwait, ManTech did not obtain for Arthur a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Arthur was denied the workplace safety, overtime and paid holiday time he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Arthur's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S.

Through Defendants' acts and omissions, Arthur was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Arthur in Kuwait and threaten him with chronic illness here in the U.S.

3. Plaintiff **Larry Bess** ("Bess"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Bess's passport. Though the contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Bess suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  Specifically, ManTech entered into a U.S.-law contract to station Bess at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Bess to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by ManTech within the U.S. and carried out in Kuwait, ManTech did not obtain for Bess a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Bess was denied the protection of both the laws of the U.S. and the laws of Kuwait. Specifically, Bess was denied the protection of U.S. and Kuwait laws, overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Bess's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and

5

omissions, Bess was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Bess in Kuwait and threaten him with chronic illness here in the U.S.

4.      Plaintiff **Darius Cain** ("Cain"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Cain's passport. Though the contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Cain suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.   Specifically, ManTech entered into a U.S.-law contract to station Cain at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Cain to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Cain a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. ManTech directly or through its agent Millbrook confiscated Cain's passport. Because of Defendants acts and omissions in the U.S,  Cain was denied the overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Cain's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and

omissions, Cain was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Cain in Kuwait and threaten him with chronic illness here in the U.S.

5.      Plaintiff **Marcus Carter** ("Carter"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Carter's passport. Though the contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Carter suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions made in the U.S. and carried out in Kuwait. Specifically, ManTech entered into a U.S.-law contract to station Carter at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Carter to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Carter a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Carter was denied the protection of both the laws of the U.S. and the laws of Kuwait. Specifically, Carter was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Carter's U.S. bank account, the harm inflicted from ManTech's denied compensation was

suffered within the U.S. Through Defendants' acts and omissions, Carter was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Carter in Kuwait and threaten him with chronic illness here in the U.S.

6.     Plaintiff **Mario Cavazos** ("Cavazos"), a citizen of Texas, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Cavazos's passport. Though the contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Cavazos suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  Specifically, ManTech entered into a U.S.-law contract to station Cavazos at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Cavazos to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Cavazos a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Cavazos was denied the protection of both the laws of the U.S. and the laws of Kuwait. Specifically, Cavazos was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Cavazos's U.S.

bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Cavazos was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Cavasos in Kuwait and threaten him with chronic illness here in the U.S.

7.    Representative Plaintiff **Mike Cowley** ("Cowley"), a citizen of Texas, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Cowley's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Cowley suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. Specifically, ManTech entered into a U.S.-law contract to station Cowley at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Cowley to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Cowley a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. ManTech directly or through its agent Because of Defendants acts and omissions in the U.S., Cowley was denied the protection of both the laws of the U.S. and the laws of Kuwait. Cowley was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of

Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Cowely's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Cowley was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Cowley in Kuwait and threaten him with chronic illness here in the U.S.

8.      Plaintiff **Bonita Cromartie** ("Cromartie"), a citizen of South Carolina, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Cromartie's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Cromartie suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Cromartie at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Cromartie to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Cromartie a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Cromartie was denied the protection of both the laws of the U.S. and the laws of Kuwait. Cromartie was denied the overtime pay and

paid holiday she was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Cromartie's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Cromartie was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Cromartie in Kuwait and threaten him with chronic illness here in the U.S.

9.    Plaintiff **Vernon Dasher** ("Dasher"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Dasher's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Dasher suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Dasher at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Dasher to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Dasher a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Dasher was denied the protection of both the laws of the U.S. and the laws of Kuwait. Dasher was

11

denied the overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Dasher's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Dasher was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Dasher in Kuwait and threaten him with chronic illness here in the U.S.

10.    Plaintiff **Misael Diaz** ("Diaz"), a citizen of New York, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Diaz's passport. Diaz was denied the protection of both the laws of the U.S. and the laws of Kuwait. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Diaz suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Diaz at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Diaz to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Diaz a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Diaz was denied the workplace safety, overtime pay, and paid holidays he was entitled

to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Diaz's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Diaz was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Diaz in Kuwait and threaten him with chronic illness here in the U.S.

11.     Plaintiff **Jason Foster** ("Foster"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Foster's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Foster suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Foster at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Foster to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Foster a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Foster was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's

13

payments were made from ManTech's U.S. bank account into Foster's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Foster was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Foster in Kuwait and threaten him with chronic illness here in the U.S.

12.    Plaintiff **Delonte Green** ("Green"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Green's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Green suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Green at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Green to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Green a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Green was denied the protection of both the laws of the U.S. and the laws of Kuwait. Green was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Green's U.S. bank

account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Green was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Green in Kuwait and threaten him with chronic illness here in the U.S.

13.     Plaintiff **Jerome Greene** ("Greene"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Greene's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Greene suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Greene at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Greene to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Greene a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Greene was denied the workplace safety, overtime pay, and paid holidays he was protection of both the laws of the U.S. and the laws of Kuwait. Greene was denied the overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Greene's U.S. bank account, the harm inflicted from

ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Greene was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Greene in Kuwait and threaten him with chronic illness here in the U.S.

14.    Representative Plaintiff **Christopher Jacobs** ("Jacobs"), a citizen of Alabama, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Jacobs's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Jacobs suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Jacobs at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Jacobs to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Jacobs a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Jacobs was denied the workplace safety, overtime pay, and paid holidays he was protection of both the laws of the U.S. and the laws of Kuwait. Jacobs was denied the overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Jacobs's U.S. bank account, the harm inflicted

from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Jacobs was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Jacobs in Kuwait and threaten him with chronic illness here in the U.S.

15.    Plaintiff **Ryan Jakubowski** ("Jakubowski"), a citizen of Maryland, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Jakubowski's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Jakubowski suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Jakubowski at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Jakubowski to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Jakubowski a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Jakubowski was denied the protection of both the laws of the U.S. and the laws of Kuwait. Jakubowski was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Jakubowski's U.S. bank account, the harm

inflicted from ManTech's denied compensation was suffered within the U.S. Additionally, Jakubowski was denied the protection of both the laws of the U.S. and the laws of Kuwait with respect to workplace safety. Jakubowski was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the U.S. or the laws of the State of Kuwait. Through Defendants' acts and omissions, Jakubowski was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Jakubowski in Kuwait and threaten him with chronic illness here in the U.S.

16.    Plaintiff **Kyle Kendrick** ("Kendrick"), a citizen of Texas, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Kendrick's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Kendrick suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Kendrick at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Kendrick to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Kendrick a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Kendrick was denied

the protection of both the laws of the U.S. and the laws of Kuwait. Kendrick was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Kendrick's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Kendrick was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Kendrick in Kuwait and threaten him with chronic illness here in the U.S.

17.    Plaintiff **Justin Logan** ("Logan"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Logan's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Logan suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Logan at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Logan to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Logan a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Logan was

19

denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Logan's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Logan was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Logan in Kuwait and threaten him with chronic illness here in the U.S.

18.     Plaintiff **Alton McNeil** ("McNeil"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated McNeil's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, McNeil suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed McNeil at the U.S.-operated KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused McNeil to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for McNeil a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. ManTech directly or through its agent Millbrook confiscated McNeil's passport. McNeil was

denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into McNeil's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, McNeil was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on McNeil in Kuwait and threaten him with chronic illness here in the U.S.

19.    Plaintiff **LaDarius Phillips** ("Phillips"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Phillips's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Phillips suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Phillips at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Phillips to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Phillips a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Phillips was denied the workplace safety, overtime pay, and paid holidays he was

entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Phillips's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Phillips was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Phillips in Kuwait and threaten him with chronic illness here in the U.S.

20.    Plaintiff **Frank Lambey** ("Lambey"), a citizen of California, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Lambey's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Lambey suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Lambey at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Lambey to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of acts and omissions made by Defendants within the U.S. and carried out in Kuwait, ManTech did not obtain for Lambey a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Lambey was denied the protection of both the laws of the U.S. and the laws of Kuwait. Lambey was denied the workplace safety,

overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Lambey's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Lambey was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Lambey in Kuwait and threaten him with chronic illness here in the U.S.

21.    Plaintiff **Lawrence Freeman** ("Freeman"), a citizen of Tennessee, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Freeman's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Freeman suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Freeman at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Freeman to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Freeman a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Freeman was denied the protection of both the laws of the U.S. and the laws of Kuwait.

Freeman was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Freeman's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Freeman was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Freeman in Kuwait and threaten him with chronic illness here in the U.S.

22.     Plaintiff **Eric Nelson** ("Nelson"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Nelson's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Nelson suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Nelson at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Nelson to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Nelson a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Nelson at constant risk of being arrested. Nelson was denied the protection of both the laws of the U.S. and the laws of Kuwait with respect to workplace safety.

Nelson was not provided the personal protective equipment, ventilator, or other safety equipment he would have been provided under the laws of the U.S. or the laws of the State of Kuwait. Through Defendants' acts and omissions, Nelson was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Nelson in Kuwait and threaten him with chronic illness here in the U.S.

23.     Plaintiff **Michael Nomura** ("Nomura"), a citizen of California, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Nomura's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Nomura suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Nomura at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Nomura to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Nomura a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Nomura was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Nomura's U.S. bank account, the harm inflicted from ManTech's denied compensation was

suffered within the U.S. Through Defendants' acts and omissions, Nomura was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Nomura in Kuwait and threaten him with chronic illness here in the U.S.

24.     Plaintiff **Josean Ortiz-Medina** ("Ortiz-Medina"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Ortiz-Medina's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Ortiz-Medina suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.   ManTech stationed Ortiz-Medina at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Ortiz-Medina to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Ortiz-Medina a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., Ortiz-Medina was denied the overtime pay and paid holiday he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Ortiz-Medina's U.S. bank account, the harm inflicted from ManTech's denied compensation

was suffered within the U.S. Through Defendants' acts and omissions, Ortiz-Medina was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Ortiz-Medina in Kuwait and threaten him with chronic illness here in the U.S.

25.    Plaintiff **Edward Ponder** ("Ponder"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Ponder's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Ponder suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Ponder at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Ponder to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Ponder a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S.,  Ponder was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Ponder's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and

omissions, Ponder was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Ponder in Kuwait and threaten him with chronic illness here in the U.S.

26.    Representative Plaintiff **Tamecia Turner** ("Turner"), a citizen of Alabama, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Turner's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Turner suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas. ManTech stationed Turner at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S. and carried out in Kuwait, caused Turner to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Turner a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S.,  Turner was denied the protection of both the laws of the U.S. and the laws of Kuwait. Turner was denied the workplace safety, overtime pay, and paid holidays she was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Turner's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through

Defendants' acts and omissions, Turner was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Turner in Kuwait and threaten him with chronic illness here in the U.S.

27.     Plaintiff **Jeffery Willis** ("Willis"), a citizen of Mississippi, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Willis's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Willis suffered harm both in the U.S. and overseas consequent to Defendants' acts and omissions in the U.S. and overseas.  ManTech stationed Willis at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Willis to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Willis a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Willis was denied the protection of both the laws of the U.S. and the laws of Kuwait. Willis was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Willis's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Willis was subject to severe workplace hazards that included exposure to isocyanates,

toluene diisocyanate, and other chemicals. Such exposures inflicted harm on Willis in Kuwait and threaten him with chronic illness here in the U.S.

28.    Plaintiff **Tristan Yumul** ("Yumul"), a citizen of California, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated Yumul's passport. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, Yumul suffered harm both in the U.S. and Kuwait consequent to Defendants' acts and omissions in the U.S. and overseas. Specifically, ManTech entered into a U.S.-law governed contract to station Yumul at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused Yumul to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for Yumul a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S.,  Yumul was denied the workplace safety, overtime pay, and paid holidays he was entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank account into Yumul's U.S. bank account, the harm inflicted from ManTech's denied compensation was suffered within the U.S. Through Defendants' acts and omissions, Yumul was subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other

chemicals. Such exposures inflicted harm on Yumul in Kuwait and threaten him with chronic illness here in the U.S.

