**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL ABERNATHY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CARLYLE GROUP, INC., MANTECH INTERNATIONAL CORPORATION, MANTECH TELECOMMUNICATIONS AND INFORMATION SYSTEMS CORPORATION, MICHAEL BROGAN, KEVIN CODY, MUGE CODY, BONNIE COOK, AND KATHRYN ROMANCE<br><br>Defendants. | Civil Action No. 22-3603 (ABJ) |

**ORDER ON MANTECH'S MOTION TO DISMISS**

The twenty-eight named plaintiffs in this case have sued their former employer, ManTech International Corporation and ManTech Telecommunications and Information Systems Corporation (collectively "ManTech"); The Carlyle Group; and five ManTech employees: Michael Brogan, Kevin Cody, Muge Cody, Bonnie Cook, and Kathryn Romance. *See* First Am. Compl. [Dkt. # 15] ("FAC"). Plaintiffs are mechanics who worked for ManTech repairing vehicles for the U.S. military in Kuwait and Afghanistan in 2012 and 2013. FAC at 1 (Introduction), ¶¶ 1–28. They allege that defendants forced them to work under conditions that violated the Trafficking Victims Protection Reauthorization Act ("TVPRA") and that they engaged in a pattern of money laundering that constitutes a violation of section 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* FAC ¶¶ 47–177, ¶ 182–90.

ManTech has filed a motion to dismiss the complaint on numerous grounds, including that Count 1, the TVPRA claim, and Count 4, the RICO claim, should be dismissed because they are improperly extraterritorial. *See* ManTech's Mot. to Dismiss or Alternatively to Strike Class Allegations [Dkt. # 17] ("Defs.' Mot."); Defs.' Mem in Supp. of Defs.' Mot. [Dkt. # 17-1] ("Defs.' Mem."). Plaintiffs oppose the motion, Pls.' Opp. to Defs.' Mot. [Dkt. # 21] ("Pls.' Opp."), and defendants filed a reply. Defs.' Reply in Supp. of Defs.' Mot. [Dkt. # 32].

The issue of the extraterritoriality of TVPRA and RICO claims was briefed in a parallel case before this Court, *Hawkins v. ManTech International*, 15-cv-2105.[1] The claims in *Hawkins* are nearly identical to those in this case. Indeed, plaintiffs describe *Hawkins* as involving the same defendant and "the same course of conduct towards mechanics" in Kuwait, FAC ¶ 197, and they rely entirely on the arguments made in *Hawkins* in opposing ManTech's motion in this case. *See* Pls.' Opp. at 12–13 (incorporating by reference the plaintiffs' arguments in *Hawkins* to their opposition brief). Because the parties make the same arguments in both cases, the Court will rule on the extraterritoriality arguments in both cases at the same time, along with the rest of ManTech's motion in this case. It will address defendants' other motion to dismiss in a separate opinion.[2]

---

1 The relevant filings in *Hawkins v. ManTech Int'l Corp.*, 15-cv-2105, appear on the docket of that case: Pls.' Mot. to Reinstate Count VI of the Third Am. Compl. (RICO Claim) [Dkt. # 116] (hereinafter "Pls.' *Hawkins* RICO Mot."); Defs.' RICO Opp. [Dkt. # 121]; Pls.' RICO Reply [Dkt. # 122]; Defs.' Mot. to Dismiss Count IV of the Third Am. Compl. (TVRPA Claim) [Dkt. # 108]; Pls.' Opp. [Dkt. # 115] (hereinafter "Pls.' *Hawkins* TVPRA Opp."); Defs.' Reply [Dkt. # 123].

2 This ruling does not address the motion to dismiss filed by The Carlyle Group and the five individual defendants. The Carlyle Group Mot. to Dismiss or Alternatively Strike Class Allegations [Dkt. # 18] ("Carlyle Mot.").

For the following reasons, the Court will **DENY** ManTech's motion to dismiss the TPVRA claim (Count 1) and **GRANT** its motion to dismiss the claim for medical monitoring (Count 3) and the RICO claim (Count 4).

## FACTUAL ALLEGATIONS

ManTech is a U.S. company that provides defense-related services to the U.S. government. FAC ¶ 30. In 2012, it entered into a contract with the U.S. Army to maintain and repair Mine Resistant Ambush Protected vehicles in Afghanistan and Kuwait ("the Contract"). FAC at 1 (Introduction). Like the plaintiffs in *Hawkins*, the named plaintiffs in this case worked for ManTech pursuant to the Contract. *See* FAC ¶¶ 1–29. Most of the plaintiffs in the instant case worked at the Kuwait Maintenance and Sustainment Facility ("KMSF" or the "Facility") in Kuwait. *Id.*[3]

Plaintiffs allege that individual defendants Kevin Cody and Muge Cody[4] calculated costs for ManTech's bid for the Contract. FAC ¶ 54. In doing so, they made "certain assumptions about ManTech's ability to lower the compensation of ManTech's workforce" at the Facility. FAC ¶ 54. After ManTech won the bid, the two allegedly realized that the planned compensation cuts would result in a "dramatic attrition" of mechanics, and they believed that ManTech would be "unable to perform the Contract as signed." FAC ¶ 54. They "notified ManTech's senior management that ManTech needed to adjust upwards" mechanic compensation to prevent workforce attrition, but senior management "refused." FAC ¶ 55.

---

3 One plaintiff, Michael Gatson, is alleged to have worked for ManTech in Afghanistan. FAC ¶¶ 207–12. While he is listed as a plaintiff in the case caption, he does not appear in the paragraphs identifying the named plaintiffs in the case. *See* FAC ¶¶ 1–28.

4 Kevin and Muge Cody are married. *See* FAC ¶ 89.

Rather than increasing mechanic compensation, plaintiffs allege, "ManTech created a coercive mechanism to keep qualified mechanics working." FAC ¶¶ 55–56. First, ManTech required them to work for two years and imposed a financial penalty if their employment was terminated early.

> Due to the significant cost for sponsorship, (up to and exceeding $10,000 per person for first year and $5,000 for second year), you agree to commit to a minimum period of employment (deployment) of 24 months or the completion of the contract whichever comes first. Once the process is completed, should you decide to terminate employment, or are terminated for any reason, voluntary or involuntary, prior to completing 24 months (non-consecutive) of "boots on ground" (BOG) service, you are responsible for costs incurred and will be required to reimburse the cost to obtain a work visa. In this event, ManTech will make a determination of financial obligation based on the current circumstances. Reimbursable costs include all expenses related directly and indirectly to the sponsorship, including travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees. If terminated, you may also be responsible for employment and deployment costs as described in the Offer Addendum, as well as costs related to any training or certification process provided to you as part of your employment, including employment related expenses described in the Offer Addendum.

FAC ¶ 56 (emphasis omitted), quoting the MRAP-FOV Contract Offer Addendum ("Addendum"). According to plaintiffs, the "Addendum was created to threaten financial harm to force incumbent KMFS mechanics to stay on the job and to discourage newly-hired mechanics from exercising their rights as alleged 'at-will' employees." FAC ¶ 57. Plaintiffs "feared the consequences of being fired by ManTech, including the financial penalty for termination prior to completing 24-months of service." FAC ¶ 168.

Second, plaintiffs allege that "[i]n Kuwait, ManTech controlled Plaintiffs' . . . lives" by "confiscate[ing] Plaintiffs' passports upon their arrival in Kuwait," FAC ¶ 59, and keeping them in fear of arrest by Kuwaiti authorities by failing to obtain the necessary work visas to work legally in Kuwait. *See* FAC ¶¶ 1–28, 59, 61–62. According to plaintiffs, Kuwaiti law requires foreign

nationals to be employed by a Kuwaiti-national owned company and have "Visa 18" work visas obtained by their employer from the Kuwaiti Ministry of Labor and Social Affairs ("MOSAL"). FAC ¶ 66. Plaintiffs allege that ManTech knew about these requirements, FAC ¶¶ 73, 89, 91–92, but it evaded them by arranging for mechanics to work under temporary tourist visas, which plaintiffs were forced to keep current by doing "visa runs." FAC ¶ 74. These visa runs required mechanics to "fly out of Kuwait to a third country, usually Bahrain, turn around and fly back into Kuwait so that a fresh entry stamp could be made in that employee's passport." FAC ¶ 74. ManTech and its agent in Kuwait, Millbrook, returned plaintiffs' passport to them only to make visa runs and required them to surrender their passports upon return. FAC ¶ 74. Further, ManTech fired employees who refused to do visa runs as a "warning to the rest of its Kuwait workforce about the consequences of disobeying ManTech's instruction." FAC ¶ 75.