29.     The **Absent KMSF Class Members.** Absent Class members are citizens of the U.S., who entered into employment contracts with ManTech governed by the laws of the U.S. and were stationed by ManTech at the U.S.-operated KMSF during the relevant time giving rise to this complaint. ManTech directly or through its agent Millbrook confiscated absent class members' passports. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months. As ManTech's employee, absent class members suffered harm both in the U.S. and Kuwait consequent to Defendants' acts and omissions in the U.S. and overseas. Specifically, ManTech entered into a U.S.-law governed contract to station absent class members at the KMSF to service U.S. government-owned vehicles yet, because of intentional acts and decisions made by Defendants within the U.S., caused absent class members to be violation of Kuwaiti law, subject to arrest, incarceration, and deportation. As a consequence of decisions and acts made by Defendants within the U.S., ManTech did not obtain for absent class members a valid Kuwait Resident Visa ("Visa 18") or a valid work permit required to have the benefit and protection of Kuwait's labor and workplace safety laws. Because of Defendants acts and omissions in the U.S., the absent class members were denied the workplace safety, overtime pay, and paid holidays they were entitled to under the laws of the U.S. and the laws of the State of Kuwait. Given that ManTech's payments were made from ManTech's U.S. bank accounts to, generally speaking, U.S. bank accounts,  the harm inflicted from ManTech's denied compensation was suffered predominantly within the U.S. Through Defendants' acts and

31

omissions, the absent class members were subject to severe workplace hazards that included exposure to isocyanates, toluene diisocyanate, and other chemicals. Such exposures inflicted harm on the absent class members in Kuwait and threaten them with chronic illness here in the U.S.

### *Defendants Are U.S. Citizens Who Violated U.S. Law by Violating the TVPRA and Participating in a Venture that Profited from Violations of the TVPRA*

30.    Defendant **ManTech International Corporation** ("MT International") is a Delaware corporation with offices in the District of Columbia at 1100 New Jersey Avenue, SE Suite 740, Washington, D.C. 20003 and 600 Maryland Avenue, SW, Washington, D.C. 20024. MT International is a publicly traded company that provides defense-related services to the U.S. Government in the District of Columbia and throughout the world.

31.    Defendant **ManTech Telecommunications and Information Systems Corporation** ("MT Telecom"), at times relevant to this complaint was a wholly owned subsidiary of MT International, incorporated in Delaware and based in Virginia, with a registered agent for service of process located in the District of Columbia. at 1015 15th Street, NW, Suite 1000, Washington, D.C. 20005. MT Telecom transacted considerable, ongoing business in the District of Columbia with various U.S. government agencies, in its own name and through MT International. On information and belief, MT Telecom merged in 2013 with and into ManTech Advanced Systems International, Inc., a Virginia corporation and subsidiary of ManTech International Corporation. Accordingly, all allegations made against MT Telecom are made against ManTech Advanced Systems International, Inc. For ease of review, MT International, MT Telecom, and ManTech Advanced Systems International, Inc. are referred to herein as "ManTech." On information and belief, ManTech is now wholly-owned by The Carlyle Group, Inc.

32.    Defendant **Michael Brogan** ("Brogan") is a resident of Virginia. At times relevant to this complaint,  Brogan served as ManTech's Senior Vice President for Strategy with authority over ManTech's operations in Kuwait. All the acts and omissions giving rise to Defendant Brogan's liability under the TVPRA were committed within the U.S. As Senior Vice President for Strategy, and as is detailed below, Brogan had firsthand knowledge of, and participated in, and personally obtained unjust riches derived from abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPRA. Brogan had knowledge of the abuses of Kuwait law through email communication and through briefings provided by a variety of persons working on the Contract. Defendant Brogan's participation in the venture described herein consisted of a variety of acts including, *inter alia*, instructing junior staff members to conceal facts that might cause ManTech's abuse of Kuwait's immigration and labor laws to be detected; colluding with Millbrook, as described *infra* to create the false impression that Plaintiffs and absent class members were employed by Millbrook; approving and acting in furtherance of a scheme whereby ManTech funds were wired to the Millbrook in the UK so that Millbrook, in Kuwait, could make the false and illegal representation to the Kuwaiti government that Millbrook was paying Plaintiffs and absent class members as if they were Millbrook's own employees; and consenting to and ratifying illegal conduct wherein Plaintiffs and absent class members were ordered to execute "visa runs" (described *infra*) in order to circumvent Kuwait's laws. For what ManTech viewed to be Defendant Brogan's efforts on the Contract (including tacit approval of the bad acts in further of the venture herein described), ManTech awarded Defendant Brogan stock and bonuses. As one who personally profited by furthering ManTech's violations of the TVPRA, Defendants Brogan is liable to Plaintiffs and absent class members under 18 U.S.C. §1595.

Defendant Brogan is also named as a Defendant because he has riches subject to the restitution pursuant to the TVPRA.

33.    Defendant **Kevin Cody** ("K. Cody") is a resident of Virginia. At times relevant to this complaint,  K. Cody served as ManTech Business Unit President of ManTech's Global Contingency Operations division, a subdivision of ManTech's Technical Services Group Systems Sustainment and Integrated Logistics Business Unit ("TSG SSILOG" Business Unit). As Business Unit President, K. Cody was the person responsible for winning the bid to perform the Contract. Most, if not all, of the acts and omissions giving rise to Defendant K. Cody's liability under the TVPRA were committed within the U.S. Cody had firsthand knowledge of, participated in, and personally obtained unjust riches from the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPRA. Defendant K. Cody's participation in the venture described herein consisted of a variety of acts including, *inter alia*, submitting to the Army bid on the Contract that could not realize a profit for ManTech unless ManTech coerced its employees to work at the KMSF and in Afghanistan, denied them wages due under the law, and avoided the cost of complying with Kuwait's immigration and labor laws. Moreover, K. Cody participated in a coverup of ManTech's wrongdoing and was an active participant in the venture's efforts to keep Plaintiffs and absent class members ignorant of the fact that their presence in Kuwait violated the law, that they were entitled to benefits and overtime compensation under Kuwait's law, and that they were entitled to paid time off under Kuwait law. For what ManTech viewed to be Defendant K. Cody's efforts on the Contract (including tacit approval of the bad acts in further of the venture herein described), ManTech awarded Defendant K. Cody stock and bonuses. As one who personally profited by furthering ManTech's violations of the TVPRA, Defendants Brogan is

liable to Plaintiffs and absent class members under 18 U.S.C. §1595. Defendant Brogan is also named as a Defendant because he has riches subject to the restitution pursuant to the TVPRA.

34.    Defendant **Muge Cody** ("M. Cody") is a resident of Virginia. At times relevant to this complaint,  M. Cody served as Vice President for ManTech's Ground Systems Operations or Program Manager of the Contract. As is detailed below, M. Cody was a participant in, and personally obtained unjust riches from the venture described herein. Specifically, M. Cody transported Plaintiffs and absent class members into Kuwait with actual notice that their presence there was illegal. M. Cody engaged in abusive conduct towards Plaintiffs and absent class members, including summary firings, designed to intimidate the workforce put them in fear of disobeying ManTech commands with respect to visa runs, the confiscation of Plaintiffs' and absent class members' passports, and the payment of overtime. M. Cody also instructed other ManTech employees conceal facts that might cause ManTech's abuse of Kuwait's immigration and labor laws to be detected; colluded with Millbrook, as described *infra* to create the false impression that Plaintiffs and absent class members were employed by Millbrook; approved and acted in furtherance of a scheme whereby Millbrook faked salary payments to Plaintiffs and absent class members to provide the appearance that the mechanics working at the U.S.-operated KMSF were Millbrook's employees. Defendant K. Cody also ordered that Plaintiffs and absent class members participate in "visa runs" (described *infra*) to circumvent Kuwait's laws. For what ManTech viewed to be Defendant M. Cody's efforts on the Contract (including tacit approval of the bad acts in further of the venture herein described), ManTech awarded Defendant M. Cody stock and bonuses. As one who personally profited by furthering ManTech's violations of the TVPRA, Defendants M. Cody is liable to Plaintiffs and absent class members under 18 U.S.C. §1595.

Defendant M. Cody is also named as a Defendant because she has riches subject to the restitution pursuant to the TVPRA.

35.    Defendant **Bonnie Cook** ("Cook") is a resident of Virginia. At times relevant to this complaint, Cook served as the Senior Vice President for Business Operations for ManTech Technical Services Corporation. As is detailed below, Cook had firsthand knowledge of, participated in, and obtained unjust riches from the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPRA. All the acts and omissions giving rise to Defendant Cook's liability under the TVPRA were committed within the U.S. Cook concealed from Plaintiffs and absent class members information that would have revealed to the mechanics that their presence and work in Kuwait was illegal. Cook gave false information to the U.S. Army, false information that was designed to conceal ManTech's relationship with Millbrook and abuses of Kuwait's immigration and labor laws. Cook ratified the scheme whereby ManTech sent money to Millbrook so that Millbrook to mislead the Kuwaiti government into believing that Millbrook was paying a salary to the mechanics working at the KMSF. For what ManTech viewed to be Defendant Cook's efforts on the Contract (including tacit approval of the bad acts in further of the venture herein described), ManTech awarded Defendant Cook stock and bonuses. As one who personally profited by furthering ManTech's violations of the TVPRA, Defendants Cook is liable to Plaintiffs and absent class members under 18 U.S.C. §1595. Defendant Cook is also named as a Defendant because she has riches subject to the restitution pursuant to the TVPRA.

36.    Defendant **Kathryn Romance** ("Romance") is a resident of Virginia. At times relevant to this complaint,  Romance served as ManTech's Procurement Manager with authority over ManTech's operations in Kuwait as well as serving in other corporate leadership positions. As ManTech's Procurement Manager, and as is detailed below,  Romance had firsthand knowledge

of, and participated in, the abuses of Kuwaiti law, coercive conduct, and predicate acts giving rise to liability under the TVPRA. All the acts and omissions giving rise to Defendant Romance's liability under the TVPRA were committed within the U.S. Romance concealed from Plaintiffs and absent class members that they were entitled to compensation and benefits under Kuwait law. Moreover, Romance participated in a scheme wherein Plaintiffs and absent class members were forced to sign letters that falsely represented to the Kuwaiti government that not only were they employees of Millbrook but that Millbrook, as their employer, had provided them with all the benefits and protections owed to them under Kuwaiti law. Defendant Romance also had knowledge and provided approval of illegal turn and burn visa runs to Bahrain designed to frustrate Kuwait's immigration and labor laws. For what ManTech viewed to be Defendant Romance's efforts on the Contract (including tacit approval of the bad acts in further of the venture herein described), ManTech awarded Defendant Romance stock and bonuses. As one who personally profited by furthering ManTech's violations of the TVPRA, Defendants Romance is liable to Plaintiffs and absent class members under 18 U.S.C. §1595. Defendant Romance is also named as a Defendant because she has riches subject to the restitution pursuant to the TVPRA.

37.    Defendant **The Carlyle Group, Inc.** ("Carlyle") is a publicly-traded (NASDAQ "CG") multinational private equity, alternative asset management and financial services corporation based in Washington, DC with $376 billion of assets under management. The wage theft complained of herein and the unjust riches realized by ManTech have now been absorbed by Caryle. As Carlyle is now the custodian of Plaintiffs' stolen wages and ManTech's unjust riches, it is now subject to an order of restitution pursuant to 18 U.S.C. §1593 and is named as a Defendant pursuant to that obligation. Moreover, by purchasing ManTech with notice that ManTech had engaged in wage theft and had enriched itself through violations of the TVPRA, The Carlyle Group

is liable under the TVPRA for participating and realizing profits from a venture which has engaged in forced labor.