ManTech allegedly knew that it was illegal for mechanics to work in the country without a work visa, as did at least one Facility employee. *See* FAC ¶ 89 (alleging that a ManTech shop manager in Kuwait emailed Muge Cody on December 2, 2012 to inform her that he received "a phone call from a guy at the ministry saying we were not in compliance with Kuwait government rules because working in Kuwait on tourist visa's (sic) is illegal . . . this guy threatened me with jail time"). Plaintiffs allegedly "lived in fear of arrest for lack of U.S. passports, proper immigration papers, and a proper work authorization." FAC ¶ 168.

According to plaintiffs, these "coercive mechanism[s]" allowed ManTech to knowingly deprive them of the protections and benefits of Kuwaiti labor laws and workplace safety requirements. *See* FAC ¶ 56. ManTech allegedly knew that Kuwait had maximum weekly hours requirements but took no action to comply with them, "forcing Plaintiffs to work 72 hours a week . . . in violation of Kuwait's laws." *See* FAC ¶ 90 (alleging that a U.S. Army contracting staffer

emailed ManTech to ask how "ManTech's pledge to schedule its employees ten hours a day, seven days a week" complied with Kuwait Labor Law which "requires an individual to work an eight-hour day, six days a week"); *see also* FAC ¶¶ 161–63 (describing Kuwaiti labor law requirements pertaining to maximum weekly hours, overtime pay, and paid leave). This, plaintiffs allege, resulted in "wage theft" by ManTech. *See* FAC ¶ 164–66.

With respect to workplace safety, plaintiffs allege that conditions at the Facility were "horrific" and the "air was putrid and thick with suffocating smoke and fumes from a variety of sources." FAC ¶¶ 116, 151; *see* FAC ¶¶ 117–42 (describing the chemicals used in working on military vehicles and the health risks they pose). Kuwaiti laws impose workplace safety requirements, FAC ¶¶ 147–50, but ManTech allegedly disregarded them and "ignored Plaintiffs and other ManTech employees' frequent and repeated complaints about the thick, caustic, smoke that gathered within the facility," FAC ¶ 152; *see also* FAC ¶¶ 153–54 (witness accounts of working conditions), and "refused to provide PPE or respirators." FAC ¶ 156.[5] ManTech allegedly "threatened to fire" employees that complained about the lack of respirators. FAC ¶ 157.

"To conceal that its employees were working illegally in Kuwait," plaintiffs allege, "ManTech entered into an agreement with Millbrook, a company that was, at least on papers submitted to the Kuwait Government, owned by a Kuwaiti national." FAC ¶ 93. ManTech told both U.S. government and Kuwaiti officials that it had entered into a "sponsorship" agreement with Millbrook, FAC ¶ 94, under which Millbrook would provide it with "approximately 250 American Nationals to support" the Contract through December 2013. FAC ¶ 95. Beginning in

---

5 "PPE" refers to personal protective equipment. *See Valentine v. Collier*, 141 S. Ct. 57, 59 (2020).

April 2013, Kuwait issued Visa 18s to eighteen plaintiffs and Civil Identification Cards to five plaintiffs. FAC ¶¶ 108–112. Plaintiffs contend that these papers were illegally obtained and based on false representations made by ManTech because the foreign nationals working at the Facility were not Millbrook employees. FAC ¶ 97, 108–112.[6]

Plaintiffs claim that ManTech's activities with Millbrook involved a "money laundering scheme" in which Millbrook paid the salaries of plaintiffs and other Facility employees. FAC ¶ 98. ManTech and Millbrook allegedly forced Facility employees "to sign blank signature cards" that authorized Millbrook to open accounts for them at a Kuwait bank. FAC ¶ 99. ManTech "agreed to wire funds owed to its employees for *per diem* and cost reimbursement to Millbrook," which Millbrook would use to pay employee's salaries through the Kuwait bank accounts it opened for the employees. FAC ¶ 101. According to plaintiffs, the scheme enabled ManTech to "use its employee[s'] own money, launder that money into Millbrook's bank account in London, UK so that Millbrook could withdraw that money in Kuwait to fake salary payments to deceive the governments of the United States and Kuwait regarding the identity of the mechanics' employer." FAC ¶ 103. They quote defendant Michael Brogan, who instructed ManTech management in Kuwait:

> [W]e do not have to "loan" Millbrook money they cycle in and out of the Kuwait bank and return to us at the end of the effort; we do not have to try to invoice the Government the amount we "loan" Millbrook to recognize revenue and then adjust that amount back out at the end of the POP; we retain relative high ground and avoid criticism with respect to complying

---

6 Plaintiffs also allege that "[n]early simultaneous with delivering the Visa 18s to ManTech's employees, Millbrook demanded that those to whom it provided Visa 18s to sign a letter written in Arabic (with no English language translation)" affirming that they were employed by Millbrook Kuwait, had received all due to them under the law and their employment contract, and waiving any claims against Millbrook. FAC ¶ 113. Plaintiffs, however, do not allege that they were required to sign the letter. *See* FAC ¶¶ 113–15.

> with Kuwaiti law; and we do not have to modify our subcontract with "interesting" language that could draw unwanted scrutiny from D[efense] C[ontract] M[anagement] A[gency].

FAC ¶ 103.

According to plaintiffs, the "scheme collapsed" when ManTech employees could not access money they were owed that was in Kuwait bank accounts, and ManTech was forced to make direct payments to Millbrook's UK bank accounts to pay ManTech employees. FAC ¶¶ 105–06.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

Count 1 of the amended complaint asserts that defendants violated the TVPRA by "create[ing ] coercive mechanism[s]" to keep plaintiffs working at the Facility, FAC ¶ 56, including "ManTech's constant threat of summary employment termination . . . , confiscation of their passports, ManTech's refusal to obtain legal authorization . . . necessary for them to live without constant fear of arrest, and ManTech's threat of severe financial penalties were Plaintiffs to leave their employment prior to the expiration." FAC ¶ 160; *see* FAC ¶¶ 47–177.

Count 4 asserts that ManTech violated the RICO statute by laundering money to further their violations of the TVPRA. FAC ¶¶ 188–89.

ManTech seeks dismissal of plaintiffs' First Amended Complaint, including the TVPRA and RICO claims on the grounds that they are each impermissibly extraterritorial. *See* Defs.' Mem. at 10–24, 39–42.

## I. Extraterritoriality

The law governing this motion is the same as set out in the Court's Memorandum Opinion in *Hawkins v. ManTech International*, 15-cv-2105 [Dkt. # 140].

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States'" and is "presume[d to be] 'primarily concerned with domestic conditions.'" *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991), quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949). Extraterritoriality is a canon of construction, "or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Thus, whether a statutory provision has extraterritorial reach is a merits question, not a matter that goes to subject matter jurisdiction. *Id*. at 253–54.

In considering whether a statute rebuts the presumption against extraterritoriality, courts apply a two-step analysis. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023), citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). First, courts determine whether "'Congress has affirmatively and unmistakably instructed that' the provision at issue should 'apply to foreign conduct.'" *Id.* at 418, quoting *RJR Nabisco*, 579 U.S. at 335 (internal citation omitted). If the statute gives "a clear, affirmative indication" that it applies extraterritorially, the provision is extraterritorial. *Id.* at 419, quoting *RJR Nabisco*, 579 U.S. at 337. If the statute does not provide

this indication, then courts must go on to the second step of the analysis. *Id.*[7] The Supreme Court has explained:

> [A]t the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 579 U.S. at 337. In other words, "to prove that a claim involves a domestic application of a statute, plaintiffs must establish that the *conduct relevant to the statute's focus* occurred in the United States." *Abitron Austria*, 600 U.S. at 418 (emphasis in original) (internal citations and quotation marks omitted).

In *RJR Nabisco*, the Court was asked to address whether the RICO statute, and in particular, the provision creating a private right of action for those harmed by a violation of the statute, applies extraterritorially. 579 U.S. 325 (2016). RICO establishes criminal offenses under section 1962 and a private civil cause of action under section 1964, *id.* at 331, and the Court held it was necessary to examine the extraterritoriality of each provision separately. *Id.* at 346. It ruled that the statute's substantive prohibition in section 1962 rebuts the presumption against extraterritoriality at step one with respect to certain applications of the statute. *See id.* at 338–40. Even though section 1962 does not itself state that it applies extraterritorially, "Congress's incorporation of . . . extraterritorial predicates into RICO gives a clear, affirmative indication that

---

7 If a provision is found to be extraterritorial at step one of the analysis, it is not necessary to go on to step two. *RJR Nabisco*, 579 U.S. at 337.