38.    As the Contract was the largest contract ever performed by ManTech, the unjust riches obtained by ManTech through violations of the TVPRA during performance of the Contract caused ManTech's stock to increase in value thus personally enriching Defendants Brogan, K. Cody, M. Cody, Cook, and Romance.   Defendants Brogan, K. Cody, M. Cody, Cook, and Romance benefited financially by participating in a venture that engaged in forced labor. Defendants, including Carlyle, are joint and severally liable for the offenses described herein. Carlyle, with explicit notice and a duty to investigate ManTech's trafficking activities, chose to purchase ManTech whose value had been inflated by the unjust riches realized through trafficking activity. Thus, with actual knowledge, Carlyle incorporated the value of ManTech's unjust enrichment into its purchase price of ManTech and thus, itself, intended to be unjustly enriched through its purchase of ManTech. By doing so, Carlyle further enriched and rewarded the other Defendants for their TVPRA violations. Moreover, on information and belief, between announcing its intention to purchase ManTech on or about May 16, 2022 and its consummation of that purchase on or about September 15, 2022, Carlyle joined a venture that had been created for the purpose of defeating attempts to disgorge the unjust enrichment ManTech had obtained through its TVPRA violations. By joining this venture, Carlyle, itself, sought to become unjustly enriched from ManTech's TVPRA violations.

## JURISDICTION AND VENUE

39.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1332, 1367 and 3730(b), and as Plaintiffs are U.S. citizens seeking relief from the Court pursuant to Chapter 77, Peonage, Slavery, and Trafficking in Persons, 18 U.S.C. §§1581 *et seq*. Defendants are U.S citizens found within the U.S.

40.     This Court has subject matter jurisdiction in this case because most of the acts and omissions giving rise to Defendants' liability under the TVPRA were committed within the U.S. Moreover, many of the harms inflicted upon Plaintiffs, including loss of income and long-term effects from exposure to the lack of protection from the chemical pollution at the U.S.-operated KMSF, were and are being experienced within the U.S. The acts and omissions complained of herein touch and concern the U.S. in a manner that compels this court to exercise subject matter jurisdiction consistent with the imperatives of halting violations of Chapter 77 of the U.S. Code.

41.     The Court has subject matter over this action because, the U.S. District Court has duty under international law to hold to account Defendants for doing injury in a manner that offends international efforts at eradicating forced labor. The Court cannot permit Defendants to use the U.S. as a safe harbor where U.S. citizens may inflict harms overseas.

42.     The Court has personal jurisdiction over Defendants consistent with the Fifth Amendment of the U.S. Constitution. Defendants pervasive contacts with the U.S. is evidenced by the fact that Defendants drew mechanics from a wide variety of states into their forced labor scheme and made them victims. The Court also has personal jurisdiction over Defendants because Defendants' acts and omissions were appurtenant to a contract with the United States.

43.    The Court has personal jurisdiction over Defendants Brogan, K. Cody, M. Cody, Cook, and Romance because, during their time working at ManTech, they regularly traveled to and did ManTech business within the District of Columbia.

44.    The Court has personal jurisdiction over Defendants as there is pending, before this court, a related case, *United States ex rel. Larry Hawkins et al. v. ManTech International Corp.*, 15-cv-02105.

45.    Should the Court find that lacks personal jurisdiction over Defendants, Plaintiffs, by and through Plaintiff Jakubowski (a resident of the State of Maryland who has suffered damages within the State of Maryland consequent to Defendants' violation of the TVPRA) request a transfer to the U.S. District Court for the District of Maryland where a case, *United States ex rel. Fadlalla et al. v. DynCorp International, LLC et al.*, 15-cv1806, which addresses similar issues of ManTech's compliance with the TVPRA and the alleged abuse of Kuwait's immigration and labor law, is pending.

46.    Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(3) and 3732(a), as Carlyle is headquartered in Washington, DC and regularly conducts business in Washington, DC. Also, ManTech has conducted a continuous, robust course of business in the District of Columbia, maintaining offices in the District of Columbia and contracting with various U.S. government agencies based in the District of Columbia. Venue is appropriate for the remainder of Defendants as they were employees of ManTech, visited Washington, DC, and its immediate suburbs as a regular course of conducting their business in DC, and could reasonably be expected to be haled into court in Washington, DC.

## COUNT 1
### Violations of the TVPRA
### 18 U.S.C. §§ 1581, *et seq.*

47.     The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

48.     Plaintiffs bring this count under18 U.S.C. § 1581, *et seq.*

49.     Section 1595 of the TVPRA allows private citizens to sue a perpetrator who has violated the TVPRA.

50.     A Defendant is liable under the TVPRA if her or she knowingly provides or obtains the labor or services of a person by means of harm or threats of serious harm to that person or another person; abuse or threatened abuse of law or legal process; or any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. 18 U.S.C. § 1589(a).

51.     Section 1592 establishes that whoever knowingly conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person – in the course of a violation of section 1589 with intent to violate section 1589; or to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the services of that person, is liable under the TVPRA.

### *ManTech and Millbrook Confiscated Plaintiffs' Passports in Violation of 18 U.S.C. §1592*

52.     Pursuant to policies adopted in the U.S. and implemented in Kuwait, ManTech regularly took Plaintiffs' passports from them and denied Plaintiffs' possession of their passports for weeks and months at a time.

53.     ManTech gave Millbrook possession of Plaintiffs passports thereby further denying Plaintiffs' access to their own passports for weeks and months at a time. Typically, Millbrook would only return passports for the limited purpose of requiring Plaintiffs to execute a "visa run" to Bahrain. However, Millbrook would typically confiscate Plaintiffs' passport again immediately upon their return from Bahrain.  *See* discussion *infra*.

### *ManTech Threatened Plaintiffs with Serious Financial and Professional Harm if They Left Their Overseas Station*

54.     In calculating the costs associated with ManTech's bid for the Contract, K. Cody and M. Cody had made certain assumptions about ManTech's ability to lower the compensation of ManTech's workforce as compared to the compensation that had been paid by the incumbent contractors. However, after the U.S. accepted ManTech's bid for the contract, K. Cody and M. Cody realized that ManTech would experience dramatic attrition of qualified mechanics due to ManTech's planned compensation cuts. The expected attrition was expected to be so high that K. Cody and M. Cody believed that ManTech would be unable to perform the Contract as signed.

55.     K. Cody and M. Cody notified ManTech's senior management that ManTech needed to adjust upwards the cost of ManTech to perform the contract to maintain the financial incentive for the incumbent and incoming workforce of mechanics to service the MRAP vehicles. However, ManTech's senior management refused the recommended upward adjustment in compensation.

56.     With the prospect that ManTech would lose a significant number of personnel in the face of planned (and executed) compensation cuts, ManTech created a coercive mechanism to keep qualified mechanics working at the KMSF and other locations. The MRAP-FOV Contract Offer Addendum – SSILOG, Host Nation Sponsorship & Work Visa- Kuwait (CIVIL ID) provided just such coercion. It stated:

Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. Once the process is completed, *should you decide to terminate employment, or are terminated for any reason*, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, *you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa*. In this event, ManTech will make a determination of financial obligation based on the current circumstances. *Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees. If terminated, you may also be responsible for employment and deployment costs* as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum.

Emphasis added.

57.     The Addendum threated to saddle the Plaintiffs and absent class members with the burden of reimbursing ManTech $15,000 for the cost of compliance with host nation laws if the mechanic did not finish two years of employment in Kuwait. This $15,000.00 amount not only did not corollate with ManTech's actual cost of compliance, but it could also not have correlated with such costs because ManTech, itself, did not know the cost of compliance with Kuwait's immigration and labor laws. The Addendum was created to threaten financial harm to force incumbent KMFS mechanics to stay on the job and to discourage newly-hired mechanics from exercising their rights as alleged "at-will" employees.

58.     The same was true of the "MRAP-FOV Contract Offer Addendum Contract Mandated Training and Training Certification." It stated:

In the event that you fail to complete an assigned training course or fail to complete an obligated employment period under this contract and defined in this offer, you will be required to reimburse prorated costs related to the training and certification process. You further

understand and agree that in the event your employment with ManTech is voluntarily terminated or terminated for cause before you complete this commitment period, you will be required to reimburse training related expenses as defined above on a prorated basis (1/12th for each month that your employment term is short of the twelve (12) month commitment). *Ibid* (emphasis added).

### *ManTech and Millbrook Confiscated Plaintiffs' Passports, Forced Plaintiffs to Work Without the Protection of Any Nation's Laws and Denied Them the Compensation and Benefits of U.S. and Kuwaiti Law*

59.    In Kuwait, ManTech controlled Plaintiffs and absent class members' lives. Specifically, ManTech directly or through its agent Millbrook, confiscated Plaintiffs' passports upon their arrival in Kuwait.

60.    Plaintiffs' average day, Monday through Saturday, consisted of waking up 4:00 a.m. to be picked up by a ManTech bus from the ManTech-provided apartment at 5:00 a.m. The ManTech work facility was approximately an hour drive away. After signing in at the KMSF, Plaintiffs started work at 7:00 a.m. Plaintiffs were provided a fifteen-minute break at 9:15 a.m. Plaintiffs were provided a one-hour break from 11:30-12:30 – a time that Plaintiffs and most employees would try to venture outside of the KMSF facility to obtain fresh air. Frequently, however, the outside desert conditions were too severe to venture outside, and Plaintiffs were forced to take their lunch break within the toxic fume/smoke-filled FMSF facility. Plaintiffs were provided another fifteen-minute break at 3:00 p.m. Their workday ended at 6:00 p.m. After clocking out reboarding the ManTech bus back to their ManTech-provided apartment, Plaintiffs were in their own living quarters at 7:30 p.m. They had virtually no personal freedom except to work, shower, relieve themselves, and go to bed to be ready to rise again at 4:00 a.m. Plaintiffs were provided one day off per week. Sunday was the only day that the mechanics could catch up on sleep, shop for food, communicate with family members, or get fresh air.

61.    ManTech told Plaintiffs that it would be responsible, as their employer, for obtaining all the immigration approvals and work permits needed for them to work in Kuwait. Through such statements, Plaintiffs were led to believe that ManTech would act in accordance with the law in obtaining the necessary immigration approvals and necessary authorizations for Plaintiffs to work legally in Kuwait.

62.    ManTech further controlled Plaintiffs by confiscating, or allowing ManTech's agent Millbrook, to confiscate their passports. The decision to confiscate Plaintiffs' passports was made in the U.S. Because ManTech held their passports, Plaintiffs could not leave Kuwait without ManTech's permission.

63.    The Kuwait Private Sector Labor Law ("KPSLL") mandates that "the replacement of the expatriate labor force by the national labor force – whenever it can be possible – . . . is one of the main objectives of the State that should finally be achieved." Explanatory Memorandum Law No. (6) of 2010 Concerning Private Sector Labour Law Explanatory Memorandum, pp. 45-6. Expatriates, such as Plaintiffs, cannot work in Kuwait unless they subject themselves to Kuwait's laws.

64.    Article 10 of the KPSLL states: "The employer is banned to employ foreign labor force unless they are duly authorized by the Competent Authority to work for him."

65.    Article 10 further states, "If the worker abandons coming to his work and worked for another employer, the employer shall be obliged to return the employer back to his home country, upon registering an absconding notice against the worker by his main sponsor."

66.    The issuance of a Resident Visa (frequently and hereinafter referred to as a "Visa 18") is a pre-condition to working legally in Kuwait. To qualify for a Visa 18, the Kuwait-national owned company must apply for authorization from the Ministry of Labor and Social Affairs

("MOSAL") for permission to employ such foreign national workers. This application includes submitting information about the prospective employee's qualifications to be a resident alien working in Kuwait such as a criminal records background check, a medical examination, and the provision of important information including fingerprints. If MOSAL approves a Kuwaiti company's application to employ a foreign worker, the necessary Visa 18, Work Authorization, and Civil Identification number are issued to the Kuwait company and the foreign national is then authorized to work as an employee of the Kuwaiti-owned company.

67.    Defendants were on notice that it is illegal for foreign national companies, such as ManTech, to directly employ foreign national workers in Kuwait. Notwithstanding this notice, ManTech directly employed Plaintiffs and absent class members in Kuwait. To hide this illegality, Defendants entered into an illegal contract with Millbrook. *See infra.*

68.    Defendants were on notice that only companies that are majority owned by Kuwait nationals may provide employment in Kuwait. Notwithstanding this notice, ManTech colluded with Millbrook to falsely represent to the Kuwait government that Plaintiffs worked for Millbrook. In furtherance of this misrepresentation, Millbrook took control of Plaintiffs passports.