§ 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 339.

In contrast, the Court found that section 1964(c), which provides for a private right of action, did not rebut the presumption: "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id*. at 349. Therefore, the majority went on to require that a plaintiff seeking to pursue a civil RICO claim "must allege and prove a *domestic* injury to its business or property." *Id.* at 346 (emphasis in original).

### A. The RICO claim in Count 4 is improperly extraterritorial and will be dismissed because plaintiffs fail to allege a domestic injury.

Count 4 in this case alleges that defendants engaged in money laundering in violation of 18 U.S.C. § 1956, and that this criminal activity gives rise to a violation of 18 U.S.C. § 1962 of the RICO statute.[8] FAC ¶¶ 182–90. Plaintiffs base their civil claim for damages flowing from this alleged criminal violation on 18 U.S.C. § 1964(c), FAC ¶ 189, and they allege that they suffered the requisite domestic injury because they received diminished pay in their U.S. bank accounts.

---

8 Since the Court will be dismissing the RICO claim for failure to allege a domestic injury to plaintiffs' business or property, it will not address any other deficiencies in the RICO allegations, such as the failure to specify whether the defendants allegedly engaged in the activities prohibited by section 1962(a), (b), (c), or (d) and the failure to track the language of any of those subsections to clearly delineate the nature of the RICO claim.

> The ManTech/Millbrook money laundering operation had a significant financial impact on Plaintiffs and absent class members within the U.S. Plaintiffs and absent class members' pay was not realized in Kuwait. Instead, it was realized in the U.S. where ManTech made deposits into their U.S. bank accounts. These diminished bank deposits – diminished because of Defendants' wage theft – had an adverse financial impact not only upon Defendants but upon Defendants' dependents. The wage theft perpetrated by Defendants had little to no impact on Kuwait, where Plaintiffs worked; however, the loss of income had a profound effect on Plaintiffs and their dependents within the U.S.

FAC ¶ 190. They cite a recent Supreme Court ruling on extraterritoriality and the briefs they filed in *Hawkins v. ManTech* on the issue. *See* Pls.' Opp at 1–2, 13, citing *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023) and Pls.' *Hawkins* RICO Mot.[9]

**1. *Yegiazaryan* requires courts to apply a context-based analysis to determine if a plaintiff has alleged or proven a "domestic injury."**

As the Court explains in the *Hawkins* opinion, in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), the Supreme Court addressed what was necessary to show "domestic injury" to support a civil RICO claim under *RJR Nabisco*.[10] In that case, Smagin, a Russian national who lives in Russia, filed a civil RICO case against Yegiazaryan, a Russian national who lives in California.

9 Plaintiffs argue the Court has "subject matter jurisdiction" over their RICO claim, but extraterritoriality is an issue of merits and not subject matter jurisdiction. *Morrison*, 561 U.S. at 253–54. Whether the "domestic injury" requirement to state a civil RICO claim has been satisfied turns on the facts alleged in a complaint, *see Yegiazaryan*, 599 U.S. at 543, not facts outside it. Thus, to the extent plaintiffs' motion relies on "jurisdictional facts" facts or exhibits not alleged or incorporated into the FAC, they are not appliable to the inquiry, and the Court will not consider them. *Compare Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986) (a court "is not limited to the allegations of the complaint" when considering its jurisdiction), *vacated on other grounds,* 482 U.S. 64 (1987), *with Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face").

10 The Supreme Court did not address what would constitute "domestic injury" in *RJR Nabisco* because the plaintiffs in that case had stipulated that they were not seeking redress for domestic injuries. 579 U.S. at 354.

599 U.S. at 536–37. Smagin alleged that Yegiazaryan engaged in criminal activity, mostly in California, to prevent Smagin from collecting on a California judgment enforcing a foreign arbitration award that he had secured against Yegiazaryan. *See id.* at 536–39. The district court ruled that Smagin had failed to allege a domestic injury under *RJR Nabisco* and dismissed the case, reasoning based in part on a Seventh Circuit decision,[11] that Smagin resides in Russia and experienced the loss from his inability to collect on the judgment in Russia. *Id.* at 540. The Ninth Circuit reversed, rejecting the residency-based test applied by the district court and the Seventh Circuit. *Id*. It ruled that courts must use a "context-specific" approach when examining whether a plaintiff has a "domestic injury." *Id.* That is, courts must consider not only the residency of the injured party but also where the alleged pattern of racketeering activity occurred and was targeted. *See id.*

Taking up *Yegiazaryan* to resolve the circuit split, the Supreme Court agreed with the approach taken by the Ninth Circuit, and the Second and Third Circuits as well. *Id.* at 540–41. It found a context-specific inquiry to be most consistent with the decision in *RJR Nabisco* in that a contextual approach "better reflects the [domestic injury] requirement's origin in step two of the extraterritoriality framework," under which courts look to a statute's "focus" to assess whether it is being applied domestically. 599 U.S. at 544. *Yegiazaryan* observed that the focus of section 1964(c) "is injuries in 'business or property by reason of a violation of' RICO's substantive provisions." *Id.* at 544.

---

11 *See Smagin v. Compagnie Monegasque De Banque*, No. 2:20-CV-11236-RGK-PLA, 2021 WL 2124254, at *3 (C.D. Cal. May 5, 2021), rev'd and remanded sub nom. *Smagin v. Yegiazaryan*, 37 F.4th 562 (9th Cir. 2022), aff'd and remanded, *Yegiazaryan*, 599 U.S. 533 (2023), citing *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018), abrogated by *Yegiazaryan*, 599 U.S. 533 (2023).

> So understood, § 1964(c)'s focus is on the injury, not in isolation, but as the product of racketeering activity. Thus, in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury.

*Id*. at 545.

The Court further held that this analysis "turns largely on the particular facts alleged in a complaint." *Id*. at 543. Relevant factors may include "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity," *id.* at 544 (footnote omitted), but this list is not exhaustive. *Id.* at 545 ("Because of the contextual nature of the inquiry, no set of factors can capture the relevant considerations for all cases.").

Applying this contextual approach to Smagin's claim, the Court recognized that while Smagin's home had some bearing on the analysis, *see id*. at 545 ("it may be true, in some sense, that Smagin has felt his economic injury in Russia"), the narrow focus on his residency "miss[ed] central features of the alleged injury. Zooming out, the circumstances surrounding Smagin's injury make clear it arose in the United States." *Id*. at 545.[12] The Court observed that "much of the alleged racketeering activity that caused the injury occurred in the United States": Yegiazaryan allegedly created U.S. shell companies to hide his U.S. assets, he submitted a forged document to a California District Court, and he intimidated a U.S.-based witness. *Id.* His actions were devised, carried out in, and directed towards L.A. County, California, to impede enforcement of the

12 Plaintiffs also directed the Court to another Supreme Court case decided after this Court's dismissal order, citing it for the principle that at step two "courts must identify the statute's focus and ask whether the conduct relevant to that focus occurred in United States territory." Pls.' *Hawkins* RICO Mot. at 3, quoting *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. at 418. But this quote merely states *RJR Nabisco*'s holding and does not alter the analysis under *Yegiazaryan*. *See id.*

California judgment against him. *Id.* at 545–46. The effects, then, were largely realized in California, where Smagin obtained the judgment against Yegiazaryan, where Yegiazaryan lived and had assets, where Smagin hoped to collect on the judgment, and where the alleged RICO scheme thwarted Smagin's rights under the judgment. *Id.* at 546. "In sum, Smagin's interests in his California judgment against Yegiazaryan, a California resident, were directly injured by racketeering activity either taken in California or directed from California, with the aim and effect of subverting Smagin's rights to execute on that judgment in California." *Id*. at 546.