69.    Defendants were on notice that for foreign nationals to work legally in Kuwait, they must be employed by a Kuwaiti-national owned company, and they must obtain a Resident Visa – a resident visa that ensures that, as a resident of Kuwait, they are subject to Kuwait's laws. Notwithstanding this notice, Defendants colluded with Millbrook to have the Kuwaiti government issue Resident Visas in Millbrook's name based on the false representation that Plaintiffs worked for Millbrook.

70.    Defendants abused Kuwait's laws because, during all times pertinent to this complaint, Plaintiffs were not duly authorized by any competent authority to work for ManTech

and their presence in Kuwait was illegal. Further, ManTech and the other Defendants engaged in a pattern of behavior designed to hide from Kuwaiti authorities that Plaintiffs were not authorized to work in Kuwait. In addition, Defendants hid from Plaintiffs the benefits, including enhanced income, that they would receive if ManTech had complied with the KPSLL.

71.     Defendants were on notice that it was illegal for Plaintiffs to enter, work, and live in Kuwait without proper immigration and employment authorization. However, compliance with Kuwait's immigration and KPSLL would be expensive for ManTech, erode its profitability, and make it less likely that the individual defendants would realize bonuses and additional stock. Moreover, a drop in profitability would lead to a decrease in ManTech's stock value thereby eroding the individual's personal wealth.

72.     Early in ManTech's deployment to Kuwait,  M. Cody lamented in an email that was widely circulated among ManTech's senior management that she had 46 employees illegally in present in Kuwait, stating, "I have 46 people I (sic) Kuwait with no sponsor. Government will notice . . . soon."

73.     Defendants were on notice that it was illegal for Plaintiffs to remain in Kuwait after the expiration of a temporary entry visa such as a "tourist" or a "commercial" visa (a commercial visa is also known as a "Visa 14" and is issued to professionals for the purpose of transacting business, but not for the purpose of being employed in Kuwait).

74.     For Plaintiffs to have current tourist visas, ManTech forced them to engage in "visa runs" (otherwise known as "turn and burns") wherein Plaintiffs were forced to fly out of Kuwait to a third country, usually Bahrain, turn around and fly back into Kuwait so that a fresh entry stamp could be made in that employee's passport. To facilitate this visa run, ManTech arranged for the effected employee to meet a Millbrook representative in the early hours of the morning to receive

his or her passport to facilitate travel. When the ManTech employee returned from Bahrain the night of the same day, that employee was instructed by ManTech to surrender their passport back to Millbrook.

75.     ManTech was ruthless in its policy of forcing Plaintiffs to engage in turn and burns. On January 6, 2013, six ManTech employees (Chester Rodriguez, Randy Bennett, Gregory Fuller, Julian Poe, Edward Broeder, and Timothy Jennings) refused to participate in a turn and burn to Bahrain and back. Upon learning that these employees had failed to obey the directions given to them by ManTech's in-country management, ManTech's U.S.-based executives M. Cody and Brogan terminated Rodriguez, Bennett, Fuller, Poe, Broeder, and Jennings. On information and belief, ManTech charged these employees for the cost of transporting them back to the U.S. ManTech intended that swift, public termination of Rodriguez, Bennett, Fuller, Poe, Broeder, and Jennings would serve as a warning to the rest of its Kuwait workforce about the consequences of disobeying ManTech's instruction.

76.     ManTech forced Ortiz-Medina, Willis, and Logan to execute a visa run on or about February 3, 2013. Absent class members also were forced to execute a visa run on this date.

77.     ManTech forced Bess and Carter to execute a visa run on or about February 6, 2013. Absent class members also were forced to execute a visa run on this date.

78.     ManTech forced Ponder, Phillips, Jakubowski, Foster, and Greene to execute a visa run on or about February 7, 2013. Absent class members also were forced to execute a visa run on this date.

79.     ManTech forced Phillips, Turner, and Yumul to execute a visa run on or about February 10, 2013. Absent class members also were forced to execute a visa run on this date.

80.     ManTech forced Cavazos and Ortiz-Medina to execute a visa run on or about February 13, 2013. ManTech forced Cavazos to execute another visa run on or about July 19, 2013.Absent class members also were forced to execute a visa run on this date.

81.     ManTech forced Jacobs, McNeil, and Lambey to execute a visa run on or about February 20, 2013. Absent class members also were forced to execute a visa run on this date.

82.     ManTech forced Ortiz-Medina and Willis to execute a visa run on or about March 3, 2013. Absent class members also were forced to execute a visa run on this date.

83.     ManTech forced Cromartie and Nomura to execute a visa run on or about March 11, 2013. Absent class members also were forced to execute a visa run on this date.

84.     ManTech forced Abernathy and Green, to execute a visa run on or about March 17, 2013. Absent class members also were forced to execute a visa run on this date. ManTech tried to force Arthur to execute a visa run on that same date; however, because he did not take the flight to Bahrain as ManTech had demanded, he was terminated.

85.     ManTech forced Freeman to execute a visa run on or about April 21, 2013. Absent class members also were forced to execute a visa run on this date.

86.     ManTech forced Cowley and Kendrick to execute a visa run on or about April 14, 2013 and another visa run on July 19, 2013. Absent class members also were forced to execute a visa run on this date.

87.     After each "visa run," yet prior to securing a properly authorized Visa 18 for each effected ManTech employee, ManTech instructed those with fresh tourist visas to resume compensated employment at the KMSF – a violation of Kuwait's laws.

88.     Between November 1, 2012 and September 1, 2013, ManTech forced Absent Class Members to execute visa runs to obtain new tourist stamps in those Absent Class Members

49

passports. However, visa runs made for the purpose of continuing to earn income in Kuwait are illegal as it is illegal to work without a valid resident visa (Visa 18). Thus, ManTech requiring Absent Class Members to execute visa runs was an abuse of Kuwait immigration and labor law within the meaning of the TVPRA.

89.    ManTech was explicitly warned that Plaintiffs were in danger of being arrested because they were working having only entered Kuwait on tourist visas. on December 2, 2012, M. Cody received an email from Keith D. Hunter, a ManTech MRAP Shop Manager who informed Cody "Last evening I received a phone call from a guy at the ministry saying we were not in compliance with Kuwait government rules because working in Kuwait on tourist visa's (sic) is illegal . . . this guy threatened me with jail time . . . The bottom line is this contract means allot (sic) to me and other (sic) who are employed here and problems like this is not good for the long-term effort." Cody summarily dismissed Mr. Hunter's concerns in an email she copied to her husband, K. Cody.

90.    On December 3, 2012, Contracting Officer Loretta Bursey, Department of the Army, U.S. Contracting Command – Warren, wrote to Kristy Leavitt, Contracts Senior Manager for ManTech. Referencing the Contract and ManTech's pledge to schedule its employees ten hours a day, seven days a week, Contracting Officer Bursey asked, "[C]an you please detail how ManTech is complying with the Kuwait Labor Law? Based on the 2010 law, and with limited exceptions, the Kuwait Labor Law requires an individual to work an eight-hour day, six days a week." By this correspondence, ManTech had direct notice that its practice of forcing Plaintiffs to work 72 hours a week was in violation of Kuwait's laws. However, ManTech took no action to bring its employment practices with respect to Plaintiffs' work hours, conditions, pay, and safety into compliance with Kuwait's laws.

91.    On December 4, 2012, Defendants Muge and K. Cody received an email from Neeto Sahni, the owner of Neeto International Logistics & Gen. Trading Co., wherein Mr. Sahni warned them "a large number of ManTech employees that are working at the [K]MSF building in Mina Abdullah on a Visa 14 which is a tourist visa. As per Ministry of Labor this is not allowed, and any person found to be working without a valid Visa 18 or document stating that Visa 18 has been processed will face consequences as per Labor Law."

92.    On December 12, 2012, was, again, directly notified that the terms and conditions by which ManTech employed Plaintiffs was illegal. On that date, Neto Sahni followed up with another email warning to Defendants Muge and K. Cody stating, "ManTech has put their employees at risk for working illegally on tourist Visa. Is ManTech ready to continue risking its employees working without visa 18 on tourist visa and risk them on random checking by Ministry for illegal workers?"  M. Cody forwarded the email to  Romance, ManTech Procurement Manager Joy O'Brien, and  K. Cody with the instruction "Don't share this with personnel."

93.    To conceal that its employees were working illegally in Kuwait, ManTech entered into an agreement with Millbrook, a company that was, at least on papers submitted to the Kuwait Government, owned by a Kuwaiti national.

94.    Under the terms of this agreement (improperly called a "sponsorship agreement"), Millbrook agreed to deliberately misrepresent to the U.S. and Kuwaiti governments that the U.S. citizens (and other foreign nationals) who were working at the KMSF were Millbrook's own employees.

95.    In furtherance of this scheme to misrepresent its employees as employees of a Kuwaiti-national owned company, on December 20, 2012, Defendant Romance sent a letter, drafted in the U.S. to the Host Nation Affairs ("HNA") in Kuwait that stated:

This is to confirm that Millbrook Kuwait, a company registered to conduct business in Kuwait, has been subcontracted by ManTech Telecommunications and Information Systems Corporation to provide labor (AN), in support of referenced prime contract (W56HZV-12-0127), under subcontract CSSV020104 . . . Millbrook is required to provide approximately 250 American Nationals to support subject prime contract thru (sic) 31 December 2013 and with potential option periods thru (sic) 30 June 2013. Millbrook Kuwait is considered by ManTech as a responsible subcontractor, pursuant to both United States Acquisition Regulations (FAR) and supplements thereto, including Kuwaiti laws.

96.    This letter was false because Romance and ManTech knew that the mechanics working under the Contract, had already been hired by ManTech and never worked for Millbrook. Moreover, ManTech never entered into a contract with Millbrook for the purpose of providing Americans to work on the Contract.

97.    ManTech sent another letter to HNA, on January 3, 2013, that stated, "This is to confirm that Millbrook Kuwait commits to bringing the first months proof of payroll to the Host Nations office upon opening the labor file." This statement was false because, as ManTech knew, the mechanics working for it on the Contract had not been paid by Millbrook, were not being paid by Millbrook, and would not be paid by Millbrook. The mechanics were paid by ManTech.

### ManTech and Millbrook Colluded to Launder Money into Kuwait to Further Violations of the TVPRA

98.    ManTech and Millbrook entered into an illegal agreement to fake Millbrook salary payments to Plaintiffs and the others working for ManTech at the KMSF. The money laundering, in support of ManTech's TVPRA violations, touches and concerns the U.S. as Millbrook utilized the regulated U.S. banking system, utilized wires to perpetrate a fraud on the State of Kuwait, resulting in less income (and less resulting tax revenue) being realized by U.S. citizens within the U.S. Moreover, in keeping with this country's obligations in fighting forced labor, this Court has

an obligation to remediate ManTech's money laundering committed in support of its TVPRA obligations.

99.     In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech and Millbrook forced Plaintiffs and ManTech's other employees at the KMSF to sign blank signature cards that provided Millbrook with authorization to open Kuwait-based depository bank accounts at Burgan Bank in Kuwait. When ManTech employees objected to signing these blank authorizations, ManTech ordered them to do so. It was understood by the mechanics that if they refused to sign this letter they would be summarily terminated.

100.    The plan to create Kuwait-based, Burgen Bank accounts in the name of the individual Plaintiffs (and all ManTech employees working in Kuwait) was presented to and approved by Brogan. Brogan knew of the impropriety of this scheme as he instructed ManTech's U.S.-based executive staff not to communicate about it in writing.

101.    In furtherance of the scheme to fake salary payments by Millbrook to "its" employees at the KMSF, ManTech agreed to wire funds owed to its employees for *per diem* and cost reimbursement to Millbrook. Using a spreadsheet provided also by ManTech, Millbrook then deposited the funds owed by ManTech to its employees into the Kuwait-based bank accounts Millbrook had opened in these mechanic's' names.

102.    ManTech and Millbrook agreed to use cost reimbursements and *per diem* payments owed to the KMSF mechanics as the source of funds to fake Millbrook's salary payments to these persons to conceal this scheme from the U.S.