**2. The First Amended Complaint does not allege a domestic injury.**

Applying the context-based analysis established by *Yegiazaryan*, the Court holds that the First Amended Complaint here does not allege a domestic injury. Plaintiffs are mechanics who worked at a maintenance facility in Kuwait, repairing U.S. military vehicles under a contract defendant ManTech had with the U.S. government. FAC ¶¶ 1–28. The FAC asserts that ManTech violated the TVPRA by "transporting the mechanics to foreign locales where, by Defendants' design, they were denied the protection of law . . . in a pervasive pattern of inherent coercion." FAC at 2 (Introduction). This allegedly involved plaintiffs working "under the inhumane and arduous conditions . . . , confiscation of their passports, ManTech's refusal to obtain legal authorization (Visa 18, employment authorization, and Ministry of Labor identifications) necessary for them to live without constant fear of arrest, and ManTech's threat of severe financial penalties" if they quit. FAC ¶ 160; *see also* FAC ¶ 164 ("Had Plaintiffs worked legally in Kuwait, as required under the [Kuwait Private Sector Labor Law] and consistent with the requirements of Kuwait's immigration laws and the necessity of a Visa 18, they would have been entitled to the paid time off, double-time, and overtime wages and other benefits mandated by the laws of

Kuwait."). In other words, unlike the situation in *Yegiazaryan*, the alleged conduct giving rise to the claim was undertaken almost exclusively abroad.

Plaintiffs do allege that four of the five individual defendants engaged in "acts and omissions . . . committed within the U.S." that give rise to liability under the TVPRA. *See* FAC ¶¶ 32–36. But many of those allegations offer no more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 555. Further, the allegations concerning the individual defendants all involve actions targeted or directed to Kuwait. *See* FAC ¶¶ 72, 75, 89, 91–92, 95, 100, 103, 114, 115. *Yegiazaryan* requires the Court to consider where an alleged racketeering scheme was devised, carried out, and directed, *see* 599 U.S. at 545–46, and here, even with the allegations about the individual ManTech employees in the United States, the bulk of the alleged scheme was carried out in Kuwait and directed toward Kuwait.

The circumstances here can also be described as the reverse of what the Court faced in *Yegiazaryan* when one considers the nature of the allege injury, as *Yegiazaryan* requires. 594 U.S. at 544. The injury here includes the physical and emotional harm caused by the conditions plaintiffs were forced to endure, as well as the alleged deprivation of wages. The FAC details the fear plaintiffs experienced from being required to work in Kuwait without proper immigration papers, *see* FAC ¶¶ 1–28, 59, 61–62; "horrific" working conditions and the resulting impact on their health, FAC ¶¶ 116–44, 147–57; and the "overtime wages and other benefits mandated by the laws of Kuwait" that they were denied. FAC ¶ 164. The injuries were felt in Kuwait.

Plaintiffs assert, though, that the lost income earned in Kuwait had "little to no impact on Kuwait" where they worked, but "had a profound effect on Plaintiffs and their dependents within the U.S." ¶ 190 (maintaining that their "pay was not realized in Kuwait" but "in the U.S. where

ManTech made deposits into their U.S. bank accounts"). They also assert that the exposure to hazardous chemicals that "initially inflicted harm on Plaintiffs in Kuwait continues to cause suffering here in the U.S., and threatens chronic future ill-health, with attendant emotional distress and financial loss, in the U.S." FAC at 1–2 (Introduction).[13] These claims are analogous to Yegiazaryan's claim that Smagin experienced the injury in Russia and not the United States because that was where the money was supposed to end up eventually, but they do not alter the fact that the bulk of the alleged injury took place in Kuwait.

Turning to the racketeering activity that directly caused plaintiffs' injuries, *see Yegiazaryan*, 599 U.S. at 544, plaintiffs allege defendants engaged in a scheme to conceal the fact that plaintiffs were working illegally in Kuwait. To carry it out, ManTech confiscated their passports, FAC ¶¶ 1–28, 52–53, 59; used fear and financial pressure to force them to stay in their jobs and comply with ManTech's directives, *see* FAC ¶¶ 56, 168; and starting in 2013, used Millbrook Kuwait to "fake salary payments" to plaintiffs. FAC ¶ 103. Plaintiffs allege that the individual defendants directed the alleged scheme from the United States, FAC ¶¶ 32–36, 72, 75, 89, 92, 95, 100, 103, but the plan was carried out abroad and specifically directed at Kuwait. *See Yegiazaryan*, 599 U.S. at 545–46 (finding that even though "other components of the scheme occurred abroad," it was primarily carried out "through acts and communications initiated in and directed towards Los Angeles County, California"). Kuwait is where ManTech or Millbrook personnel took plaintiffs' passports. *See, e.g.*, FAC ¶¶ 1–28, 52–53, 59. It is where plaintiffs were made to engage in activities to hide ManTech's violations of Kuwaiti immigration laws. *See* FAC

13 Given the Court's ruling, it need not address the question of whether allegations concerning emotional distress constitution any injury to business or property.

¶¶ 74, 76–86. And it is where the scheme was specifically directed since its alleged purpose was to conceal ManTech's violations of Kuwaiti law from Kuwaiti officials and deprive plaintiffs of their rights under Kuwaiti law. *See* FAC ¶¶ 93, 164.

The alleged "effects" of the injuries overlap considerably with the alleged injuries from the racketeering scheme. *See Yegiazaryan*, 599 U.S. at 545–46. Plaintiffs allegedly received less pay than they were owed, *see* FAC ¶ 166 (providing sample weekly hours worked by named plaintiffs and asserting what Kuwaiti or U.S. labor laws required to be paid as overtime pay), and they experienced ill-health effects from working at the Facility. FAC ¶ 158 (alleging headaches, respiratory distress, sinus congestion, mucus expectoration, burning eyes and throat, and nosebleeds); FAC ¶ 159 (alleging some plaintiffs continue to have "chronic respiratory and sinus illness" and that they all "might experience other more serious ailments"). Notwithstanding the alleged withholding of wages in Kuwait and workplace hazards in Kuwait, plaintiffs assert that the effects of the scheme were "realized in the U.S. where ManTech made deposits into their U.S. bank accounts," where their dependents were located, FAC ¶ 190, and where they continue to have "chronic respiratory and sinus illness" and "might experience other more serious ailments" in the future. FAC ¶ 159. But this contradicts plaintiffs' allegations that ManTech paid plaintiffs through its agent in Kuwait, Millbrook, using Kuwait-based bank accounts set up in the names of ManTech employees, *see* FAC ¶ 101, and it ignores the fact that the health effects began and were experienced in Kuwait. So for the reasons set out above concerning the locus of the "injury," these secondary "effects" do not change the calculus.

Under the context-based analysis as elaborated in *Yegiazaryan*, the Court holds that plaintiffs' alleged injury and the circumstances surrounding it do not sufficiently ground the injury in the United States, so the injury did not arise domestically. This means that under *RJR Nabisco*,

plaintiffs have not stated a cognizable civil RICO claim, and the Court will, therefore, GRANT ManTech's motion to dismiss the RICO claim.

**B. The TVPRA claim in Count 1 is not improperly extraterritorial because the TVPRA civil remedy applies extraterritorially to alleged violations by U.S. government contractors.**

Count 1 of the FAC alleges that defendants violated two provisions of the Trafficking Victims Reauthorization Protection Act: section 1589(a), which prohibits forced labor, and section 1592, which makes it a crime to confiscate or possess a victim's passport in the course of violating certain sections of the TVPRA, including section 1589. *See* FAC ¶¶ 50–51; 18 U.S.C. §§ 1589(a), 1592. Plaintiffs file their claim pursuant to section 1595 of the TVPRA, which gives victims of violations of the Act a civil remedy. *See* FAC ¶ 49; 18 U.S.C. § 1595. This claim will move forward based on the same principles of law detailed in the *Hawkins* opinion.

**1. The Trafficking Victims Protection Reauthorization Act**

The Trafficking Victims Protection Reauthorization Act imposes liability for offenses related to human trafficking. *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 638 (2021). The Act appears in chapter 77 of Title 18 of the United States Code and is titled "Peonage, Slavery, and Trafficking in Persons." 18 U.S.C. § 77. Enacted in 2000, the statute initially imposed only criminal liability. *Nestlé USA, Inc.*, 593 U.S. at 638.[14] It established a number of criminal offenses, *see* 18 U.S.C. §§ 1581–92, some of which apply extraterritorially by their own terms. *See, e.g.*, *id.* § 1585 (making it a crime "on any foreign shore [to] seize[] any person with intent to make that person a slave"); *id.* § 1586 ("Whoever . . . voluntarily serves on board of any vessel employed or made use

14 Portions of the statute, codified at 22 U.S.C. Chapter 78, authorize funds and programs to support victims of human trafficking and international efforts to curtail it. *See* 22 U.S.C. §§ 7101–15.

of in the transportation of slaves from any foreign country or place to another, shall be fined under this title or imprisoned not more than two years, or both.").