103.    This scheme (wherein ManTech would use its employee's own money, launder that money into Millbrook's bank account in London, UK so that Millbrook could withdraw that money

in Kuwait to fake salary payments to deceive the governments of the U.S. and Kuwait regarding the identity of the mechanics' employer) was approved by Brogan specifically to avoid detection by the U.S. On May 1, 2013, Brogan instructed ManTech's Kuwait-based management to follow through with this scheme because it had the benefit of helping ManTech in several ways, including:

> [W]e do not have to "loan" Millbrook money they cycle in and out of the Kuwait bank and return to us at the end of the effort; we do not have to try to invoice the Government the amount we "loan" Millbrook to recognize revenue and then adjust that amount back out at the end of the POP; we retain relative high ground and avoid criticism with respect to complying with Kuwaiti law; and we do not have to modify our subcontract with "interesting" language that could draw unwarranted scrutiny from D[efense] C[ontract] M[anagement] A[gency].

104.    After Millbrook secured these signature authorizations, it set up hundreds of bank accounts at Burgan Bank of Kuwait. However, these bank accounts were established on the false pretense that these employees were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, these Plaintiffs were placed in danger of arrest, criminal prosecution, and deportation. Specifically,

a.    Millbrook, acting on behalf of ManTech, established a bank account for Lambey on or about April 23, 2013.

b.    Millbrook, acting on behalf of ManTech, established a bank account for Carter, Ponder, Diaz, Bess, Foster, Greene, Jacobs, Jakubowski, McNeil, Phillips, Turner, and Yumul on or about April 30, 2013.

c.    Millbrook, acting on behalf of ManTech, established a bank account for Abernathy, Green, and Nomura on or about May 2, 2013.

d.    Millbrook, acting on behalf of ManTech, established a bank account for Cromartie, Dasher, Logan, Nomura, and Turner on or about May 16, 2013.

e.    Millbrook, acting on behalf of ManTech, established a bank account for Cowley on or about May 30, 2013.

f.    Millbrook, acting on behalf of ManTech, set up bank accounts for Absent Class Members for the above-described purposes between November 1, 2012 and September 30, 2013.

105.    This money laundering scheme collapsed when ManTech employees could not access the cost and *per diem* reimbursements that they were expected to withdraw from the Kuwait bank accounts that Millbrook had established in their name.

106.    Upon the collapse of the ManTech/Millbrook scheme for using *per diem* and cost reimbursements as the source of cash to launder money into Kuwait, ManTech made direct payments to Millbrook's UK bank accounts for the purpose of Millbrook withdrawing those funds in Kuwait to fake salary payments into the Burgan Bank accounts set up in the names of the ManTech employees.

107.    On information and belief, ManTech's transfers to Millbrook for the purposes of faking salary payments exceeded $10,000. On information and belief, ManTech was obligated to characterize the purpose for its overseas transfer of funds to Millbrook in the United Kingdom. On information and belief, ManTech mischaracterized the purpose of the transaction as it was unlikely that ManTech accurately characterized the transaction as being for the purpose of defrauding the State of Kuwait. Such acts touch and concern the U.S.

### *ManTech and Millbrook Illegally Obtained Kuwait Resident Visas and Work Permits Under False Pretenses and Through Systemic Fraud*

108.    Between approximately April 23, 2013 and May 16, 2013, MOSAL issued Visa 18s in the name of Bess, Carter, Cromartie, Dasher, Foster, Greene, Jacobs, Jakubowski, Lambey, Logan, McNeil, Phillips, Ponder, Turner, Willis, and Yumul. However, these Visa 18s were issued

on the false representation that these persons were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, these persons were placed in danger of arrest, criminal prosecution, and deportation.

109.    On or about February 21, 2013, MOSAL issued a Visa 18 to Cowley. However, this Visa was issued on the false representation that Cowley was an employee of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, Cowley was placed in danger of arrest, criminal prosecution, and deportation.

110.    On or about June 11, 2013, MOSAL issued a Visa 18 in the name of Abernathy. However, that Visa 18s was issued on the false representation that Abernathy was an employee of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, Abernathy was placed in danger of arrest, criminal prosecution, and deportation.

111.    On information and belief, MOSAL issued other Visa 18s in the names of various ManTech employees. However, such visas were issued on the false representation that these persons were employees of Millbrook. Because of this fraud on the State of Kuwait and the attendant abuse of Kuwait law, such ManTech employees were placed in danger of arrest, criminal prosecution, and deportation.

112.    On or about June 17, 2013, Bess, Jakubowski, Logan, Ponder, and Turner were issued Civil Identification Cards ("CID cards"). Because of the abuse of Kuwait law complained of herein, these CID cards were issued on the false, illegal, and fraudulent representation that they were Millbrook employees.

### ManTech and Millbrook Intentionally Denied Plaintiffs and Absent Class Members the Benefits and Protections of Kuwait's Laws

113.    None of the Plaintiffs or the Absent KMSF Class Members ever received any of the benefits and protections of Kuwait's labor laws. Nearly simultaneous with delivering the Visa

18s to ManTech's employees, Millbrook demanded that those to whom it provided Visa 18s to

sign a letter written in Arabic (with no English language translation). By this letter, the Visa 18

recipients were required to pledge that she or he had been employed by Millbrook Kuwait

Company and Fawzan United Trading Company (identified as the "Employer"). The letter also

required the ManTech employee to certify that she or he had "received from the Employer any and

all rights, amounts, dues, salaries, and travel expenses, annual and official leaves, as well as other

forms of leave which are applicable by law or payments in lieu of leave, compensation that are

due under the employment contract or Kuwaiti law and other rights which may be due to me in

relation to my employment with the Employer." Then, the mechanics were required to affirm the

statement, "I do hereby expressly declare that I do not have any claims for any rights, amounts,

dues, salaries, annual and official leaves, as well as other forms of leave which are applicable by

law or payments in lieu of leave, compensations due as per the employment contract or the Kuwaiti

law and other rights which may be due to me by the Employer." Finally, the letter required the

mechanics to affirm the statement "I hereby expressly, unconditionally, irrevocably release the

Employer from any rights, claims or legal proceedings of whatever nature or form, regardless of

whether known or unknown to me, and I hereby expressly waive my right, at any time hereafter,

to initiate any legal proceeding against the Employer for any matter, kind or nature whatsoever."

114.    The initial reaction of the ManTech management at the KMSF was to order

ManTech's employees not to sign this letter. Wrote ManTech's Senior Maintenance Supervisor at

the KMSF Brian Earhart to Romance, "I am not allowing our employees to sign this until [U.S.-

based ManTech International] Corp. gives it's blessing. When I spoke to [Millbrook] in regards to

this he tells me that they will not surrender our passports unless it is signed this is ILLEGAL!!!!"

At first, Romance agreed with Earhart's assessment, replying, and copying  M. Cody, "Good

Morning – I would not encourage the employee's (sic) to sign this. Its intent lends itself to releasing Millbrook of any responsibility, liability, or accountability."

115.    However, after the question of the propriety of the letter was passed up the chain of command to Brogan. After Brogan had a telephone call with Mark Croll, the head of Millbrook, Brogan passed the order down the chain of command, including to Romance, that every ManTech employee who received a Visa 18 from Millbrook had to sign this Arabic language letter. These executed letters were collected by Millbrook and later, on information and belief, presented to MOSAL as evidence that Millbrook had fully complied with Kuwait's laws. However, contrary to the representations, Millbrook and ManTech had flagrantly abused Kuwait's laws. The purpose of this letter was to prevent ManTech's fraudulent conduct, which included denying Plaintiffs the compensation, benefits, and health and safety protection to which they would have been entitled if ManTech had obeyed Kuwait's laws.

### Defendants' TVPRA Violations Caused Plaintiffs to be Denied the Protection of Law and Thus Exposed to Dangerous and Illegal Levels of Toxic Poison

116.    ManTech used intimidation and coercion to keep its employees in constant fear of being terminated and deported. The work conditions were horrific. The air was putrid and thick with suffocating smoke and fumes from a variety of sources.

117.    The Army's MRAPs are coated with CARC paint. CARC paint is a coating system routinely used on military vehicles to make metal surfaces highly resistant to corrosion and penetration of chemical agents encountered in chemical weapons attacks.

118.    CARC paint contains isocyanate and other toxic chemicals.

119.    Isocyanates are a family of highly reactive, low molecular weight chemicals.

120.    Isocyanates are powerful irritants to the mucous membranes of the eyes and gastrointestinal and respiratory tracts.

58

121.    Direct skin contact with isocyanates can also cause marked inflammation. Isocyanates can also sensitize workers, making them subject to severe asthma attacks which might result in death.

122.    Respiratory and dermal exposure to isocyanates can lead to sensitization. Workers potentially exposed to isocyanates might experience persistent or recurring eye irritation, nasal congestion, dry or sore throat, cold-like symptoms, cough, shortness of breath, wheezing, or chest tightness.

123.    Industry standard is to protect workers by limiting exposure to isocyanates. Engineering controls such as closed systems and ventilation are principal industry standard methods for minimizing isocyanate exposure in the workplace. Other controls, such as worker isolation and use of personal protective equipment such as respirators and personal protective clothing to prevent dermal exposures are also recommended. Early recognition of sensitization and prompt and strict elimination of exposures is essential to reduce the risk of long-term or permanent respiratory problems for workers who have become sensitized.

124.    Burning, grinding, or welding CARC paint on an MRAP also releases toluene diisocyanate.

125.    Toluene diisocyanate can cause eye irritation, inflammation of the eye membrane, inflammation of the cornea, clouding of the eye surface, and secondary glaucoma.

126.    Concentration-dependent effects of exposure to toluene diisocyanate occur even after a delay of 4 to 8 hours and may persist for 3 to 7 days.

127.    High-concentration inhalation of toluene diisocyanate can lead to chest tightness, cough, breathlessness, and inflammation of the bronchi with sputum production and wheezing.

128.    Skin contact with toluene diisocyanate may also result in respiratory sensitization. After an acute, high-concentration exposure to toluene diisocyanate, persons may develop non-specific bronchial hyperresponsiveness and toluene diisocyanate hypersensitization. Accumulation of fluid in the lungs can also occur.

129.    Toluene diisocyanate is a skin irritant. Contact with the liquid may cause second- and third-degree skin burns.

130.    Flu-like symptoms such as fever, malaise, shortness of breath, and cough can develop 4 to 6 hours after exposure to toluene diisocyanate and persist for 12 hours or longer. Chest x-rays may indicate lung changes.

131.    Acute exposure to high levels of toluene diisocyanate vapor or toluene diisocyanate-containing smoke has been associated with lightheadedness, headache, insomnia, mental aberrations, impaired gait, loss of consciousness, and coma.

132.    After an acute, high-concentration exposure to toluene diisocyanate, persons may develop non-specific bronchial hyperresponsiveness and toluene diisocyanate hypersensitization.

133.    Previously exposed persons may develop inflammation of the lungs when reexposed to extremely low levels of toluene diisocyanate.

134.    In sensitized individuals, asthmatic attacks can occur after exposure to extremely low toluene diisocyanate air concentrations (0.0001 ppm). Asthmatic reactions can be immediate, delayed (4 to 8 hours), or both.

135.    Exposure to toluene diisocyanate can lead to Reactive Airway Dysfunction Syndrome (RADS), a chemically- or irritant-induced type of asthma. Sensitization occurs after exposure to levels greater than 0.02 ppm or after skin exposure. Allergic tendency is not a strong predisposing factor.

136.    Toluene diisocyanate can also cause lung-function decline in persons not sensitized to the chemical. Respiratory symptoms related to narrowing of the bronchi can persist for years.

137.    Neurologic effects, such as difficulty concentrating, poor memory, and dull headache, have been reported to persist years after a high-level exposure to toluene diisocyanate. It is not known whether these complications resulted from the neurotoxic effects of toluene diisocyanate or from lack of oxygen in the blood.

138.    Workers who chronically inhale low levels of toluene diisocyanate may have minimal or no respiratory symptoms, then suddenly develop asthma. Chronic workplace exposure is associated with an increased prevalence of sensitization; the reported sensitization rate has varied between 2% and 20% of workers and is dependent on the level of exposure.