In 2003, Congress amended the statute to provide a civil remedy.

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a); Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, § 4, 117 Stat. 2878. In that same amendment, Congress expanded the extraterritorial reach of the statute to include offenses involving sex trafficking committed by anyone "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1591; 117 Stat. at 2879; *see* 18 U.S.C. § 7(9) (defining "special maritime and territorial jurisdiction of the United States" to include locations such as U.S. military and diplomatic installations abroad).

In 2006, Congress again explicitly expanded the extraterritoriality of the statute. It added section 3271 to authorize the prosecution of U.S. government employees and contractors who violate the TVPRA abroad.

> Whoever, while employed by or accompanying the Federal Government outside the United States, engages in conduct outside the United States that would constitute an offense under chapter 77 or 117 of this title if the conduct had been engaged in within the United States or within the special maritime and territorial jurisdiction of the United States shall be punished as provided for that offense.

18 U.S.C. § 3271(a) ; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109–164, § 103, 119 Stat. 3562 (2006).[15]

And in 2008, it further expanded the extraterritoriality of specific offenses that were not extraterritorial on their own terms.

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if –
>
>> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
>>
>> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. § 1596(a); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, § 223, 122 Stat. 5071.

**2. Section 1595 expressly and directly incorporates the TVPRA's offenses and has extraterritorial application with respect to offenses that apply extraterritorially.**

Defendants move to dismiss plaintiffs' TVPRA claim on the basis that it is improperly extraterritorial. Based on *RJR Nabisco*, they argue at step one of the extraterritoriality analysis that nothing in section 1595 – the civil provision of the statute – "shows a clear, affirmative congressional intent to allow private plaintiffs to bring TVPRA claims for overseas conduct" and

---

15 Chapter 117 prohibits transportation for illegal sexual activity and related crimes. 18 U.S.C. §§ 2421–29. The term "employed by the Federal Government outside the United States" includes anyone employed "as a Federal contractor . . . or as an employee of a Federal contractor" who is "present or residing outside of the United States in connection with such employment" and is "not a national of or ordinarily resident in the host nation." 18 U.S.C. § 3272(1).

at step two, that the claim does not allege a domestic application of the provision. Defs.' Mem. at 2. Plaintiffs reply that section 1589 – the forced labor provision that underlies Count IV – applies extraterritorially pursuant to section 1595, *see* Pls.' *Hawkins* TVPRA Opp. at 20–21, citing *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164–65 (9th Cir. 2022) (discussing Congress's 2008 amendment of the TVPRA), and that what they are seeking is domestic enforcement of the TVPRA. Pls.' *Hawkins* TVPRA Opp. at 11–12.[16]

Section 1595(a) of the TVPRA states simply that an "individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator." 18 U.S.C. § 1595(a). There is no mention of extraterritoriality on the face of the provision, and defendants contend that "Congress's silence is controlling." Defs.' Mem. at 13. But "an express statement of extraterritoriality is not essential." *RJR Nabisco*, 579 U.S. at 340. The presumption can be overcome "by a clear indication of extraterritorial effect," and a provision's context is relevant to determining whether such an indication exists. *Id.*, citing *Morrison* 561 U.S. at 265; *see also Roe*, 917 F.3d at 242, citing *RJR Nabisco*, 579 U.S. at 340 ("*RJR Nabisco* teaches that, even absent an express statement of extraterritoriality, a statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritorially.").

Congress gave some offenses of the TVPRA extraterritorial application when it enacted the statute in 2000. See 18 U.S.C. §§ 1585, 1586. When it provided a civil remedy to victims of violations of the statute three years later, it did so without limitation, making the civil reach of the statute coextensive with its criminal reach: "[a]n individual who is a victim of a violation of this

---

16 Plaintiffs ask the Court to begin its analysis at step two, which courts have the discretion to do, *see WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018), but the Court bases its decision on the first step of the analysis.

chapter may bring a civil action against the perpetrator." 18 U.S.C. § 1595(a) (emphasis added). Indeed, it did so in legislation that expanded the number of extraterritorial provisions of the statute, so one can only draw the conclusion that it was well aware it was adding a broadly worded civil provision to a statute that applied to conduct abroad. Thus, the Court finds that section 1595 expressly and by its own terms incorporates offenses that themselves have extraterritorial application, *see, e.g.*, 18 U.S.C. §§ 1585–86, and that there is a clear indication that the civil remedy was meant to apply extraterritorially as to those offenses.

Defendants rely upon *RJR Nabisco* to assert that the two-step extraterritoriality analysis must be applied separately to the TVPRA's substantive and civil remedy provisions. *See* Defs.' Mem. at 12. But that decision involved the provision creating a private right of action for violations of the RICO statute, and it can only be understood and applied here if one understands the unique structure of the RICO statute, and how it differs from the TVPRA. A defining aspect of the RICO statute, 18 U.S.C. § 1961 *et seq.*, is that there can be no violation of the statute without the commission of one of a series of itemized separate offenses not found in the statute. Indeed, one is not enough; there must be a *pattern* of such offenses. And only some of the so-called RICO "predicate offenses" are extraterritorial. Therefore, in the Supreme Court's view, the extraterritoriality of the RICO criminal provisions was purely derivative, and it depended entirely on whether the predicate offenses underlying the alleged RICO offenses in any particular case were extraterritorial themselves. *See* 579 U.S. at 339. It then concluded (notwithstanding the absence of limiting language) that it could not read that transferred or derivative extraterritoriality into the RICO civil provision. *See id.* at 346–50.

The TVPRA, by contrast, prohibits conduct at home and abroad *itself*, and not by reference to other statutes. Its express objective, unlike RICO, was to reach certain types of conduct and the

resulting harm both at home and abroad. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386 § 102, 114 Stat. 1464, 1466–69 (congressional finding that "[a]t least 700,000 persons annually" are trafficked "within or across international borders," and trafficking in persons is a "growing transnational crime"). Congress included provisions with extraterritorial reach in the statute from the start. When it amended the statute in 2003, it found that "[t]rafficking in persons continue[d] to victimize countless men, women, and children in the United States and abroad," Trafficking Victims Protection and Reauthorization Act of 2003, Pub. L. No. 108–193, § 2(1), 117 Stat 2875, and it added the civil remedy, which provided that *anything* that constituted a crime under the statute could also serve as the basis for a civil claim. So there is no basis to conclude that when other extraterritorial provisions were added to the statute, that somehow they could not support a civil action as well.

Defendants rely on a recent case in this district to argue the contrary. *See* Defs.' Mem. at 14–16, citing *Doe I v. Apple Inc.*, No. 19-cv-3737, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd sub nom. Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024) (affirming without reaching the extraterritoriality issue). That case involved civil claims filed pursuant to 18 U.S.C. § 1595 alleging that several U.S. manufacturers of electronics products violated two provisions of the TVPRA because the electronics they produced use cobalt mined in the Democratic Republic of the Congo using child labor. 2021 WL 5774224, at *1, *14.

The court considered the text of the TVPRA's civil remedy and held it does not rebut the presumption against extraterritoriality, *id.* at *14, rejecting the plaintiffs' argument that section

1596 provides a clear indication that the civil remedy has extraterritorial effect. *Id.* at *15–*16.[17] The court observed that it "seems likely that when in § 1596(a) Congress granted extraterritorial jurisdiction over 'any offense (or any attempt or conspiracy to commit an offence) under section 1581, 1583, 1584, 1589, 1590, or 1591,' its omission of § 1595 was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16 (emphasis omitted). The court added that section 1596's use of terms associated with criminal matters – "offense" and "prosecution" – to indicate section 1596 "was focused on criminal, not civil, applications." *Id.* at *15.

The Court is not persuaded by this analysis. First, it fails to take into account the order in which the various provisions were enacted. When the statute was first passed in 2000, it included some extraterritorial offenses. It was after that, in 2003, that Congress announced that a victim could bring a civil action for violation, and it added more extraterritorial provisions. And it was only after that, in 2008, that Congress expressed is intention in section 1596(a) that other offenses should also have extraterritorial reach. So it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute.