139.    Persons sensitized to toluene diisocyanate are at risk of developing chronic asthma that may be precipitated by exposures to other chemicals.

140.    The Department of Health and Human Services has determined that toluene diisocyanate may reasonably be anticipated to be a carcinogen. The International Agency for Research on Cancer has determined that toluene diisocyanate is possibly carcinogenic to humans.

141.    Exposure to isocyanate and toluene diisocyanate can result in a multitude of adverse health effects. The adverse health effects of toluene diisocyanate exposure include acute airway irritation and sensitization ("isocyanate asthma"). Exposure to toluene diisocyanate can also cause kidney damage.

142.    Occupational asthma related to isocyanate exposure can develop in individuals with no prior history of asthma and can sometimes be followed by more generalized hyperreactivity to other irritants.

143.    Occupational safety best practices dictate that CARC-coated materials should never be cut or welded, and CARC-coated materials should not be grinded or sanded without high-efficiency air purifying respirators in use.

144.    Given the serious health hazards associated with working with CARC paint, it was incumbent upon ManTech to provide workers with suitable and safe work conditions in which workers can avoid the risk of being exposed to or inhaling CARC fumes, particles, or other by-products.

145.    As an Army contractor, ManTech was obligated to follow Department of Defense and Army legal mandates with respect to servicing CARC coated vehicles.

146.    U.S. Army Technical Bulletin 43-0242, WD CARC Spot Painting, Department of the Army, 3 Dec 2007, asserts bluntly at 7-1: "Welding is Out. Never weld or use a cutting torch on CARC – or WD CARC-painted material. Welding or cutting painted surfaces releases toxic gases, vapors, and metal fumes."

147.    The laws of Kuwait also require employers to ensure workplace safety. Specifically, KPSLL Article 83 states,

> The employer shall take all needful precautionary safety measures for securing the safety of his labourers, machinery, equipment, circulated materials in the firm and the persons utilizing these materials against the work hazards. Also, the employer shall provide the required safety and occupational health instruments and kits regarding of which a decision shall be issued by the competent Minister upon seeking the opinion of the competent authorities. The labourer shall not be afforded with any expenses or any amounts may be deducted from his salary against the provision of protection measures & safety tools for him.

148.    Article 84 of the KPSLL creates affirmative obligations for ManTech to inform its employees of the dangers contained in the putrid air they were breathing every day at the KMSF, including the danger caused by burning or grinding CARC paint. This article states:

> The employer shall explain to the labourer, before commencing his work, the hazards which he may be exposed to and the necessary protection measures he

should have. The Minister shall issue the relevant regulatory decisions on the instructions and precautionary warning signboards to be fixed in conspicuous places in the work center. and the personal safety measures which the employer shall provide for the different activities.

149.    KPSLL Article 86 establishes additional workplace safety obligations for employers such as ManTech. It states:

The employer shall take the necessary precautionary measures for protecting workers against health hazards and occupational diseases resulting from the practice of such work and shall further provide the necessary first aid kits and medical services. The Minister shall have the right, upon obtaining the opinion of the Minister of Health, to issue the decisions organizing these precautionary measures, occupational diseases schedules, professions and industries that cause such diseases, schedules of harmful materials and the permissible concentrates for such materials.

150.    The KPSLL also provides for 1) employer-provided insurance at Article 88, 2) employer-obligated payment for treatment of workplace injuries at Article 91, and 3) compensated sick time at Article 93.

151.    The air at the KMSF was polluted with the smoke of burning CARC paint caused by arc-welding of MRAP vehicles, grinding of CARC paint and metal by sanders, the release of fossil fuels from engine exhaust, fumes released from petroleum products, and other toxins released by the employees' abrasive work on the MRAP vehicles.

152.    ManTech ignored Plaintiffs and other ManTech employees' frequent and repeated complaints about the thick, caustic, smoke that gathered within the facility. Most days, an ever-increasing black cloud of toxic smoke filled with caustic chemicals gathered within the KMSF. Plaintiffs were often forced to go out into the searing heat during breaks simply to get fresh air.

153.    An eyewitness stated:

And as soon as you, like, start walking towards the bay door . . . you're hit with the smell of, you know, all the things that they're doing, from the welding, the grinding, the cutting, you know, it's just everywhere, it's dispersed everywhere. . . . Soot just from the metal shavings and everything that was just dispersed into the air, it was all black. So you would have black stuff on your clothes. I would have stuff in my

hair. . . . You could literally take your finger and run it across . . . wipe it across the table, and then it would be this black, like, build-up, soot that's on your finger. Yeah, I mean, it was all over us. People would drink -- you know, have, like, bottled waters and other cans of, you know, some type of drink, and you could see the black soot on the top of the cans and the bottles of water. If they ate their food . . . once everything starts to settle down, you know, because all that haze and smoke and whatever, everything, all the particles up in the air would come down and, of course, it would land on everything. . . . all that smoky haze that would just cover the entire facility, it was very hard to see all the way at the end of the facility because of the smoke. It was so smoky, like, you couldn't pinpoint, you know, is that so-and-so sitting there, you know, when it was really smokey. . . . it was bad every day, all day long, it was bad, just -- I can't even -- my words doesn't -- can't really truly, you know, like, express how bad it was.

154.    As another witness has described:

Yeah, my nose bled a lot, and I couldn't understand what that was, and that's when -- apparently, it wasn't just me because there were several guys that were having the same problem, and that's when we started requesting the additional PPE to try to combat that. But that was the biggest part that I had a problem with. Now, I was always concerned about the long-term effect of what I was breathing. I would not smoke as a child because I had family members in my life that died of lung cancer. I did not want to -- I didn't want to lose my family because of that. I didn't want to leave here because of that. So that did concern me a lot. You know, you'd have to concern yourself with it, especially if you've never -- I've never used tobacco because I just didn't want to have that issue. . . . Whenever they moved the welding department up and started doing the gauge welding. The smaller welding didn't seem to have an effect on it, but the gauge welding I started having nosebleeds. And I thought, you know, I guess it's just sinuses. I mean, I never had nosebleeds from sinuses before, but it started -- and it seemed like the days that it was really bad was when air was just really foggy, and that's when it really affected me. . . During the week, probably two or three times a week during the day. And at that point you just stick something up your nose and keep moving.

155.    In response to the complaints about the poor air quality and in rejecting requests to restart the ventilator fans, ManTech instructed its employees to keep the bays doors of the warehouse open. However, this was not a realistic solution as the outside temperature in Kuwait was frequently 120 degrees Fahrenheit.

156.    Despite many requests from Plaintiffs and other employees at the KMSF, ManTech refused to provide PPE or respirators.

157.    When Plaintiffs and other ManTech employees complained about the lack of respirators to filter the smoke-filled air, ManTech threatened to fire them.

158.    Plaintiffs and other ManTech employees experienced immediate and long-term ill-health effects from their exposure to toxic pollution at the KMSF that continue to this day. Plaintiffs variously experienced headaches, respiratory distress, sinus congestion, mucus expectoration, and burning in their eyes and throat during the time that they worked at the KMSF. Some Plaintiffs experienced chronic, daily nosebleeds because of working in the KMSF during ManTech's control of the facility.

159.    Many Plaintiffs and other former ManTech employees continue to experience chronic respiratory and sinus illness since working for ManTech at the KMSF. Furthermore, Plaintiffs and other workers might experience other more serious ailments that are associated with long-term exposure to CARC and CARC solvents.

160.    Plaintiffs did not want to work under the inhumane and arduous conditions to which they were subjected by ManTech, but reasonably believed that they had no choice, due to ManTech's control over their lives, as manifested, *inter alia*, by ManTech's constant threat of summary employment termination (with all the attendant damage including loss of insurance for the mechanic and dependents, lack of unemployment insurance, and the detrimental effect upon future employment having been terminated "for cause."), confiscation of their passports, ManTech's refusal to obtain legal authorization (Visa 18, employment authorization, and Ministry of Labor identifications) necessary for them to live without constant fear of arrest, and ManTech's threat of severe financial penalties were Plaintiffs to leave their employment prior to the expiration of the twenty-four months required of their contract.

***Defendants' TVPRA Violations Caused Plaintiffs to Be Denied the Protection of
Law and Allowed ManTech to Profit From Wage Theft***

161.    KPSLL Article 64 of the State of Kuwait Labor Law states: "it is forbidden to allow

workers to work for more than 48 hours per week or 8 hours a day, except in such events as are

specified in this Law." Moreover, "[w]orking hours during the holy month of Ramadan shall be

equal to 36 hours per week." Id.

162.    KPSLL Article 66 provides when a laborer is required to work more than forty-

eight (48) hours per week, the laborer has the "right to obtain a wage against the overtime hours

in a rate which is more than his ordinary rate in a similar period by 25%." The KPSLL makes clear

that, "[t]he additional working hours shall not be more than two hours per day and in a maximum

number of one hundred eighty (180) hours per year. Also, the additional work periods shall not

exceed three days a week and ninety days per year." *Id*.

163.    Per KPSLL Article 68, Kuwait residents were entitled to a significant number of

paid holidays. Also under KPSLL, if a Kuwait resident was required to work on a legal holiday,

that resident was supposed to be paid a double wage together with an alternative day off.

164.    Had Plaintiffs worked legally in Kuwait, as required under the KPSLL and

consistent with the requirements of Kuwait's immigration laws and the necessity of a Visa 18, they

would have been entitled to the paid time off, double-time, and overtime wages and other benefits

mandated by the laws of Kuwait.

165.    Plaintiffs worked 72 hours a week in Kuwait -- 24 hours beyond the Kuwaiti

maximum of 48 hours per week (and 32 hours beyond the maximum established by the U.S. Fair

Labor Standards Act, which did not cover them in Kuwait).

166.    By forcing Plaintiffs to work without the protection of any country's laws,

ManTech engaged in flagrant wage theft. By way of example, working 12 hours a day, seven days

a week would have entitled the Plaintiffs to thirty-two hours of "time and a half" overtime wages under the U.S. Fair Labor Standards Act. Calculated under the KPSLL, Plaintiffs should have received twenty-four hours of "time and a quarter" overtime pay. Instead, operating in a place and under conditions where no country's laws applied, Plaintiffs received no overtime pay and ManTech's profit increased accordingly.

   a. During the pay period ending on March 15, 2013, Abernathy worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Abernathy worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Abernathy worked 68 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Abernathy would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Abernathy, ManTech kept for itself the overtime wages that Abernathy was owed under law. Such non-payment of wages owed to Abernathy is wage theft. On information and belief, Abernathy worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

   b. During the pay period ending on March 15, 2013, Arthur worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Arthur worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Arthur worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Arthur would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse

of Kuwait's laws and abuse of Arthur, ManTech kept for itself the overtime wages that Arthur was owed under law. Such non-payment of wages owed to Arthur is wage theft. On information and belief, Arthur worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

c.    During the pay period ending on March 15, 2013, Bess worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Bess worked 48 hours at the KMSF; during the pay period that ended on March 29, 2013, Bess worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Bess would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Bess, ManTech kept for itself the overtime wages that Bess was owed under law. Such non-payment of wages owed to Bess is wage theft. On information and belief, Bess worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

d.    During the period of March 15-29, 2013, Cain worked 66 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cain would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cain, ManTech kept for itself the overtime wages that Cain was owed under law. Such non-payment of wages owed to Cain is wage theft. On information and belief, Cain worked at least 60 hours each week he was employed by ManTech in Kuwait and was

denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

e.    During the pay period ending on March 15, 2013, Carter worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Carter worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Carter worked 68 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Carter would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Carter, ManTech kept for itself the overtime wages that Carter was owed under law. Such non-payment of wages owed to Carter is wage theft. On information and belief, Carter worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

f.    During the pay period ending on March 15, 2013, Cavazos worked 66 hours at the KMSF; during the pay period that ended on March 22, 2013, Cavazos worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cavazos worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cavazos would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cavazos, ManTech kept for itself the overtime wages that Cavazos was owed under law. Such non-payment of wages owed to Cavazos is wage theft. On information and belief, Cavazos worked at least 60 hours each week he was employed by ManTech