Second, the *Doe* opinion finds meaning in the fact that the civil remedy provision, section 1585, was not listed in 2008 when Congress identified additional provisions that could be applied abroad. *See* 2021 WL 5774224 at *16; 18 U.S.C. § 1596(a) ("In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense . . . under section 1581, 1583, 1584, 1589, 1590,

17 In *Doe*, the court granted the defendants' motion to dismiss on a number of other grounds, but it went on to discuss the extraterritoriality issue anyway.

or 1591 . . . .”). But that would not have made sense. Section 1956(a) listed “offenses” over which courts would have extraterritorial jurisdiction, and section 1595 is not an “offense” – it is a free-standing provision that creates a civil remedy for an “offense,” that is, any “violation of this chapter.” 18 U.S.C. § 1595(a).

The Court finds the Fourth Circuit decision in *Roe v. Howard*, 917 F.3d 229 (2019), to be more in line with the text of the TVPRA. The defendants in that case were a married couple who worked for the U.S. State Department. *Id.* at 233. The plaintiff worked for them as a housekeeper when they were stationed at the U.S. embassy in Yemen, and she sued the wife for her role in sexual abuse that she suffered at the hands of the husband. *Id.*[18] A jury found the defendant liable of four violations of the TVPRA, all of which occurred in Yemen, and the defendant challenged the verdict on the basis that the civil provision under which the plaintiff had sued does not apply extraterritorially. *Id.* at 238.

The Fourth Circuit ruled that while section 1595 does not expressly state it has extraterritorial application, its text “directly incorporates a set of predicate offenses ‘that plainly apply to at least some foreign conduct.’” *Id.* at 242, quoting *RJR Nabisco*, 579 U.S. at 338.

> [Section] 1595 permits “a victim of a violation of this chapter [chapter 77 of Title 18]” to bring “a civil action against the perpetrator.” *See* 18 U.S.C. § 1595. Many of the predicate offenses proscribed by chapter 77 apply extraterritorially, either expressly or by way of other provisions delineating their extraterritorial application. *See, e.g.*, 18 U.S.C. § 1585 (prohibiting, inter alia, seizure of persons “on any foreign shore” with “intent to make that person a slave”).

*Id.* (second edit in original). This structure and context, the Fourth Circuit held, give “a clear, affirmative indication” that section “1595 provides a civil remedy for the foreign conduct”

18 The husband was deceased by the time the lawsuit was filed. 917 F.3d at 234.

prohibited by chapter 77 "to the extent that the particular predicate offense supporting a specific claim applies extraterritorially." *Id.*, citing *RJR Nabisco*, 579 U.S. at 339.[19] And it held that the substantive offenses at issue in the case – forced labor and forced labor trafficking under TVPRA sections 1589 and 1590 – applied extraterritorially even though they do not directly refer to foreign conduct: "since 2006, those sections have applied to extraterritorial acts committed by United States employees like [the defendant]." *Id.* at 244, citing 18 U.S.C. § 3271.

Finally, the Court finds the *Roe v. Howard* context and reasoning to be more analogous to this case than either *RJR Nabisco* or *Doe* – in which the plaintiffs sued only U.S.-based private manufacturers and not their foreign suppliers – because here, defendants are federal government contractors. As in the *Roe* case, where it was of key importance to the ruling that the illegal acts were perpetrated by U.S. embassy personnel, the instant lawsuit also involves what is essentially an extension of the United States government abroad. Indeed, Congress explicitly stated its intention in section 3271 that the TVPRA would cover government contractors operating beyond our shores in 18 U.S.C. § 3271(a).

Defendants argue that Congress's repeated use in section 3271 (and section 1596) of the term "offense" and its inclusion of requirements governing prosecutions indicates a focus on criminal matters. Defs.' Mem. at 16–18, 14–16, citing *Doe I* at *15; *see* 18 U.S.C. §§ 1596(b), 3271(b). But section 3271 expands the scope of criminal liability under the TVPRA to specific individuals – U.S. government employees and contractors – and it establishes requirements on how

---

19 The court also found that the statute's legislative history and multiple provisions supporting international efforts to address the global problem of human trafficking supported this conclusion. *See id.* at 242 ("Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.").

that expanded liability is to be enforced. 18 U.S.C. § 3271. It is thus unremarkable that Congress used terms related to criminal matters in amending a criminal statute.[20]

Finally, defendants argue that section 3271 "does not reach the procedural civil remedy provision" because it regulates "conduct." *See* Defs.' Mem. at 17. But section 3271 is a procedural provision that extends criminal liability for conduct that is already "an offense under chapter 77" to U.S. government employees and contractors who commit them abroad. 18 U.S.C. § 3271(a). It does not expand the scope of conduct prohibited by the statute. The fact that Congress added this provision to Part II of Title 18 ("Criminal Procedure"), and not Part I ("Crimes"), confirms this. *See* 18 U.S.C. 212A; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109–164, § 103, 119 Stat 3562 (2006) ("Part II of title 18, United States Code, is amended by inserting after chapter 212 the following new chapter: . . . .").

For all of these reasons, the Court holds that section 1595 applies extraterritorially to the extent that the offenses for which it supplies a private right of action have extraterritorial application.

Given this conclusion, the Court must next determine whether the offenses plaintiffs in this case allege were violated have extraterritorial effect. *See RJR Nabisco*, 579 U.S. at 354; *Roe*, 917 F.3d at 243. Section 1589(a) makes it a crime to "obtain[] the labor or services of a person . . . by means of the abuse or threatened abuse of law or legal process" or "by means of the abuse

20 Indeed, the TVPRA's civil provision specifically refers to prosecutions and uses the terms "offense" and "perpetrator," which is often associated with criminal matters. 18 U.S.C. § 1595; *see, e.g., Ojo v. Garland*, 25 F.4th 152, 165–66 (2d Cir. 2022) ("As defined by Black's Law Dictionary, 'crimes against persons' constitute '[a] category of criminal offenses in which the *perpetrator* uses or threatens to use force,' . . . while 'crimes against property' fall within '[a] category of criminal offenses in which the *perpetrator* seeks to derive an unlawful benefit from – or do damage to – another's property without the use or threat of force,' . . . .") (emphasis added).

or threatened abuse of law or legal process," 18 U.S.C. § 1589(a)(2),(3), and section 1592 makes it a crime to "knowingly . . . confiscate[], or possess[] . . . [a] passport" of a person in the course of violating section 1589 and other TVPRA provisions. 18 U.S.C. § 1592. While neither expressly states that it applies extraterritorially, Congress in 2006 gave all offenses under the TVPRA extraterritorial application when allegedly committed overseas by U.S. contractors, such as defendants. *See* 18 U.S.C. § 3271. Accordingly, sections 1589 and 1592 apply extraterritorially as alleged here.

The TRPVA's civil provision, by its own terms, applies to predicate offenses with extraterritorial reach, and sections 1589 and 1592 reach offenses committed by U.S. contractors abroad pursuant to section 3271. Therefore, the Court will deny defendants' motion to dismiss the TVPRA claim as improperly extraterritorial.

## II. Plaintiffs state a TVPRA claim.

ManTech argues that the TVPRA claim should be dismissed under Rule 12(b)(6) because plaintiffs fail to allege that it obtained their labor by force in violation of section 1589(a), that it confiscated their passports in violation of section 1592, or that it otherwise violated the TVPRA. Defs.' Mem. at 24.

### A. Forced Labor

Section 1589(a) of the TVPRA makes it a crime to

> knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means – . . .
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or

> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

The Act's legislative history shows that Congress intended for it "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers . . . restrain their victims without physical violence or injury." H.R. Rep. No. 106–939, at 101 (2000) ("Conf. Rep."); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012), quoting Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464, § 102(b)(13) ("Congress determined that '[i]nvoluntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion.'") (alteration in original).

**Serious Harm or Threats of Serious Harm.** Plaintiffs claim that their terms of employment with ManTech threatened them with serious financial harm if they left their posts before their employment contracts expired. *See* FAC ¶ 56; *see also* FAC ¶ 57 (alleging that although they were at-will employees, the employment terms forced mechanics to stay in their jobs). ManTech argues that plaintiffs do not allege a threat of serious harm because it did not have employment contracts with plaintiffs – they were at-will employees and the Addendum was only in an offer of employment. Defs.' Mem. at 28; Ex. 1 to Defs.' Mem. [Dkt. # 17-3] (signed offer letter of plaintiff Abernathy).