69

in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

g.      During the pay period ending on March 15, 2013, Cowley worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Cowley worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cowley worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cowley would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cowley, ManTech kept for itself the overtime wages that Cowley was owed under law. Such non-payment of wages owed to Cowley is wage theft. On information and belief, Cowley worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

h.      During the pay period ending on March 15, 2013, Cromartie worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Cromartie worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Cromartie worked 60 hours at the KMSF. Under the KPSLL, ManTech owed her 1.25x her usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Cromartie would have been entitled to 1.50x her usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Cromartie, ManTech kept for itself the overtime wages that Cromartie was owed under law. Such non-payment of wages owed to Cromartie is wage theft. On information and belief, Cromartie worked at least 60 hours each week she was employed by ManTech in Kuwait and was denied the overtime compensation she would

70

have been entitled to if she had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

        i.     During the pay period ending on March 15, 2013, Dasher worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Dasher worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Dasher worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Dasher would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Dasher, ManTech kept for itself the overtime wages that Dasher was owed under law. Such non-payment of wages owed to Dasher is wage theft. On information and belief, Dasher worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

        j.     During the pay period ending on March 15, 2013, Diaz worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Diaz worked 60 hours at the KMSF; during the pay period that ended on March 29, 2013, Diaz worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Diaz would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Diaz, ManTech kept for itself the overtime wages that Diaz was owed under law. Such non-payment of wages owed to Diaz is wage theft. On information and belief, Diaz worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied

the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

k.      During the pay period ending on March 15, 2013, Foster worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Foster worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Foster worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Foster would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Foster, ManTech kept for itself the overtime wages that Foster was owed under law. Such non-payment of wages owed to Foster is wage theft. On information and belief, Foster worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

l.      During the pay period ending on March 15, 2013, Gatson worked 84 hours in Afghanistan; during the pay period that ended on March 22, 2013, Gatson worked 84 hours in Afghanistan; during the pay period that ended on March 29, 2013, Gatson worked 84 hours in Afghanistan. Under the laws of the Islamic Republic of Afghanistan (as modified by that country's adherence to the International Labour Organization, ManTech owed him fair wages, including but not limited to overtime pay, for such excessive work. Under the Fair Labor Standards Act, Gatson would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Gaston, ManTech kept for itself the overtime wages that Gatson was owed under law. Such non-payment of wages owed to Gatson is wage theft. On information and belief, Gatson worked at least 60 hours each week he was employed by ManTech

in Afghanistan and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

m.      During the pay period ending on March 15, 2013, Green worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Green worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Green worked 70 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Green would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Green, ManTech kept for itself the overtime wages that Green was owed under law. Such non-payment of wages owed to Green is wage theft. On information and belief, Green worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

n.      During the pay period ending on March 15, 2013, Greene worked 60 hours at the KMSF; during the pay period that ended on March 22, 2013, Greene worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Greene worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Greene would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Greene, ManTech kept for itself the overtime wages that Greene was owed under law. Such non-payment of wages owed to Greene is wage theft. On information and belief, Greene worked at least 60 hours each week he was employed by ManTech

in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

o.    During the pay period ending on March 15, 2013, Jacobs worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Jacobs worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Jacobs worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Jacobs would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Jacobs, ManTech kept for itself the overtime wages that Jacobs was owed under law. Such non-payment of wages owed to Jacobs is wage theft. On information and belief, Jacobs worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

p.    During the pay period ending on March 15, 2013, Jakubowski worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Jakubowski worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Jakubowski worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Jakubowski would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Jakubowski, ManTech kept for itself the overtime wages that Jakubowski was owed under law. Such non-payment of wages owed to Jakubowski is wage theft. On information and belief, Jakubowski worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he

would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

q. During the pay period ending on March 15, 2013, Kendrick worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Kendrick worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Kendrick worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Kendrick would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Kendrick, ManTech kept for itself the overtime wages that Kendrick was owed under law. Such non-payment of wages owed to Kendrick is wage theft. On information and belief, Kendrick worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

r. During the pay period ending on March 15, 2013, Logan worked 65 hours at the KMSF; during the pay period that ended on March 22, 2013, Logan worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Logan worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Logan would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Logan, ManTech kept for itself the overtime wages that Logan was owed under law. Such non-payment of wages owed to Logan is wage theft. On information and belief, Logan worked at least 60 hours each week he was employed by ManTech in Kuwait and

was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

s.      During the pay period ending on March 15, 2013, McNeil worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, McNeil worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, McNeil worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, McNeil would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of McNeil, ManTech kept for itself the overtime wages that McNeil was owed under law. Such non-payment of wages owed to McNeil is wage theft. On information and belief, McNeil worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

t.      During the pay period ending on March 15, 2013, Phillips worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Phillips worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Phillips worked 60 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Phillips would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Phillips, ManTech kept for itself the overtime wages that Phillips was owed under law. Such non-payment of wages owed to Phillips is wage theft. On information and belief, Phillips worked at least 60 hours each week he was employed by ManTech

in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

u.      During the pay period ending on March 15, 2013, Lambey worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Lambey worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Lambey worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Lambey would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Lambey, ManTech kept for itself the overtime wages that Lambey was owed under law. Such non-payment of wages owed to Lambey is wage theft. On information and belief, Lambey worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

v.      During the pay period ending on March 15, 2013, Freeman worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Freeman worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Freeman worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Freeman would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Freeman, ManTech kept for itself the overtime wages that Freeman was owed under law. Such non-payment of wages owed to Freeman is wage theft. On information and belief, Freeman worked at least 60 hours each week he was employed by ManTech

in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

w.      During the pay period ending on May 31, 2013, Nelson worked 72 hours at the KMSF; during the pay period that ended on June 7, 2013, Nelson worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Nelson worked 88 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Nelson would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Nelson, ManTech kept for itself the overtime wages that Nelson was owed under law. Such non-payment of wages owed to Nelson is wage theft. On information and belief, Nelson worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

x.      During the pay period ending on March 15, 2013, Ponder worked 68 hours at the KMSF; during the pay period that ended on March 22, 2013, Ponder worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Ponder worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Ponder would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Ponder, ManTech kept for itself the overtime wages that Ponder was owed under law. Such non-payment of wages owed to Ponder is wage theft. On information and belief, Ponder worked at least 60 hours each week he was employed by ManTech in Kuwait

78

and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

y.      During the pay period ending on March 15, 2013, Nomura worked 68 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Nomura would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Nomura, ManTech kept for itself the overtime wages that Nomura was owed under law. Such non-payment of wages owed to Nomura is wage theft. On information and belief, Nomura worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

z.      During the pay period ending on March 15, 2013, Ortiz-Medina worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Ortiz-Medina worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Ortiz-Medina worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Ortiz-Medina would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Ortiz-Medina, ManTech kept for itself the overtime wages that Ortiz-Medina was owed under law. Such non-payment of wages owed to Ortiz-Medina is wage theft. On information and belief, Ortiz-Medina worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

aa.     During the pay period ending on March 15, 2013, Turner worked 60 hours at the KMSF; during the pay period that ended on March 22, 2013, Turner worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Turner worked 60 hours at the KMSF. Under the KPSLL, ManTech owed her 1.25x her usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Turner would have been entitled to 1.50x her usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Turner, ManTech kept for itself the overtime wages that Turner was owed under law. Such non-payment of wages owed to Turner is wage theft. On information and belief, Turner worked at least 60 hours each week she was employed by ManTech in Kuwait and was denied the overtime compensation she would have been entitled to if she had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

bb.     During the pay period ending on March 15, 2013, Willis worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Willis worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Willis worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Willis would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Willis, ManTech kept for itself the overtime wages that Willis was owed under law. Such non-payment of wages owed to Willis is wage theft. On information and belief, Willis worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

cc.   During the pay period ending on March 15, 2013, Yumul worked 72 hours at the KMSF; during the pay period that ended on March 22, 2013, Yumul worked 72 hours at the KMSF; during the pay period that ended on March 29, 2013, Yumul worked 72 hours at the KMSF. Under the KPSLL, ManTech owed him 1.25x his usual hourly rate for every hour worked over 48 hours in a week. Under the Fair Labor Standards Act, Yumul would have been entitled to 1.50x his usual hourly rate for every hour worked over 40 hours in a week. However, through its abuse of Kuwait's laws and abuse of Yumul, ManTech kept for itself the overtime wages that Yumul was owed under law. Such non-payment of wages owed to Yumul is wage theft. On information and belief, Yumul worked at least 60 hours each week he was employed by ManTech in Kuwait and was denied the overtime compensation he would have been entitled to if he had been covered under either the laws of the U.S. or the laws of the State of Kuwait.

167.   Through ManTech's abuse, Plaintiffs lacked the protection of any country's laws. They were entitled to the protections of some nation's wage and hour laws yet having left the U.S., they were no longer covered by the McNamara-O'Hara Service Contract Act which was generally applicable to the Contract. having brought Plaintiffs into Kuwait illegally and without the recognition and rights afforded to them as residents of Kuwait, Plaintiffs were denied any rights under the KPSLL. Thus, Plaintiffs were denied the compensation and benefits of U.S. law and Kuwait law, both.

168.   Plaintiffs could not advocate for their rights to fair wages because they lived in fear of arrest for lack of U.S. passports, proper immigration papers, and a proper work authorization. Plaintiffs were acutely aware of the fate of Americans who, when arrested by Kuwaiti police for immigration violations, were forced into shared, overcrowded jail cells; with inadequate food; poor sanitation; and physical, verbal, and psychological abuse. Moreover, Plaintiffs knew that, if

arrested, they would be subject to summary deportation, and a consequent lifetime ban on reentering Kuwait or any other Gulf-Cooperation Council country. Plaintiffs also feared the consequences of being fired by ManTech, including the financial penalty for termination prior to completing 24-months of service.

169.    Pursuant to 18 U.S.C. §1593(a), the Court shall enter an order of restitution for each and all the TVPRA offenses described above.

170.    Pursuant to 18 U.S.C. §1593(b)(1), such an order of restitution shall direct the Defendant to pay the victim the full amount of the victim's losses including any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense.

171.    Under 18 U.S.C. §1593(b)(1), the order of restitution shall also include the greater of the gross income or value to the Defendant of the victim's services including the offender's ill-gotten gains.

### Defendant Carlyle, With Notice That ManTech Had Been Unjustly Enriched Through TVPRA Violations and Attendant Wage Theft, Purchased ManTech Resulting in ManTech's Ill-Gotten Gains and Stolen Wages Becoming Carlyle Assets

172.    On or about May 16, 2022, Carlyle announced its intended purchase of ManTech.

173.    On May 18, attorneys at Latham & Watkins, counsel to Carlyle in the acquisition of ManTech, were sent a copy of the complaint that had been filed in a related case *United States ex rel. Larry Hawkins et al. v. ManTech International Corporation et al.*, 15-02105.

174.    Thus, to the extent that Carlyle was not aware, through its own due diligence, that ManTech's profits and value had been inflated from the profit realized through ManTech's

TVPRA violations and attendant wage theft, Carlyle had actual notice of ManTech's value had been inflated through ill-gotten gains and stolen wages.

175.    Notwithstanding the above-described actual notice, Carlyle's purchase of ManTech was consummated on our about September 15, 2022 after ManTech's shareholders approved the acquisition on or about September 7, 2022.

176.    Thus, to the extent that Carlyle was on notice of or knew that ManTech's value had been inflated through profit realized by ManTech's TVPRA activities and attendant wage theft, Carlyle's purchase of ManTech evidenced an intention to incorporate ManTech's ill-gotten gains as part of Carlyle's own assets. By incorporating, with knowledge, the profits earned by ManTech through its TVPRA-violating activities (including wage theft), into its own inventory of assets, Carlyle became part of a venture to profit from violations of the TVPRA.