The TVPRA defines "serious harm" to mean "any harm, whether physical or nonphysical, including . . . financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring

that harm." Defs.' Mem. at 27–28, quoting 18 U.S.C. § 1589(c)(2). Thus, the question is not whether the Addendum was a binding contract but whether plaintiffs allege facts to state a plausible claim that they reasonably believed they risked serious harm if they left their jobs. *See United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008), quoting 18 U.S.C. § 1589(2) ("The statute does not specify that the 'serious harm' be at the defendant's hand. It requires that the plan be 'intended to cause the [victim] to believe that' that harm will befall her.") (alteration in original).

The Addendum stated that plaintiffs "agree to commit to a minimum period of employment (deployment) of 24 months," that the cost for sponsorship is "significant, . . . up to and exceeding $10,000 per person for first year and $5,000 for second year," and that employees agree to reimburse ManTech for numerous costs, including the cost "to obtain a work visa," "travel, lodging, per diem, medical exam(s), background investigation and administration/ administrative fees." FAC ¶ 56, quoting Addendum. It further provided that if they are terminated, they must reimburse "employment and deployment costs" and "costs related to any training or certification process provided." *Id.*, quoting Addendum. Plaintiff Abernathy's offer letter, which ManTech attaches to its motion, shows the full Addendum. Ex. 1 to Defs.' Mem.[21] It states that "[b]y signing below you agree to these terms and affirm that there is nothing in your personal or work history background that would preclude you from obtaining a Work Visa," and shows plaintiff Abernathy's signature on the signature line of the Addendum. *Id.* Defendants' Exhibit 1 also shows that plaintiff Abernathy's hourly wage as a mechanic would be $15 per hour. *See id.*

Considering all the circumstances alleged in the light most favorable to the plaintiffs, the Court finds that it is plausible to infer that a reasonable person of the same background as plaintiffs

---

21 The Court may consider this attachment since the Addendum is incorporated by reference in the FAC. *See St. Francis Xavier Parochial Sch.*, 117 F.3d at 624.

would consider the terms of the Addendum as threatening serious financial harm if they left their jobs. 18 U.S.C. § 1589(c)(2). Plaintiffs are mechanics who signed a document acknowledging that costs of sponsorship are upwards of $15,000 and agreeing that they would repay certain costs if they quit before completing twenty-four months of service. *See* FAC ¶ 56; Ex. 1 to Defs.' Mem. Even if their understanding of the Addendum is incorrect, the FAC alleges sufficient facts to plausibly allege that in these circumstances, plaintiffs reasonably thought the Addendum's repayment terms presented a sufficiently serious financial consequence to compel them to stay in their jobs. The Court holds that the repayment requirement of $15,000 for someone earning $15 per hour, *see* Ex. 1 to Defs.' Mem., states a claim of "serious harm." *See, e.g.*, *United States v. Dann*, 652 F.3d 1160, 1170–71 (9th Cir. 2011) (employer's threat that a foreign worker would owe $8,000 if she quit constituted threat of "serious harm" under the TVPA); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 437–38 (E.D.N.Y. 2017) (where the contract provided for a $25,000 termination fee, court found that the fee constituted "serious harm" and therefore, plaintiff stated a claim under the TVPA); *see also Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (threatened enforcement of $15,000 confession of judgment constitutes threat of serious harm); *Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (threatened payment of $10,000 constitutes threat of serious harm).

**Abuse or Threatened Abuse of Law or Legal Process.** In response to the numerous allegations of violations of Kuwaiti labor, immigration, and workplace safety laws and regulations, ManTech argues that plaintiffs fail to allege the abuse or threatened abuse of law or legal process because they do not identify the specific Kuwaiti laws that ManTech violated. Defs.' Mem. at 26. But plaintiffs do identify a specific Kuwaiti law, as ManTech's brief acknowledges. *See* Defs.' Mem. at 26 (asserting that "the FAC relies primarily on a single sentence from the Kuwait Private Sector Labor Law"); FAC ¶ 64 ("Article 10 of the KPSLL states: 'The employer is banned to

employ foreign labor force unless they are duly authorized by the Competent Authority to work for him.'"). In any event, ManTech has not cited, and the Court has not found, any authority requiring a plaintiff to identify the specific laws allegedly violated in order to state a claim of "abuse of law or legal process." *See, e.g.*, *Calimlim*, 538 F.3d at 712 (7th Cir. 2008) (threats related to a victim's "immigration status" were sufficient support a conviction of a charge of "abuse of law" under section 1589).

ManTech also argues that plaintiffs fail to allege that it "'knowingly' abused the law or legal process as a means to *coerce* the victim to provide labor or services against her will," arguing it is not enough to assert that ManTech simply violated other laws or encouraged others to do the same. Defs.' Mem. at 25 (emphasis in original), quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 622–23 (4th Cir. 2017), cert. denied, 583 U.S. 973 (2017); Defs.' Mem. at 27 (arguing plaintiffs do not claim ManTech coerced them to work by intentionally failing to obtain work visas, exploiting their visa status, or making them do visa runs). *Muchira* is a summary judgment case, 850 F.3d at 608, not a motion to dismiss case. At this stage of the litigation, the Court must determine whether the FAC contains "sufficient factual matter, accepted as true" to state a plausible claim under the statute. *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 570.

The TVPRA defines the term "abuse or threatened abuse of law or legal process" to mean "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

Plaintiffs allege that ManTech used the potential of arrest by Kuwaiti officials to make plaintiffs "believe[] that they had no choice" but to stay in their jobs for the duration of their

contracts, *see* FAC ¶¶ 160, 168, which is not the purpose of Kuwaiti immigration laws. *See* FAC ¶ 63 (alleging that an objective of the KPSLL is "the replacement of the expatriate labor force by the national labor force" when possible). Granting plaintiffs "the benefit of all inferences that can be derived from the facts alleged" and construing the complaint in plaintiffs' favor, *Sparrow*, 216 F.3d at 1113; *Kowal*, 16 F.3d at 1276, the Court holds that these allegations state a claim that ManTech used the threat of arrest by Kuwaiti officials to "exert pressure" on plaintiffs to stay in their jobs. 18 U.S.C. § 1589(c)(1); *see United States ex rel. Fadlalla v. DynCorp Int'l, LLC*, No. 8:15-CV-01806-PX, 2022 WL 703918, at *5 (D. Md. Mar. 9, 2022) (denying motion to dismiss claim that government contractor providing translators to the U.S. military in Kuwait had obtained the labor of linguists by the "abuse or threatened abuse of law or legal process" given allegations that it "had been fully informed that the linguists were no longer working legally and risked imprisonment at any moment"); *Calimlim*, 538 F.3d at 711 (statute does not require "serious harm" to be "at the defendant's hand" but part of a plan intended to cause victims to believe that harm will befall them).

**Scheme, Plan, or Pattern.** The TVPRA also makes it unlawful to use "any one of, or by any combination of" the enumerated means set forth in section 1589(a) to obtain labor, including a "scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm." 18 U.S.C. § 1589(a)(4). Plaintiffs allege that ManTech succeeding in "create[ing] a coercive mechanism to keep qualified mechanics working." FAC ¶ 56. Although they did not want to work under the conditions to which they were subjected by ManTech, they believed they had no choice given "ManTech's control over their lives," with its "constant threat of summary employment termination," the requirements in the Addendum, its confiscation of their passports, and the risk

of arrest by Kuwaiti officials. FAC ¶ 160. Taken together, these allegations state a claim that ManTech used a "scheme" or "plan" to keep plaintiffs in their jobs in violation of section 1589(a)(4).

### B. Confiscating Passports

Section 1592 of the TVPRA makes it a crime to "knowingly . . . remove[], confiscate[], or possess[] any actual or purported passport" in the course of violating section 1589 or other provisions of the statute. 18 U.S.C. § 1592. The FAC alleges facts that, taken as true, allege a claim that ManTech confiscated and kept plaintiffs' passports in violation of section 1592. Plaintiffs allege a section 1589 claim, as explained above, and they allege that ManTech and Millbrook confiscated their passports upon their arrivals in Kuwait, returning them to plaintiffs to execute forced visa runs and taking the passports back upon their return. FAC ¶¶ 53, 74. Accordingly, plaintiffs allege a section 1592 claim.

Accepting the allegations in the FAC as true, the Court finds that Count 1 states a claim under the TVPRA.