177.    Thus, to the extent that Carlyle was on notice of or knew that ManTech's value had been inflated through profit realized by ManTech's TVPRA activities and attendant wage theft, Carlyle's purchase of ManTech evidenced an intention to incorporate ManTech's ill-gotten gains as part of Carlyle's own assets. By incorporating, with knowledge, the profits earned by ManTech through its TVPRA-violating activities (including wage theft), into its own inventory of assets, Carlyle became part of a venture to profit from violations of the TVPRA. Moreover, with control over the compensation that was stolen from Plaintiffs, Carlyle is now subject to an order of restitution by this Court.

## COUNT 2
### Equitable Relief: Order of Restitution

178.    The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

179.    To remedy the wage theft and to deny Defendants the riches purloined from their inequitable conduct, Plaintiffs seek an order of restitution of the money stolen from Plaintiffs and the profits obtained from their reprehensible conduct.

## COUNT 3
### Injunctive Relief: Medical Monitoring

180.    The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

181.    To remediate possible future ill health effects and chronic illness caused by Plaintiffs' exposure to caustic chemicals at the KMSF, Plaintiffs seek an Order from the Court establishing medical monitoring of Plaintiffs and absent class members.

## COUNT 4
### Violations of 18 U.S.C. §1956
### Laundering of Monetary Instruments

182.    The allegations in the preceding paragraphs are incorporated in this count by reference as though fully stated herein.

183.    The U.S. has obligations to the international community to eradicate human trafficking.

184.    Congress created a private right of action for citizens to pursue civil action against those who violate the TVPRA.

185.    The U.S. District Court has subject matter jurisdiction to hold Defendants to account for their violations of the TVPRA and money laundering because these offenses touch and concern the U.S.

186.    18 U.S.C. §1956 (2) establishes that whoever transmits or attempts to transmit funds from a place in the U.S. to a place outside the U.S. with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. Pursuant to 18 U.S.C. §1956 (c) (7)(B)(vii) specified unlawful activity includes trafficking in persons.

187.    18 U.S.C. §1962 makes it unlawful for any person who has received any income derived, directly or indirectly, through collection of an unlawful debt in which such person has participated as a principal to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

188.    Pursuant to 18 U.S.C. §1964 (c), any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate U.S. district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. ManTech transmitted funds using a U.S.-regulated bank, over U.S. wires , from the U.S. to a Millbrook bank account in the United Kingdom for the purpose of abusing Kuwaiti law, to wit, trafficking U.S. citizens into that country illegally and falsifying employment by Millbrook Kuwait to circumvent Kuwait's immigration and labor laws and, by doing so, obtain an unlawful debt from the U.S.

189.    Pursuant to 18 U.S.C. §1964 (c), Plaintiffs seek relief from the U.S. District Court for ManTech's illegal activity including, but not limited to, treble of damages established by Plaintiffs any person injured in his business or property by reason of a violation of section 1962.

190.    The ManTech/Millbrook money laundering operation had a significant financial impact on Plaintiffs and absent class members within the U.S. Plaintiffs and absent class members' pay was not realized in Kuwait. Instead, it was realized in the U.S. where ManTech made deposits into their U.S. bank accounts. These diminished bank deposits – diminished because of Defendants' wage theft – had an adverse financial impact not only upon Defendants but upon Defendants' dependents. The wage theft perpetrated by Defendants had little to no impact on Kuwait, where Plaintiffs worked; however, the loss of income had a profound effect on Plaintiffs and their dependents within the U.S.

## CLASS ACTION ALLEGATIONS

191.    Plaintiff incorporates all the foregoing paragraphs as though the same were set forth at length herein.

192.    Plaintiff brings this action as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1), (b)(2), and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

193.    Plaintiff brings this lawsuit as a class action on behalf of the following nationwide class, as set forth below:

***All U.S. citizens who worked for ManTech at the KMSF from January 2012 through January 2014.***

194.    Plaintiffs reserve the right to amend the class definition set forth above if discovery and/or further investigation reveals that the Class should be expanded, divided into subclasses, or modified in any way.

195.    The definition of the Class is unambiguous. Plaintiffs, except for Plaintiff Gatson, are all members of the class.

196.    As there are approximately 300 U.S. citizens who ManTech transported to Kuwait and abused in the manner herein described. In the interest of justice and judicial economy, this action should be certified as a class action to provide relief to absent class members and to prevent Defendants from retaining profits realized through TVPRA violations.

197.    The resolution of the claims of class members in a single action in the U.S. District Court for the District of Columbia will provide substantial benefits to all parties and will serve the interests of judicial economy and consistency of the law as there is, pending in this same Court, a related case that addresses the same Defendant ManTech and the same course of conduct towards mechanics at the KMSF, *United States ex rel. Larry Hawkins et al. v. ManTech International Corp.*, 15-cv-02105.

198.    Given systemic violations of Kuwait law and the mass fraud by ManTech on MOSAL and the concentration of employees at the KMSF, the claims of the representative plaintiffs are typical of the claims of the absent class members. Moreover, Defendants can be expected to defend the claims in like manner.

199.    Tamecia Turner, Mike Crowley, and Christopher Jacobs will adequately protect the interests of the absent class members.

200.    Representative Plaintiff Tamecia Turner was hired by ManTech in September 2012 and arrived in Kuwait in November, 2012. Her passport was confiscated by ManTech who held it, except for her use of it to go on visa runs, the entire time she was in Kuwait. She requested and was denied PPE. To the extent there are female-specific health issues that arise from the polluted conditions of the KMSF, we would adequately represent such interests.

201.    Representative Plaintiff Mike Cowley was a member of ManTech's management team at the KMSF and has suffered the harms described in this complaint. He has personal knowledge of Defendants' acts and omissions giving rise to this lawsuit.

202.    Representative Plaintiff Jacobs stationed by ManTech at the KMSF as of December 2012 and departed the KMSF in September 2013. His experience was typical of absent class members in that his passport was confiscated, he was falsely represented as a Millbrook employee, he was denied the compensation and benefits owed to him under Kuwait, and he suffers chronic respiratory ailments since his service at the KMSF.

203.    Plaintiff has retained counsel with substantial experience litigating complex litigation claims both on the defense and the plaintiff side including TVPRA actions, class actions foreign law actions, class actions, and claims that touch and concern the U.S. including False Claims Act actions. Plaintiffs' counsel is the same counsel as represents mechanics in a related action *United States ex rel. Larry Hawkins et al. v. ManTech International Corp.*, 15-cv-02105.

204.    Plaintiffs seek certification of a class pursuant to Fed. R. Civ. P. 23 (b) (1) because prosecuting separate actions by different mechanics in different U.S. district courts against ManTech brought under the same TVPRA statute creates a risk inconsistent or varying interpretations of the TVPRA.

205.    Class certification per Fed. R. Civ. 23 (b) (2) is also appropriate because Defendants have acted (or refused to act) with respect to the mechanics working at the KMSF on grounds that generally apply to all the KMSF mechanics – in which case the final order of restitution and an order for medical monitoring will be appropriate with respect to all the KMSF mechanics.

206.    Under Fed. R. Civ. P. 23 (b)(3), this case involves common questions of fact and law which predominate over any mechanic's particular facts. Thus, a Rule 23 class action is

superior to other available methods for fairly and efficiently adjudicating the conflict between the mechanics and Defendants. There are questions of TVPRA, KPSLL, and Kuwait labor law that are common to the experiences of the workers that ManTech brought to Kuwait. Such common questions are: 1) was it illegal for ManTech (directly or through its agent Millbrook) to confiscate Plaintiffs' passports; 2) was it illegal for ManTech to directly employ Plaintiffs in Kuwait, 3) were plaintiffs illegally denied payment of overtime under Kuwait law, 4) were Plaintiffs denied paid time off under Kuwait law, 5) were Plaintiffs denied workplace protection against environmental toxins that are provided under Kuwait law, 6) was ManTech's control over Plaintiffs – controlling where they lived, where they worked, and their passports – so pervasive that Plaintiffs were subservient to ManTech, 7) was it illegal for ManTech to force Plaintiffs to execute "visa runs" in order to obtain fresh tourist visa to extend their stay in Kuwait, 8) did ManTech conceal from Plaintiffs their right to the benefits of Kuwait's laws, and 9) did ManTech profit from its abuse of Plaintiffs and its abuse of Kuwait's laws?

### Michael Gatson's Claims with Respect to ManTech's Misconduct in Afghanistan

207.    Plaintiff Michael Gatson ("Gatson"), a citizen of Georgia, entered into an employment contract with ManTech governed by the laws of the U.S. and was stationed by ManTech in Afghanistan during the relevant time giving rise to this complaint. Though the employment contract represented an employee-at-will relationship allowing the mechanic to voluntarily leave employment at the timing of her or his choosing, addenda to the contract threatened the mechanic with severe financial harm if the mechanic left the overseas posing prior to the expiration of twenty-four months.

208.    As ManTech's employee, Gatson suffered deprivation of right, as perpetrated by Defendants, associated with working in a foreign locale without the protection of law.

209.    ManTech employed Gatson in Afghanistan to work on the Contract yet violated the laws of both the U.S. and the Islamic Republic of Afghanistan including its Labor Code (and its predecessors and as modified by that country's 1934 acceptance of the principles of the International Labour Organization).

210.    By denying transporting Gatson to Afghanistan where he was stripped of the protections of U.S. law and was denied the protections of the laws of the Islamic Republic of Afghanistan and profiting from these coercive behaviors, ManTech is liable to Plaintiff Gatson in the same manner that it is liable to mechanics employed at the KMSF.

211.    Denying Gatson the protections of state and forcing him to live in a lawless environment wherein no workplace safety standards existed, ManTech caused permanent damage to Plaintiff Gatson. Specifically, Gatson lacked protection against the toxins that permeated his workplace, and he suffers chronic respiratory distress.

212.    Moreover, Gatson is entitled to restitution from Defendants to a) extract from Defendants wages owed to him and b) deny Defendants the riches they unjustly accumulated at his expense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs/Plaintiffs, on behalf of themselves and the U.S., pray as follows:

A.    That, following a motion for class certification, that the Court will certify this action as a class action so that the rights of all of ManTech's KMSF employees may be protected and so that ManTech will be denied the profits and stolen wages it has realized from its TVPRA violations.

B.      That Plaintiffs be awarded damages against Defendants, jointly and severally, including compensatory and statutory damages, for the wrongful acts complained of herein, in an amount to be determined at trial;

C.      That the Court order Defendants to pay Plaintiffs and Absent Class Members restitution pursuant to 18 U.S.C. §1593 including but not limited to value to the Defendants of the victim's services in performing the Contract. As the Contract is primarily a human services contract for the repair and maintenance of the MRAPS, Plaintiffs estimate that the value of illegally obtained labor applied to the Contract exceeds $100 million.

D.      That the Court will establish a protocol for medical monitoring and treatment for Plaintiffs and absent class members that will be in place through the end of their natural lives.

E.      That Plaintiffs be awarded punitive or exemplary damages in an amount of which will be proven at trial;

F.      That Plaintiffs be awarded their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

G.      That Plaintiffs be awarded pre-judgment and post-judgment interest at the maximum rate allowed by law;

H.      That Plaintiffs be awarded all general, special, and equitable relief to which Plaintiffs are entitled by law;

I.      That Plaintiffs be awarded any other punitive damages not herein specifically identified; and

J.      That the Court exercise its legal and equitable powers to the fullest extent authorized by law to 1) provide complete relief to Plaintiffs, 2) deprive Defendants of the ill-gotten gains of the violations of law, 3) enforce obligations for enforcing prohibitions on forced labor and

human trafficking, and 4) prevent the U.S. against becoming a safe harbor for those inflicting human trafficking harms overseas.

Respectfully submitted,

/s/ Joseph A. Hennessey
Joseph A. Hennessey, Esq.
The Law Office of Joseph Hennessey, LLC
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Telephone: (301) 351-5614
Email: jhennessey@jahlegal.com

## **JURY DEMANDED**

Plaintiffs hereby demand a trial by jury of all claims within this action that are triable by jury.

/s/ Joseph Hennessey
Joseph A. Hennessey