## III. Derivative sovereign immunity does not warrant dismissal at this juncture of the litigation.

Defendants argue that plaintiffs' claims against them should be dismissed because they have derivative sovereign immunity for their actions, so the Court lacks subject matter jurisdiction over the claims. *See* Defs.' Mem. at 34–38; *id.* at 34 n.22, citing *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018), for the principle that derivative sovereign immunity "operates as a jurisdictional bar to suit"; *see* Defs.' Reply at 14–15.

The doctrine of derivative sovereign immunity offers federal government contractors some immunity for actions that are done pursuant to a contract with the government. *In re U.S. Off. Of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 68 (D.C. Cir. 2019) ("*OPM Data Sec. Breach*

*Litig.*") (internal citations omitted). But this immunity "is not absolute." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016); *see also OPM Data Sec. Breach Litig.*, 928 F.3d at 68–69 ("Derivative sovereign immunity . . . is less 'embracive' than the immunity a sovereign enjoys.") (internal citation omitted). Derivative sovereign immunity "applies only when a contractor takes actions that are authorized and directed by the Government of the United States and performed pursuant to the Act of Congress authorizing the agency's activity." *OPM Data Sec. Breach Litig.*, 928 F.3d at 69, citing *Campbell-Ewald*, 577 U.S. at 167 (internal quotation marks omitted); *see also Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940) (when "authority to carry out the project [is] validly conferred," "there is no liability on the part of the contractor for executing [the Government's] will"). Accordingly, when contractors perform as directed by the government, they may be shielded from liability. *See Cunningham*, 888 F.3d at 648–49 (finding that when a contractor did adhere to the terms of its contract with the government, its actions were authorized by the government, and since the government validly conferred that authority, the contractor "was entitled to derivative sovereign immunity").

Contractors cannot claim derivative immunity in situations where they have "exceeded [their] authority," or the authority "was not validly conferred" upon them. *See Campbell-Ewald*, 577 U.S. at 166 ("When a contractor violates both federal law and the Government's explicit instructions . . . no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation."). When plaintiffs "plausibly allege[]" that a defendant contractor has violated their agreement with the government and federal law, derivative sovereign immunity is "unavailable." *OPM Data Sec. Breach Litig.*, 928 F.3d at 69.

Defendants bear the burden of showing that they complied with the government's directions and therefore qualify for derivative sovereign immunity. *See OPM Data Sec. Breach*

*Litig.*, 928 F.3d at 70, citing *Campbell-Ewald*, 577 U.S. at 167 n.7 (ruling that the defendant contractor had to "establish 'compliance with all federal directions'" in order to claim immunity); *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, 74 (D.C. Cir. 2012) (holding that to claim derivative sovereign immunity, a contractor must show that it was "following the sovereign's directives") (internal citations omitted).

Plaintiffs do not dispute that the Army validly conferred some authority upon ManTech to perform its duties under the Contract, *see* Pls.' Opp. at 19, so whether ManTech has derivative sovereign immunity turns on whether it acted at the authorization and direction of the Army when it took the actions alleged here, or violated federal law and the Contract. *See OPM Data Sec. Breach Litig.*, 928 F.3d at 69, citing *Campbell-Ewald*, 577 U.S. at 167. ManTech asserts that its actions were "authorized and directed" by the Army, but it relies not on the allegations in the complaint, but emails and other documents regarding how the Contract was being implemented. *See* Defs.' Mem. at 35–37; Defs.' Reply at 14. Thus, the question of whether it enjoys derivative sovereign immunity requires further development of the facts. In light of that, and given the express language in the TVPRA that it is supposed to apply to government contracts abroad, dismissal at this juncture is not appropriate, and the motion to dismiss the TVPRA claim on the basis of derivative sovereign immunity will be denied without prejudice.

## IV. The TVPRA claim will not be dismissed as preempted by the Defense Base Act at this juncture of the litigation.

Defendants argue that plaintiffs' claims should be dismissed because the Defense Base Act, 42 U.S.C. § 1651 ("DBA"), provides the exclusive remedy for plaintiffs' claims because their alleged injuries arose from their work overseas on a government contract. *See* Defs.' Mem. at 38–39; Defs.' Reply at 15.

The DBA "provides relief to employees of government contractors whose death or injuries occurred while accompanying military forces overseas." *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1122 (D.C. Cir. 2015). The DBA "builds upon and incorporates provisions of the Longshore Act, which was enacted to provide workers' compensation coverage to maritime employees." *Id.* Both statutes "contain exclusivity provisions stating that employer liability under the statutes 'shall be exclusive and in place of all other liability.'" *Id.* at 1123, quoting 33 U.S.C. § 905(a) (Longshore Act) and 42 U.S.C. § 1651(c) (DBA). The DBA's statutory scheme represents a compromise, whereby "employees relinquish any common-law tort claims in exchange for the guarantee of a practical and expeditious statutory remedy for their workplace injuries." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 348 (D.C. Cir. 2018) (internal quotation marks and citation omitted).

The DBA does not define injury, but the Longshore Act defines the term to mean "accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury." 33 U.S.C. § 902(2). So "the DBA covers accidental injuries that arise out of and during the course of employment." *United States ex. rel Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 200 (D. Md. 2019), citing 33 U.S.C. § 902(2). "Claims arising from conduct outside a plaintiff's course of employment are not subject to the DBA's preemptive effect." *Fadlalla*, 402 F. Supp. at 200, citing *Sickle*, 884 F.3d at 348.

The Court finds that plaintiffs' claim of lost wages allegedly arising out of ManTech's TVPRA violations, FAC ¶¶ 160, 164–66, is not the kind of harm that is preempted by the DBA.

While some claims of physical injury in the workplace – in particular, injury due to workplace accidents or negligence – are generally covered by the DBA, the claims here allege

unhealthy work conditions to which plaintiffs were intentionally exposed by force and in violation of Kuwaiti law. It is unclear to the Court whether it will be shown that the alleged harm to their health, *see* FAC ¶¶ 158–59, flows from defendants' alleged violations of the TVPRA, but at this point, plaintiffs' claim will not be dismissed based on DBA preemption. At the summary judgment stage, plaintiffs must clarify the nature of their claimed damages, and as their claims are more fully developed, the issue of DBA preemption may be revisited. Defendants' motion to dismiss the TVPRA claim as preempted by the DBA will be denied without prejudice.

**V. The claim for medical monitoring will be dismissed because the TVPRA does not provide for equitable relief.**

Finally, defendants move to dismiss Count 3 for medical monitoring on the basis that the TVPRA does not provide injunctive relief. Defs.' Mem. at 42. Count 3 seeks "Injunctive Relief" for "Medical Monitoring to "remediate possible future ill health effects and chronic illness caused by Plaintiffs' exposure to caustic chemicals at the KMSF." FAC ¶ 181. But the TVPRA only provides "victim[s]" under the statute to bring civil claims for "damages and reasonable attorneys['] fees." 18 U.S.C. § 1595; *see Baricuatro v. Indus. Personnel & Mgmt. Servs., Inc.*, No. 11-2777, 2013 WL 6072702, at *21 (E.D. La. Nov. 18, 2013) (noting injunctive and declaratory relief may not be permissible under the TVPRA). Plaintiffs do not dispute that the TVPRA does not provide for injunctive relief, asserting only that medical monitoring "is a particularly effective mechanism to restore Plaintiffs' health and hedge against the long-term damage" from their alleged toxic exposure, and citing a string of cases that hold medical monitoring constitutes equitable relief and differs from monetary damages. Pls.' Opp. at 20. Because injunctive relief is not available as a remedy under the TVPRA, Count 3 will be dismissed.

## CONCLUSION

For the reasons set forth above, ManTech's Motion to Dismiss the First Amended Complaint [Dkt. # 17] is **GRANTED IN PART** and **DENIED IN PART**. ManTech's motion to dismiss the TVPRA claim at Count 1 is denied, and the claim for medical monitoring at Count 3 and the RICO claim at Count 4 are hereby **DISMISSED**.[22]

The Motion to Dismiss filed by The Carlyle Group and the individual defendants remains pending and is fully briefed.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: September 27, 2024

22 Count 2 of the FAC seeks an "order of restitution of the money stolen from Plaintiffs and the profits obtained." FAC ¶¶ 178–79. The TVPRA, the sole remaining basis for relief in this case, provides restitution to victims of TVPRA violations, *see* 18 U.S.C. § 1593(a), so Count 2 seeks duplicative relief that depends on the resolution of the TVPRA in Count 1.